# MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE  19899-1347

302 658 9200
302 658 3989 FAX

October 10, 2018

The Honorable Colm F. Connolly          ***VIA ELECTRONIC FILING***
J. Caleb Boggs Federal Building
844 N. King Street, Unit 31, Room 4124          REDACTED -- PUBLIC VERSION
Wilmington, DE 19801-3555

Re:     *HIP, Inc. v. Hormel Foods Corp., et al.*, C.A. No. 18-615 (CFC)

Dear Judge Connolly:

Plaintiff HIP, Inc. ("HIP") moves to compel Defendants ("Hormel") to promptly produce technical documents, including core technical documents, needed for HIP's Initial Infringement Contentions.  HIP filed this lawsuit because Hormel infringes U.S. Patent No. 9,510,610 (the "'610 Patent") by making Hormel Bacon 1 products.  HIP's president, David Howard, is the sole inventor of the '610 Patent, directed to a novel and highly successful process for continuously cooking and browning bacon slices in a spiral oven to produce a pre-cooked sliced bacon product resembling a pan-fried bacon product.

Pursuant to the Scheduling Order (D.I. 36), Hormel was required to produce Core Technical Documents on September 10, 2018, which would have given HIP 30 days to analyze those technical documents and prepare Initial Infringement Contentions to meet the October 10, 2018 deadline.  In addition, in early July, HIP served first sets of discovery, including requests for production seeking documents relating to Hormel's infringement (e.g., Request No. 1). Hormel's August 22, 2018 response to Request No. 1 was that "defendants are not required to produce technical documents until September 10, 2018."  Ex. 1.  Hormel's September 10 total production of 33 documents, however, failed to include documents showing relevant operating conditions of the process by which any Bacon 1 product is produced or technical documents that relate to Hormel's denials of infringement, with the possible exception of a single page with three rows of handwritten data for a run on August 1, 2018. Ex. 2.  By way of example only, Hormel produced Standard Operating Procedure documents, but they relate only to set-up or tear-down of the oven, rather than its operation during actual processing of bacon.

HIP did its best under the circumstances to timely serve Initial Infringement Contentions to trigger Hormel's Invalidity Contention obligations, but seeks the Court's assistance in obtaining relevant documents from Hormel to be able to supplement its Initial Infringement Contentions once Hormel has complied with its discovery obligations.

For context, in pertinent part, claim 1 of the '610 Patent (Ex. 3) reads as follows:

A process for continuously cooking and browning bacon slices in a spiral oven to produce a pre-cooked slices bacon product resembling a pan-fried bacon product, the spiral oven having a cooking chamber which houses a conveyor that

The Honorable Colm F. Connolly
October 10, 2018

travels in a spiral pattern between a lower inlet opening and an upper outlet opening of the cooking chamber, the process comprising the steps of:

(a) creating a substantially air-free environment in the cooking chamber of the spiral oven **by adding an amount of superheated steam** to the cooking chamber **such that** the air normally present in the cooking chamber without adding the superheated steam is reduced by about 100%; (Emphasis added.)
. . . .
(c) maintaining the substantially air-free environment of the cooking chamber **by adding superheated steam** to the superheated cooking vapor medium circulating in the cooking chamber in step (b); …. (Emphasis added.)

(d) maintaining a cooking and browning temperature of the superheated vapor cooking medium during the step (b) by passing the superheated vapor cooking medium circulating in the spiral oven over one or more heating elements **which heat the superheated vapor cooking medium to a temperature of at least** 325° F.;... (Emphasis added.)

Paragraph 4 of the ESI Default Standard contemplates an orderly process by which infringement contentions are served *after receipt of core technical documents*, which include "but are not limited to," *inter alia,* "schematics and specifications." *See, e.g., Yodlee, Inc. v. Plaid Technologies Inc.*, No. 14-1445-LPS, Oral Order (D. Del. Jul. 23, 2015) (requiring defendant to produce source code as part of core technical production to show how the accused products work), Ex. 7.  Based on the process limitations here, Hormel should have produced documents sufficient to describe operating conditions to allow HIP to perform calculations to establish that during the process Hormel's systems adds an amount of superheated air to the cooking chamber such that the air normally present in the cooking chamber without adding the superheated steam is reduced by about 100% (e.g., limitation 1(a)).  Performing that calculation requires knowledge of at least the free interior volume of the chamber, the openings at the oven inlet and exits, size variations provided by any adjusting inlet or exit shutters, the boiler output pressure and temperatures, the temperatures and pressures of superheated steam supplied to the cooking chambers from the steam boilers, and the flow rates of the superheated steam.  Hormel also should have produced documents identifying the locations of relevant sensors within the JBT oven systems and details, as well as documents to determine sensor methodologies and accuracies, all information relevant to the exemplary claim limitations.  Hormel also should have produced process recipes, either computer-control input criteria or operator guidelines about critical process limitations (e.g., limitations 1(c, d)).  Hormel also should have produced documents sufficient to allow HIP to perform calculations relating to e.g., limitation 1(c), such as the thermal fluid temperatures during production of Bacon 1, and temperatures for the cooking medium exiting the thermal fluid exchanger during production of Bacon 1.  It also should have produced documents reflecting internal heater input ratings, steam generator ratings, maximum steam flow into the oven. The 33 documents Hormel produced on September 10, however, failed to provide this needed information.

HIP prompted advised Hormel on September 17 that its production was deficient, giving Hormel examples of the types of data that should have, but had not been produced, e.g., oven temperatures for the cooking medium exiting the thermal fluid exchanger; the precise locations

The Honorable Colm F. Connolly
October 10, 2018

of the temperature sensors and the O2, MV, or humidity sensors in any of the ovens; oxygen, steam, moisture, and/or air percentages measured or desired in the spiral ovens during steady state operation; thermal fluid temperatures; and superheated steam temperatures and pressures supplied to the oven from the steam boilers.  Ex. 4.  HIP also asked for the specifications for boilers supplying steam to the spiral ovens and/or documents including performance criteria for the boilers, as well as technical documents specifying critical parameters with which all of Hormel's process operators must comply (e.g., a process recipe), including those required by the USDA (i.e., the Hazard Analysis Critical Control Points ("HACCP") plan).[1]  HIP also asked for three documents mentioned in each of 18 of the 33 produced documents.  Hormel, however, insisted that it would first produce only oven process data.

On October 3, to supposedly address HIP's concerns, Hormel produced a single day of oven process data from one of its two facilities, which a cursory review revealed to be from a highly aberrational run with non-representative process data, and Hormel was so advised.  On October 5, Hormel produced three additional specific days of oven process data for one facility and two specific days of oven process data for the other facility.  Hormel was told after HIP's same-day review that this data is internally inconsistent and includes anomalies, and HIP repeated its request for Core Technical Documents.  Ex. 5.  Hormel refused, advising that it believed HIP had of all the core technical information it needed.

HIP also believes Hormel has Quality Control documents which are likely to contain a higher level, understandable description of the process, but Hormel refuses to produce these documents either.  Hormel also sought three documents identified in each of the SOPs Hormel did produce, but Hormel refused on the basis those documents are not Core Technical Documents, but rather "are policy references for the Process Specifications Summaries that were" produced.  HIP asked for process recipes, which are referenced in the documents Hormel did produce.  Hormel asserts it has no such documents.  To be clear, HIP seeks whatever internal documents Hormel personnel use to set critical oven cooking parameters such as cooking time, temperature, humidity, etc.  HIP finds it unrealistic that there are no internal Hormel documents providing such guidance for each of the products identified by Hormel, in view of what appears in the few documents Hormel has produced.  Ex. 6 (excerpt from infringement contentions showing page HFC00032_0040 referencing a recipe selection screen but the recipes have not been provided).  Documents showing the operating target parameters are relevant and should have been produced, even if Hormel was able to limit production to only core technical documents, which it is not. Hormel produced Standard Operating Procedures, but only for set-up and tear-down, not for the actual cooking operation.

In view of the foregoing, Hormel should be compelled to produce the documents listed in the attached Proposed Order.

---

[1]   While this USDA-required plan is about food safety, HIP understands the HACCP plan document specifies the entire process.  HIP believes the HACCP plan will provide a higher level, understandable overview of the process, will include relevant data, and should include, or be accompanied by a flow chart.

The Honorable Colm F. Connolly
October 10, 2018

Respectfully,

*/s/ Karen Jacobs*

Karen Jacobs (#2881)

KJ/dam
Enclosures