```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -

 4
       HIP, INC.,                  :   CIVIL ACTION
 5                                 :
                    Plaintiff,     :
 6                                 :
           vs.                     :
 7                                 :
       HORMEL FOODS CORPORATION,   :   REDACTED - PUBLIC VERSION
 8     HORMEL FOOD CORPORATE       :
       SERVICES LLC, OSCEOLA FOOD, :
 9     LLC, ROCHELLE FOODS, LLC,   :
       and DOLD FOODS, LLC,        :
10                                 :
                    Defendant.     :   NO. 18-615-CFC
11

12                          - - -

13                        Wilmington, Delaware
                          Friday, October 12, 2018
14                        10:08 o'clock, a.m.

15                          - - -

16     BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.

17                          - - -

18     APPEARANCES:

19
              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
20            BY:  KAREN JACOBS, ESQ.

21
                       -and-
22

23

24                              Valerie J. Gunning
                                Official Court Reporter
25
```

```
 1     APPEARANCES (Continued):

 2
                   PATTERSON + SHERIDAN LLP
 3                 BY:   JERRY E. SELINGER, ESQ.
                         (Dallas, Texas)
 4

 5                        Counsel for Plaintiff

 6


 7                 POTTER, ANDERSON & CORROON LLP
                   BY:  BINDU A. PALAPURA, ESQ.
 8

 9                         -and-


10
                   FREDRIKSON & BYRON P.A.
11                 BY:  KURT J. NIEDERLUECKE, ESQ. and
                        TIMOTHY M. O'SHEA, ESQ.
12                      (Minneapolis, Minnesota)

13
                          Counsel for Defendants
14

15                       -   -   -

16

17

18

19

20

21

22

23

24

25
```

1                          **P R O C E E D I N G S**

2

3                    (Proceedings commenced in chambers, beginning at

4          10:08 a.m.)

5

6                    THE COURT:  Good morning.

7                    (Counsel respond, "Good morning, Your Honor.")

8                    THE COURT:  All right.  Good morning.  Ms.

9          Jacobs?

10                   MS. JACOBS:  Good morning, Your Honor.  Karen

11         Jacobs from Morris Nichols for HIP, and I have here with my

12         today Jerry Selinger from Patterson + Sheridan.

13                   THE COURT:  Great.  Good morning, Mr. Selinger.

14                   MR. SELINGER:  Good morning.

15                   THE COURT:  Good morning.  It's Ms. Palapura?

16                   MS. PALAPURA:  Yes.

17                   THE COURT:  I want to make sure I'm pronouncing

18         it correctly.  I know you're a regular.

19                   MS. PALAPURA:  Bindu Palapura on behalf of

20         defendants.

21                   With me today from Fredrikson & Byron is Kurt

22         Niederluecke and Timothy O'Shea.

23                   MR. NIEDERLUECKE:  Good morning, Your Honor.

24                   MR. O'SHEA:  Good morning, Your Honor.

25                   THE COURT:  Great.  Niederluecke?

| | |
|---|---|
| 10:04:17 | 1 |

           **MR. NIEDERLUECKE:  Niederluecke.  Try to think**

**lucky at the end and try not to look at the spelling.**

           **THE COURT:  All right.  Just business,**

**housekeeping business.  Going forward, if I don't have an**

**averment and a proposed order, we will cancel the**

**conference.  I just want to let you know.  Okay.**

           **And by averment, I wasn't trying to use a fancy**

**word.  I was modeling the local rule word.  I need a**

**declaration of counsel.  I really just want to avoid the**

**disputes over, well, was it raised, was it not raised, did**

**we add it, and I want the oral participation of Delaware**

**counsel in the meet and confer.**

           **All right.  And it's not disparaging to outside**

**counsel.  It's just I find that sometimes we are -- outside**

**counsel are here once and then they're gone forever.  I**

**think the fact that Delaware counsel have to appear multiple**

**times in front of the Court makes their role beneficial to**

**all.**

           **All right.  So let's see.  Why don't start with**

**the protective order issue.  And incidentally, just on the**

**housekeeping, I don't mean to sound so stern, but we'll**

**cancel it and then you can refile it.  But I need the three**

**days built in, or the two days, excuse me, to prepare, and**

**it helps to have those two.**

           **Okay.  So let's start then -- well, Mr.**

| | | |
|---|---|---|
| 10:06:06 | 1 | Selinger, are you going to argue, is Ms. Jacobs going to |
| 10:06:09 | 2 | argue on the protective order? |
| 10:06:11 | 3 | MR. SELINGER:  I'm going to argue it, your |
| 10:06:12 | 4 | Honor. |
| 10:06:12 | 5 | THE COURT:  All right.  Go ahead. |
| 10:06:14 | 6 | MR. SELINGER:  I appreciate the opportunity. |
| 10:06:15 | 7 | I will say that plaintiff, Hormel filed the opening |
| 10:06:20 | 8 | letter, but with that said, I am prepared to address the |
| 10:06:25 | 9 | issues. |
| 10:06:28 | 10 | Hormel -- |
| 10:06:29 | 11 | THE COURT:  Wait a second.  You're right.  I |
| 10:06:30 | 12 | apologize.  Right.  There are too many H's in this case. |
| 10:06:35 | 13 | HIP, Howard, Hormel.  You're right.  So it's |
| 10:06:41 | 14 | Mr. Niederluecke. |
| 10:06:41 | 15 | MR. NIEDERLUECKE:  I'm going to let Mr. O'Shea. |
| 10:06:44 | 16 | THE COURT:  Mr. O'Shea. |
| 10:06:44 | 17 | MR. O'SHEA:  Thank you, your Honor. |
| 10:06:46 | 18 | THE COURT:  Mr. O'Shea, let's hear about this |
| 10:06:48 | 19 | protective order dispute. |
| 10:06:49 | 20 | MR. O'SHEA:  I think the overarching thing is |
| 10:06:51 | 21 | that with Hormel, what Hormel is seeking here is customary |
| 10:06:56 | 22 | AEO prosecution bar.  I want to start with the AEO dispute. |
| 10:07:01 | 23 | The first dispute essentially is both parties |
| 10:07:05 | 24 | agree that outside counsel, attorneys' eyes only designation |
| 10:07:09 | 25 | is appropriate except HIP wants to unravel that, so |

| | |
|---|---|
| 10:07:13 | 1 |
| 10:07:17 | 2 |
| 10:07:22 | 3 |
| 10:07:22 | 4 |
| 10:07:28 | 5 |
| 10:07:32 | 6 |
| 10:07:35 | 7 |
| 10:07:42 | 8 |
| 10:07:48 | 9 |
| 10:07:51 | 10 |
| 10:07:53 | 11 |
| 10:07:56 | 12 |
| 10:08:00 | 13 |
| 10:08:06 | 14 |
| 10:08:09 | 15 |
| 10:08:13 | 16 |
| 10:08:17 | 17 |
| 10:08:21 | 18 |
| 10:08:26 | 19 |
| 10:08:28 | 20 |
| 10:08:32 | 21 |
| 10:08:35 | 22 |
| 10:08:38 | 23 |
| 10:08:42 | 24 |
| 10:08:45 | 25 |

to speak, by having its president, David Howard, sole employee of HIP, have access to Hormel's technical AEO information.

And there's a history between the parties. Litigation in Minnesota.  Essentially, a breach of contract case, but Mr. Howard, he's the inventor on several patents, including the patent-in-suit.  And in this case, Hormel has asserted counterclaims for both inequitable conduct and correction of inventorship.

There's a separate case that was filed by HIP before this Court seeking correction of inventorship on Hormel's hybrid cooking process.  That's disclosed in Hormel's patent.  And ultimately, what the risk that we're dealing with here, the concern that we have is, is that Mr. Howard wants to have access to the AEO technical information so that he can, before we take his deposition, frame up, define his testimony based on information he has seen, and that's too much of a heightened risk, and that's why it should be designated as AEO.

One of the things that HIP has raised on their end, well, there's no competition here.  That Mr. Howard is subject to a non-compete as to the asset sale of his business, but the reality is the non-compete is going to be up in less than two years and that if he has access to this information, he is an inventor, an inventor on several

10:08:49   1   patents, including the patent-in-suit.

10:08:52   2           THE COURT:  But you led with the risk is

10:08:56   3   essentially his testimony will be shaped.  You didn't lead

10:09:02   4   with, this is a competitive risk issue.

10:09:05   5           MR. O'SHEA:  I think it's both.  It's both, Your

10:09:08   6   Honor.  And the reason it's both is, number one, the concern

10:09:11   7   about the testimony is, is that once he starts --

10:09:14   8           THE COURT:  I get the shape in testimony.

10:09:18   9   That's a reality.  I'm not sure that's relevant.

10:09:21  10           Is that relevant to whether it's a protective

10:09:23  11   order issue?

10:09:23  12           MR. O'SHEA:  It is relevant in the sense that

10:09:25  13   once he starts seeing that information, especially when we

10:09:28  14   have the inventorship dispute, it's going to be hard to

10:09:30  15   unring the bell where he says, this is really my idea.

10:09:33  16           THE COURT:  How is that relevant to the good

10:09:35  17   cause standard under Rule 26(c)?  Do you have any cases

10:09:39  18   where that's a relevant criterion?

10:09:42  19           MR. O'SHEA:  Yes.  The case that we cited to in

10:09:46  20   the District of Delaware is the Safeflite Instruments case,

10:09:50  21   where they were addressing the concern whether the named

10:09:54  22   inventor, the sole employee, could really separate seeing

10:10:01  23   what the confidential AEO information was and being able to

10:10:07  24   understand, hey, this is information that was for my

10:10:10  25   personal knowledge versus, no, this is information that I'm

10:10:14   1    seeing in the information that otherwise should not have

10:10:17   2    been --

10:10:18   3              THE COURT:  Hold on.  Wait.  First of all, let

10:10:20   4    me just get this.

10:10:38   5              So that still doesn't address my question, which

10:10:41   6    was, I just want to be -- I go will read it.  But you're

10:10:45   7    telling me Safeflite, that one of the concerns that the

10:10:49   8    Court addressed was the possibility that the exposure to

10:11:01   9    the information would result in changes in somebody's

10:11:09   10   testimony?

10:11:11   11             MR. O'SHEA:  Not on point on that.  No, Your

10:11:13   12   Honor.

10:11:13   13             THE COURT:  Let's go to my question.

10:11:15   14             MR. O'SHEA:  Yes.

10:11:16   15             THE COURT:  Do you know of any case in the 26(c)

10:11:18   16   context which looks to the possibility that testimony will

10:11:22   17   be affected as being something the Court ought to think

10:11:26   18   about in terms of whether good cause is demonstrated to have

10:11:30   19   a protective order in place?

10:11:33   20             MR. O'SHEA:  Not as I sit here today, Your

10:11:35   21   Honor.  I really don't.

10:11:36   22             THE COURT:  Okay.  All right.  But that's your

10:11:38   23   first argument.

10:11:38   24             Your second argument, which before I came in

10:11:41   25   here is the one I thought we were going to be focusing on,

| | |
|---|---|
| 10:11:45 | 1 |

has to do with the risks, the competitive risks.

| | |
|---|---|
| 10:11:49 | 2 |

MR. O'SHEA:  Yes.

| | |
|---|---|
| 10:11:49 | 3 |

THE COURT:  So there's a non-compete in place

| | |
|---|---|
| 10:11:52 | 4 |

and Mr. Howard can't do anything competitive for two

| | |
|---|---|
| 10:11:56 | 5 |

years.

| | |
|---|---|
| 10:11:56 | 6 |

MR. O'SHEA:  Correct.  And I --

| | |
|---|---|
| 10:11:58 | 7 |

THE COURT:  So why is he a direct competitor?

| | |
|---|---|
| 10:12:00 | 8 |

MR. O'SHEA:  He's a direct competitor because in

| | |
|---|---|
| 10:12:03 | 9 |

the sense that he's an inventor.

| | |
|---|---|
| 10:12:06 | 10 |

And --

| | |
|---|---|
| 10:12:07 | 11 |

THE COURT:  That's historical.

| | |
|---|---|
| 10:12:08 | 12 |

MR. O'SHEA:  Well, he has a patent application

| | |
|---|---|
| 10:12:12 | 13 |

right now on the patent-in-suit.  Once that non-compete is

| | |
|---|---|
| 10:12:15 | 14 |

up in less than two years here, you know, having access to

| | |
|---|---|
| 10:12:20 | 15 |

Hormel's confidential information, there's a heightened risk

| | |
|---|---|
| 10:12:25 | 16 |

that that information can be used not only to improve the

| | |
|---|---|
| 10:12:32 | 17 |

and commercialize the process that he has that has been

| | |
|---|---|
| 10:12:34 | 18 |

unsuccessful thus far in the United States, but to also

| | |
|---|---|
| 10:12:37 | 19 |

disclose potentially to competitors of Hormel.  And that is

| | |
|---|---|
| 10:12:42 | 20 |

a real risk that exists, because ultimately we know that

| | |
|---|---|
| 10:12:47 | 21 |

Hormel's process works.

| | |
|---|---|
| 10:12:48 | 22 |

THE COURT:  Just so I know, if he did disclose

| | |
|---|---|
| 10:12:50 | 23 |

it, it would still be a violation of the protective order.

| | |
|---|---|
| 10:12:55 | 24 |

Right?

| | |
|---|---|
| 10:12:58 | 25 |

MR. O'SHEA:  Correct.

10:12:59  1        THE COURT:  Okay.  It would also be a violation

10:13:01  2   of the noncompete, I would think.

10:13:05  3        MR. O'SHEA:  Well, the noncompete, as I

10:13:07  4   understand it, is what the company Marlin that he sold the

10:13:10  5   assets to.  And so without, I guess, getting into the weeds

10:13:18  6   of how that would work, I think our concern is that even

10:13:20  7   putting aside the temporary period, by the time the

10:13:23  8   litigation makes its way through, the risk is that once he

10:13:27  9   knows that information and the non-compete comes up, that

10:13:31  10  information can potentially be used down the road.  That's a

10:13:34  11  concern of Hormel.

10:13:35  12       THE COURT:  Okay.

10:13:36  13       MR. O'SHEA:  The other thing I want to touch on

10:13:38  14  briefly, Your Honor, is that, you know, Mr. Howard's lack of

10:13:43  15  access is not going to impede the ability to litigate this

10:13:49  16  case.

10:13:50  17       HIP has three separate law firms in this case

10:13:52  18  that are representing its interests that will have access to

10:13:55  19  the AEO information and will be able to advise HIP

10:13:59  20  accordingly.  Our understanding is that HIP is also

10:14:03  21  expected to have at least three experts, maybe more, that

10:14:06  22  can also attribute the representation and counseling in

10:14:13  23  this case.

10:14:14  24       In terms of prejudice to HIP not allowing

10:14:18  25  Mr. Howard access to AEO information, I think that risk is,

| | | |
|---|---|---|
| 10:14:21 | 1 | or that prejudice is minimized by the fact that he has |
| 10:14:25 | 2 | competent counsel that can navigate those waters. |
| 10:14:29 | 3 | THE COURT:  Okay.  Anything else? |
| 10:14:31 | 4 | MR. O'SHEA:  No, Your Honor. |
| 10:14:31 | 5 | THE COURT:  All right.  Mr. Selinger? |
| 10:14:33 | 6 | MR. SELINGER:  Thank you, Your Honor.  Let me |
| 10:14:34 | 7 | take the points in the order they were raised. |
| 10:14:39 | 8 | First, just as Your Honor may have gleaned from |
| 10:14:43 | 9 | the letter briefs, in our view, Hormel already lost its |
| 10:14:51 | 10 | inventorship fight once in the prior case.  That's relevant |
| 10:14:56 | 11 | here because Hormel deposed Mr. Howard in that case, I think |
| 10:15:03 | 12 | at least twice.  I may be wrong on the number, but he has |
| 10:15:06 | 13 | been deposed.  My sense is Hormel played a little bit, and I |
| 10:15:12 | 14 | don't mean this in a disparaging way, of hide the ball. |
| 10:15:17 | 15 | THE COURT:  How is hide the ball not |
| 10:15:20 | 16 | disparaging, but go ahead. |
| 10:15:21 | 17 | MR. SELINGER:  In the lawyer being a zealous |
| 10:15:23 | 18 | advocate way. |
| 10:15:24 | 19 | THE COURT:  Okay. |
| 10:15:25 | 20 | MR. SELINGER:  In terms of not showing, of |
| 10:15:31 | 21 | having documents he didn't see.  And, in fact, one of the |
| 10:15:36 | 22 | exhibits attached to my response letter is an e-mail from |
| 10:15:42 | 23 | Mr. O'Shea where he said Mr. Howard ought to be able to see |
| 10:15:51 | 24 | the documents, and Mr. O'Shea said in this e-mail, he claims |
| 10:15:56 | 25 | he's an inventor. |

10:15:56  1              And I will turn to --

10:15:59  2              THE COURT:  You know, I'm sorry.  I'm just

10:16:01  3  conscious of time.

10:16:02  4              MR. SELINGER:  I'm sorry.

10:16:02  5              THE COURT:  I don't know how that's really that

10:16:04  6  relevant.  Let's deal with whether why should the protective

10:16:07  7  order not limit his, or rather why should it -- yes, not

10:16:12  8  treat him the way Hormel wants him to be treated?

10:16:17  9              MR. SELINGER:  Okay.  So he is a man with

10:16:19  10 particular knowledge.  He is fully retired.  He is bound by

10:16:24  11 a nondisclosure agreement.  He is willing and we generally

10:16:32  12 opposed the prosecution bar, but if Mr. Howard is allowed to

10:16:40  13 gain access to Hormel's technical documents, then we won't

10:16:43  14 fight the technical bar, the prosecution bar, and allow him

10:16:47  15 to be covered.

10:16:48  16             THE COURT:  All right.  I kind of was perplexed

10:16:51  17 by that tradeoff.

10:16:54  18             So Mr. Brown isn't sufficiently important for

10:16:56  19 you that -- I mean, you can just switch attorneys in front

10:17:02  20 of the PTO?

10:17:03  21             MR. SELINGER:  Not switching attorneys.  Don't

10:17:05  22 need to.  That's Hormel's speculation.

10:17:10  23             Mr. Brown --

10:17:11  24             THE COURT:  So he's not involved in front of the

10:17:13  25 PTO is what you are saying?

10:17:15  1          MR. SELINGER:  He isn't, he hasn't been involved

10:17:17  2    in some time.

10:17:18  3          THE COURT:  So then you're just fighting the

10:17:20  4    prosecution bar for sport?

10:17:21  5          MR. SELINGER:  No.  I'm fighting the prosecution

10:17:24  6    bar because I'm a registered patent attorney, and one of my

10:17:28  7    partners -- and if there's a reason for prosecution bar,

10:17:32  8    then so be it.  There wasn't a prosecution bar in the

10:17:35  9    Minnesota case where they were talking about the development

10:17:39  10   of the technology.  This is a fight about commercial

10:17:43  11   implementation of it, and so there's no need for the

10:17:48  12   prosecution -- there wasn't a need for prosecution bar, but

10:17:52  13   we're willing to agree to it if it helps -- it allows the

10:18:00  14   Court some confidence that Mr. Howard will not be doing the

10:18:07  15   kind of things that Hormel is concerned about.

10:18:11  16          THE COURT:  So I've got to say, I'm probably

10:18:14  17   missing a bunch of things, but I'm confused about this.

10:18:21  18          The point of having a protective order and

10:18:28  19   extending to attorneys in the form of a prosecution bar is

10:18:32  20   because they can't pigeonhole and bring what they learn,

10:18:39  21   right, from the materials that are disclosed.

10:18:40  22          MR. SELINGER:  That's correct.

10:18:41  23          THE COURT:  And so I mean it's too much to ask

10:18:44  24   of them.  Therefore, we say, you can't now work on

10:18:49  25   continuing applications, which incidentally, it's

| | |
|---|---|
| 10:18:51 | 1 |
| 10:18:54 | 2 |
| 10:18:54 | 3 |
| 10:18:55 | 4 |
| 10:18:55 | 5 |
| 10:18:56 | 6 |
| 10:18:57 | 7 |
| 10:18:58 | 8 |
| 10:19:03 | 9 |
| 10:19:08 | 10 |
| 10:19:13 | 11 |
| 10:19:18 | 12 |
| 10:19:20 | 13 |
| 10:19:24 | 14 |
| 10:19:28 | 15 |
| 10:19:32 | 16 |
| 10:19:38 | 17 |
| 10:19:42 | 18 |
| 10:19:48 | 19 |
| 10:19:57 | 20 |
| 10:20:02 | 21 |
| 10:20:05 | 22 |
| 10:20:05 | 23 |
| 10:20:07 | 24 |
| 10:20:08 | 25 |

undisputed.  Right?  There are continuing applications
here?

        MR. SELINGER:  There is one continuing
application.

        THE COURT:  There is one?

        MR. SELINGER:  Yes.

        THE COURT:  So Mr. Brown or anybody else can't
be expected to divide their brain so that we have a
prosecution bar.  And you're fighting that, but now you are
saying, A, it looks like he's not even before the PTO, but
the reason why you would drop it is because Mr. Hormel --
Mr. Howard would now have the materials, which raises the
question is, then is Mr. Howard effectively working before
the PTO and so we have the same issue?

        MR. SELINGER:  No, he's not.  And my point is
this, Judge.  I'm bound by a number of prosecution bars in
different lawsuits.  Those are cases where there are
typically a lot of cases going on and this is a one-off from
inventive work done in 2007.  And in my view, Mr. Brown
and me being covered by the protective order without more
as Mr. Brown was in the Minnesota case ought to be
sufficient.

        THE COURT:  So why did you fight the prosecution
bar?

        MR. SELINGER:  Because there wasn't one in

| | |
|---|---|
| 10:20:10 | 1 |
| 10:20:14 | 2 |
| 10:20:19 | 3 |
| 10:20:27 | 4 |
| 10:20:32 | 5 |
| 10:20:34 | 6 |
| 10:20:36 | 7 |
| 10:20:36 | 8 |
| 10:20:38 | 9 |
| 10:20:42 | 10 |
| 10:20:45 | 11 |
| 10:20:49 | 12 |
| 10:20:54 | 13 |
| 10:20:55 | 14 |
| 10:20:57 | 15 |
| 10:20:59 | 16 |
| 10:21:00 | 17 |
| 10:21:00 | 18 |
| 10:21:03 | 19 |
| 10:21:05 | 20 |
| 10:21:08 | 21 |
| 10:21:12 | 22 |
| 10:21:13 | 23 |
| 10:21:14 | 24 |
| 10:21:16 | 25 |

Minnesota, and I don't see, in the ordinary course of this case that we need one.  I'm willing to give that fight up in order to protect -- to get Mr. Howard access to -- it's an extra level of comfort for Hormel.

THE COURT:  So how does it give them an extra level of comfort if Brown is not involved in the first place?

MR. SELINGER:  Because the extra level of comfort is the prosecution bar will bar Howard from being involved in the prosecution.  Not that he -- whatever he's doing now in that continuation, he won't do under the protective order with the prosecution bar, and that's the additional --

THE COURT:  So you're saying you will have a prosecution bar and it will extend to both Howard and Brown?

MR. SELINGER:  Correct.

THE COURT:  Okay.

MR. SELINGER:  So let me go on.

THE COURT:  And how does that work functionally because he's an inventor?

MS. JACOBS:  I'm sorry.

MR. SELINGER:  Do you want --

MS. JACOBS:  I was just going to explain, Your Honor, that the reason that we have some concern about

10:21:19   1   entering into prosecution bars is because it does restrict

10:21:22   2   activities of Mr. Selinger, Mr. Brown, people in the future,

10:21:26   3   because the subject matter is necessarily somewhat broader

10:21:30   4   than the exact scope and so it ties people's hands about

10:21:35   5   what they can do in the future.  And I think what Mr.

10:21:38   6   Selinger is saying, you know, that's why you don't just do

10:21:40   7   it lightly without some kind of showing that it's

10:21:43   8   particularly important here.

10:21:46   9           But to answer your Honor's question, you know,

10:21:51   10   if the concern was that Mr. Howard may be continuing to

10:21:54   11   prosecute patents, we can resolve that by saying we won't,

10:21:58   12   he won't be involved in that.  He will agree to a

10:22:01   13   prosecution bar where he would not be involved in future

10:22:04   14   prosecution activities as, you know, in terms of the

10:22:09   15   proceedings before the PTO.

10:22:12   16           THE COURT:  And I'm just wondering, it sounds

10:22:14   17   like -- how would that work?  For instance, I'm just saying

10:22:23   18   in terms of litigation.

10:22:24   19           If you are a client and you say I won't be part

10:22:27   20   of the defense going forward in the case?  I mean, how does

10:22:29   21   that work in front of the PTO?  If he's the inventor, there

10:22:33   22   are no mandatory things he has to do before the PTO?

10:22:39   23           MS. JACOBS:  I don't think the prosecution bar

10:22:41   24   would extend to, for example, filing a necessary oath, or

10:22:48   25   something, but what it would bar, he couldn't draft claims

| 10:22:51 | 1 | or participate in the drafting of claims. |
| 10:22:53 | 2 | MR. SELINGER:  And let me go farther because, as |
| 10:22:56 | 3 | a very practical matter, Judge, we see inventors for big |
| 10:23:02 | 4 | clients come and go all the time.  They'll file an |
| 10:23:05 | 5 | application.  Then they'll go somewhere else, and they're |
| 10:23:08 | 6 | not involved anymore.  And whatever the -- whatever the |
| 10:23:13 | 7 | prosecution bar prohibits attorneys from doing, frankly, |
| 10:23:19 | 8 | whatever it prohibits experts, technical experts are |
| 10:23:22 | 9 | involved in a lot of prosecution.  They're barred by the |
| 10:23:26 | 10 | prosecution bar also. |
| 10:23:27 | 11 | THE COURT:  All right.  Are you familiar -- I'm |
| 10:23:30 | 12 | just relatively new to the patent arena, so do you know of |
| 10:23:34 | 13 | any cases where the inventor was subject to a prosecution |
| 10:23:39 | 14 | bar? |
| 10:23:39 | 15 | MR. SELINGER:  I don't, but these -- |
| 10:23:44 | 16 | THE COURT:  But you can live with it? |
| 10:23:45 | 17 | MR. SELINGER:  I can live with it and Mr. Howard |
| 10:23:47 | 18 | can live with it. |
| 10:23:48 | 19 | THE COURT:  Okay.  All right.  Just give me a |
| 10:23:53 | 20 | second. |
| 10:23:53 | 21 | (Pause.) |
| 10:24:25 | 22 | THE COURT:  Mr. O'Shea, do you have anything |
| 10:24:27 | 23 | else? |
| 10:24:27 | 24 | MR. O'SHEA:  Your Honor, yes.  Just briefly.  A |
| 10:24:29 | 25 | couple points to respond. |

| 10:24:30 | 1 | I think from what we're hearing, the |
| 10:24:34 | 2 | practicality reality, how would this work?  How would Hormel |
| 10:24:37 | 3 | police Mr. Howard's activity?  Mr. Howard is going to have |
| 10:24:41 | 4 | input into how his patent is prosecuted. |
| 10:24:44 | 5 | THE COURT:  Well, they're saying he's not. |
| 10:24:46 | 6 | MR. O'SHEA:  I think they just said if there are |
| 10:24:49 | 7 | certain things he needs to file -- |
| 10:24:51 | 8 | THE COURT:  No.  Ms. Jacobs said he has to file |
| 10:24:54 | 9 | an oath.  He has nothing to do with the claims.  Other than |
| 10:24:56 | 10 | your mistrust of the other side, what do you need? |
| 10:24:59 | 11 | MR. NIEDERLUECKE:  If I may Your Honor? |
| 10:25:00 | 12 | THE COURT:  Sure. |
| 10:25:00 | 13 | MR. NIEDERLUECKE:  A lawyer represents a client. |
| 10:25:01 | 14 | A lawyer takes direction from the client.  What they are |
| 10:25:04 | 15 | essentially saying, the lawyer will be out there, the |
| 10:25:06 | 16 | prosecuting lawyer will now be out there on his own |
| 10:25:09 | 17 | without any advice from his own client.  He has nobody to |
| 10:25:12 | 18 | tell -- |
| 10:25:13 | 19 | THE COURT:  That's litigation tactics that you |
| 10:25:18 | 20 | don't -- I don't understand why -- I mean, I wouldn't expect |
| 10:25:21 | 21 | the client to be dictating or involved in making decisions |
| 10:25:24 | 22 | like that and, frankly, he's for going it.  Why isn't that |
| 10:25:27 | 23 | good enough? |
| 10:25:29 | 24 | MR. NIEDERLUECKE:  In terms of the protective |
| 10:25:31 | 25 | order, Your Honor, or in terms of the -- |

10:25:33  1        THE COURT:  No.  He's for going the ability to

10:25:36  2   play a role in deciding the scope of claims or how claims

10:25:39  3   should be presented or what arguments should be presented to

10:25:41  4   the PTO.  He's foregoing that.

10:25:43  5        MR. O'SHEA:  And I think the reason our concern

10:25:45  6   is that he's willing to forego that in at least this case as

10:25:50  7   well as the case in which he's seeking correction of

10:25:54  8   inventorship on Hormel's patent, he's looking at it as that

10:25:57  9   is more important that he get access to the AEO material so

10:26:01 10   that he can see that information.

10:26:02 11        THE COURT:  Because he's a plaintiff in the

10:26:04 12   case.

10:26:04 13        MR. O'SHEA:  He raised the issue of Hormel, you

10:26:08 14   know, for lack of a better term is trying to hide the ball

10:26:11 15   in the Minnesota case.

10:26:12 16        The issue of Mr. Howard's access to the AEO was

10:26:15 17   decided twice by the Minnesota Court.  They said the first

10:26:18 18   time, Mr. Howard, you're not getting access to the AEO.

10:26:22 19   They raised it again.  They said, quote unquote, "We're

10:26:24 20   being overaggressive with the AEO designation," and the

10:26:27 21   Court denied that, because Hormel is not being

10:26:29 22   overaggressive.  And so here we are again.  They are trying

10:26:32 23   to get Mr. Howard access to Hormel's confidential AEO and

10:26:35 24   they are even willing to even forego his involvement in

10:26:39 25   further prosecution, and that is one of the reasons why

10:26:42   1   we're concerned about his access to the AEO information.

10:26:44   2          THE COURT:  See, I know your concern and I think

10:26:48   3   as evident from what your lead argument was, you're really

10:26:51   4   concerned that he's going to shape his testimony, and I

10:26:55   5   thought it was telling that that was what your first

10:26:57   6   argument was.  I was very surprised that was your first

10:27:01   7   argument.

10:27:04   8          MR. NIEDERLUECKE:  Your Honor --

10:27:04   9          THE COURT:  You put in here there's no dispute

10:27:06   10  he's a competitive decision-maker in your letter.  It

10:27:09   11  sounds like the guy is out of business for the next

10:27:11   12  two years.

10:27:11   13         MR. NIEDERLUECKE:  For the next two years.

10:27:12   14         THE COURT:  Do you know of any cases that say

10:27:15   15  that competitive decision-makers shouldn't be decided on

10:27:18   16  anything other than the current facts as opposed to what

10:27:21   17  happens in two years?  If you know of any case, I will be

10:27:23   18  happy to read it.

10:27:24   19         MR. NIEDERLUECKE:  Your Honor, I would expect

10:27:25   20  that almost every case is dealing with that.  Rarely I think

10:27:28   21  does a case actually address today if I disclose this to

10:27:32   22  you, will you use it today.  It is about the future.  All of

10:27:35   23  those cases that deal with this are about the future.  And

10:27:38   24  our concern, I think, with regard to the prosecution bar, it

10:27:41   25  doesn't ameliorate the concern.  It has nothing to do with

| | |
|---|---|
| 10:27:44 | 1 |
| 10:27:47 | 2 |
| 10:27:50 | 3 |
| 10:27:52 | 4 |
| 10:27:53 | 5 |
| 10:27:54 | 6 |
| 10:27:58 | 7 |
| 10:28:01 | 8 |
| 10:28:06 | 9 |
| 10:28:09 | 10 |
| 10:28:13 | 11 |
| 10:28:16 | 12 |
| 10:28:19 | 13 |
| 10:28:24 | 14 |
| 10:28:30 | 15 |
| 10:28:34 | 16 |
| 10:28:38 | 17 |
| 10:28:42 | 18 |
| 10:28:45 | 19 |
| 10:28:46 | 20 |
| 10:28:48 | 21 |
| 10:28:52 | 22 |
| 10:28:54 | 23 |
| 10:28:55 | 24 |
| 10:28:56 | 25 |

that concern.  It has to do with a different concern.  So the idea of trading those off, they're two separate issues, Your Honor.

THE COURT:  What are two separate issues?

MR. NIEDERLUECKE:  The question of whether or not Mr. Howard in using this, whether he breaches or doesn't breach his non-compete, which isn't with us, but the question of whether or not he intentionally or just subliminally, because he can't separate the information, utilizes it as he moves forward in the future.

Mr. Howard has a lot of money right now because he sold the assets to his business.  He has got plenty of money to get into this field again, and Hormel has a fantastic product that they developed, and its competitors would love to get ahold of how Hormel is making it.

And Hormel has a serious concern that if Mr. Howard had that information, and based on the last case and the conduct of Mr. Howard in the last case --

THE COURT:  He won the last case.  Right?

MR. NIEDERLUECKE:  No.  He asked for $62 million.  He got zero.  He lost on summary judgment.

THE COURT:  All right.  So you won the entire case?

MR. NIEDERLUECKE:  Yes.

MR. SELINGER:  No.

10:28:56    1          MR. NIEDERLUECKE:  Well, we lost on our

10:28:58    2   compulsory counterclaims, which was the --

10:29:00    3          MR. O'SHEA:  The contract interpretation.

10:29:02    4          MR. NIEDERLUECKE:  Yes.

10:29:02    5          MR. SELINGER:  May I, Your Honor?

10:29:05    6          THE COURT:  I didn't read --

10:29:06    7          MR. SELINGER:  Hormel lost on its counterclaim

10:29:10    8   for ownership of --

10:29:13    9          THE COURT:  The invention?

10:29:14   10          MR. SELINGER:  -- of the invention.

10:29:16   11          THE COURT:  That's why I thought he lost.

10:29:18   12          MR. NIEDERLUECKE:  If I can, Your Honor, the

10:29:20   13   case, the case was brought by Unitherm, which is HIP, and

10:29:26   14   they sued us for over $60 million, saying we breached the

10:29:28   15   joint development agreement and the MCDA.  They lost on

10:29:32   16   every single claim.

10:29:35   17          In return, we said under the JDA, under these

10:29:38   18   agreements, there are provisions in the agreements that sa,

10:29:41   19   whatever we develop together, we own, period.  The Court

10:29:45   20   ultimately said that they lose and that the JDA didn't cover

10:29:49   21   this development process, so what the parties did together

10:29:52   22   for the process wasn't covered by the JDA, so Hormel, no,

10:29:56   23   you don't automatically get ownership of it.

10:29:58   24          It had nothing to do with an inventorship fight

10:30:02   25   because, in fact, at the time the Court decided it, these

10:30:04    1    claims didn't even exist.  This patent didn't exist.  There

10:30:07    2    was an application sitting out there.  So it is in no way

10:30:11    3    about a Court deciding what the inventorship is.  Everything

10:30:14    4    is clear that they always talk under the contract, we don't

10:30:17    5    get.

10:30:19    6                    THE COURT:  Okay.

10:30:19    7                    MR. NIEDERLUECKE:  And that's what was

10:30:21    8    decided, Your Honor.  We had a 60-plus-million dollar

10:30:23    9    claim.

10:30:24   10                    THE COURT:  Right.  I was focusing on

10:30:25   11    inventorship.  Actually, it will have no role in my

10:30:29   12    approach.  You just brought it up to me and so that's why I

10:30:31   13    mentioned it.  So that's fine.

10:30:34   14                    Other than what occurred in the Minnesota case,

10:30:37   15    what else do you want to argue then?

10:30:38   16                    MR. NIEDERLUECKE:  I think, unless you've got

10:30:41   17    anything else?

10:30:41   18                    MR. O'SHEA:  No.  They are the main points in

10:30:44   19    dispute on the protective order, Your Honor.

10:30:46   20                    THE COURT:  You realize you have the burden.

10:30:47   21    Right?

10:30:48   22                    MR. O'SHEA:  Yes.

10:30:49   23                    THE COURT:  Okay.

10:30:54   24                    MS. JACOBS:  Your Honor, may we respond?

10:30:56   25                    THE COURT:  Sure.

10:30:57  1          MS. JACOBS:  I think to say that the cases would

10:31:00  2    recognize -- this kind of activity in the future, our letter

10:31:05  3    says that Mr. Howard is fully retired.  The cases talk about

10:31:09  4    fear or risk of inadvertent disclosure, how there's a risk

10:31:14  5    of Mr. Howard having inadvertent disclosure when he's fully

10:31:18  6    retired and not working at a company.  It's really just an

10:31:21  7    assumption or speculation that in two years, he's going to

10:31:25  8    deliberately violate a protective order and go out and find

10:31:28  9    a competitor to talk to, and that's not the kind of thing

10:31:32  10   that, you know, the case law is looking at as constituting

10:31:36  11   good cause.  And it's just really pure speculation that

10:31:40  12   there's going to be some bad acting in the future.

10:31:43  13          THE COURT:  All right.

10:31:44  14          MR. NIEDERLUECKE:  I guess the question would

10:31:46  15   be, are they willing to agree that he can't consult in this

10:31:48  16   industry anymore?  If they say he's retired from it, would

10:31:52  17   they be willing to agree --

10:31:54  18          THE COURT:  Well, I mean, he's fully retired and

10:31:56  19   he's prohibited from doing it for two years.

10:31:59  20          MR. NIEDERLUECKE:  They indicate --

10:32:01  21          THE COURT:  Is that right?

10:32:01  22          MR. NIEDERLUECKE:  I don't know.  That's the

10:32:02  23   indication in their letter.  That's all we know.  ███████

10:32:04  24   ████████████████████████████████████████████████  and I

10:32:10  25   don't know if he still runs businesses in Europe that relate

| | | |
|---|---|---|
| 10:32:13 | 1 | to this.  He may.  So that's just their statement that |
| 10:32:18 | 2 | they've made.  He certainly has not come out to declare |
| 10:32:22 | 3 | that. |
| 10:32:22 | 4 | THE COURT:  Would he be willing to execute |
| 10:32:24 | 5 | something to prohibit him from engaging in business |
| 10:32:27 | 6 | activities for the next two years? |
| 10:32:29 | 7 | MR. SELINGER:  He did. |
| 10:32:32 | 8 | THE COURT:  I haven't seen it. |
| 10:32:33 | 9 | MR. SELINGER:  It's an exhibit, Your Honor.  We |
| 10:32:36 | 10 | included it, those pages. |
| 10:32:37 | 11 | And let me say -- |
| 10:32:39 | 12 | THE COURT:  Well, you included the pages, not |
| 10:32:41 | 13 | the entire agreement. |
| 10:32:43 | 14 | MR. SELINGER:  We just wanted to show that he's |
| 10:32:49 | 15 | bound by competing. |
| 10:32:52 | 16 | THE COURT:  I'm sorry.  What? |
| 10:32:53 | 17 | MR. SELINGER:  He is fully retired and he has |
| 10:32:56 | 18 | got a non-compete. |
| 10:32:57 | 19 | THE COURT: How old is he? |
| 10:32:58 | 20 | MR. SELINGER:  He is going to be 58 next month. |
| 10:33:01 | 21 | And what I would say, Your Honor, is, I don't |
| 10:33:05 | 22 | think it's fair to have counsel say will he sign something |
| 10:33:09 | 23 | else, and I would hope the Court wouldn't need to -- with |
| 10:33:14 | 24 | the record we have and the defenses with the burden of proof |
| 10:33:21 | 25 | don't.  But if the Court says that's a condition to giving |

| | |
|---|---|
| 10:33:23 | 1 |
| 10:33:29 | 2 |
| 10:33:32 | 3 |
| 10:33:33 | 4 |
| 10:33:37 | 5 |
| 10:33:40 | 6 |
| 10:33:41 | 7 |
| 10:33:43 | 8 |
| 10:33:45 | 9 |
| 10:33:50 | 10 |
| 10:33:54 | 11 |
| 10:33:57 | 12 |
| 10:34:00 | 13 |
| 10:34:02 | 14 |
| 10:34:03 | 15 |
| 10:34:07 | 16 |
| 10:34:09 | 17 |
| 10:34:11 | 18 |
| 10:34:14 | 19 |
| 10:34:19 | 20 |
| 10:34:24 | 21 |
| 10:34:27 | 22 |
| 10:34:33 | 23 |
| 10:34:39 | 24 |
| 10:34:42 | 25 |

him access, I will need to talk with him.  My guess is he would, but I think it's just unfair under these circumstances.

MS. JACOBS:  And premature to suggest that he needs to basically write off today his --

THE COURT:  No.

MS. JACOBS:  -- professional life.

THE COURT:  I mean, if you are saying he has got the NDA or the non-compete, then what's the downside to having him execute something that says, yes, I agree I won't be in business, because you are saying he's fully retired and he already has this non-compete for two years.  Really, this should be no burden for him at all.

MR. SELINGER:  Is what Your Honor is thinking now something that says I will agree, I will comply with the non-compete for --

THE COURT:  See, that's what I'm saying.  I don't want to necessarily get into parsing the non-compete.

MR. SELINGER:  And what is it Your Honor is asking that he sign?

THE COURT:  I'm not asking, first of all.  I'm just proposing what would be your receptivity to him signing some document that would leave no doubt that he couldn't be a direct competitor for two years since you're saying that he's not a direct competitor because he has signed this

10:34:46  1   non-compete.

10:34:47  2              MR. SELINGER:  He has never been a direct

10:34:49  3   competitor, and Hormel concedes he wasn't a direct

10:34:54  4   competitor when he actually was in business, and that's

10:35:00  5   going to be, we're going to I think come up with a fight

10:35:03  6   differently, not about whether he was a direct competitor,

10:35:06  7   but how it impacts.

10:35:08  8              But if the concern is him being a direct

10:35:10  9   competitor, we've cited in our letter exactly where Hormel

10:35:14  10  said he's not a direct competitor.

10:35:17  11             THE COURT:  Okay.  Any other argument on this

10:35:20  12  issue?

10:35:21  13             MR. O'SHEA:  No.  Just two other issues within

10:35:23  14  the protective order, one that's related to the AEO, if Your

10:35:27  15  Honor would like to hear that.

10:35:30  16             THE COURT:  Sure.

10:35:31  17             MR. O'SHEA:  7.3(e) in the protective order,

10:35:33  18  there's the dispute between the parties regarding the

10:35:35  19  language there.

10:35:37  20             Hormel --

10:35:39  21             THE COURT:  Why don't we run through them.

10:35:40  22  Okay.

10:35:41  23             So the first dispute was on the AEO, which is --

10:35:50  24  that's going to be at what page?

10:35:52  25             MR. O'SHEA:  7.3.  I believe it's page 12, Your

| | | |
|---|---|---|
| 10:35:54 | 1 | Honor. |
| 10:35:54 | 2 | THE COURT:  Page 12.  All right. |
| 10:36:14 | 3 | So basically, it's your proposal.  We were |
| 10:36:18 | 4 | talking about F.  Correct? |
| 10:36:19 | 5 | MR. O'SHEA:  On 7.3(e), Your Honor. |
| 10:36:23 | 6 | MR. NIEDERLUECKE:  No.  G.  G and H are the two |
| 10:36:26 | 7 | that we just discussed. |
| 10:36:27 | 8 | MR. O'SHEA:  Yes.  Yes. |
| 10:36:28 | 9 | THE COURT:  We were just talking about them. |
| 10:36:29 | 10 | MR. O'SHEA:  I apologize, Your Honor.  Yes, |
| 10:36:32 | 11 | that's correct. |
| 10:36:32 | 12 | THE COURT:  All right.  We've dealt with G. |
| 10:37:00 | 13 | MR. NIEDERLUECKE:  Correct. |
| 10:37:01 | 14 | THE COURT:  As far as H -- |
| 10:37:10 | 15 | MR. NIEDERLUECKE:  I think H is their proposal |
| 10:37:11 | 16 | along with G. |
| 10:37:12 | 17 | MR. SELINGER:  I was offering our version of H, |
| 10:37:15 | 18 | Your Honor, to allow one of their in-house attorneys who |
| 10:37:21 | 19 | would not be a competitive decision-maker have access to all |
| 10:37:24 | 20 | of our documents. |
| 10:37:25 | 21 | THE COURT:  Right. |
| 10:37:26 | 22 | MR. SELINGER:  As -- |
| 10:37:27 | 23 | THE COURT:  And you don't want that? |
| 10:37:28 | 24 | MR. NIEDERLUECKE:  No.  We would take that if |
| 10:37:30 | 25 | you would -- |

| | |
|---|---|
| 10:37:31 | 1 |
| 10:37:32 | 2 |
| 10:37:33 | 3 |
| 10:37:36 | 4 |
| 10:37:39 | 5 |
| 10:37:41 | 6 |
| 10:37:42 | 7 |
| 10:37:43 | 8 |
| 10:37:44 | 9 |
| 10:37:46 | 10 |
| 10:37:49 | 11 |
| 10:37:52 | 12 |
| 10:37:55 | 13 |
| 10:37:56 | 14 |
| 10:38:01 | 15 |
| 10:38:04 | 16 |
| 10:38:05 | 17 |
| 10:38:06 | 18 |
| 10:38:09 | 19 |
| 10:38:10 | 20 |
| 10:38:13 | 21 |
| 10:38:16 | 22 |
| 10:38:21 | 23 |
| 10:38:24 | 24 |
| 10:38:28 | 25 |

1    THE COURT:  That's my question.

2    MR. NIEDERLUECKE:  Yes.

3    THE COURT:  All right.  So what I'm getting at

4  is, it's G and H as proposed by the plaintiff versus what

5  the defendants wanted?

6    MR. O'SHEA:  Correct, Your Honor.

7    THE COURT:  All right.  That's issue one.  We'll

8  table it for a second.

9    Let's go to issue two.

10    MR. O'SHEA:  Okay.  Issue two that we had

11  covered before that was the prosecution bar in Section 8.

12    THE COURT:  In Section 8.  That's on page --

13    MR. O'SHEA:  13.

14    THE COURT:  13.  Right.  But they're willing to

15  accept the prosecution bar if I rule in their favor, so

16  we'll table that.

17    Next.

18    MR. O'SHEA:  And then back to page 12, 7.3(e).

19    THE COURT:  Right.

20    MR. O'SHEA:  So this is language that Hormel

21  proposed was that AEO material be limited to persons that

22  are shown on the face of the document, they've offered it or

23  received it.  HIP's proposed language would allow a person

24  to access AEO materials if that person otherwise possessed

25  or reviewed the information.

10:38:29  1   We're not sure how that would work in practice.

10:38:31  2   It seems to be just another way of getting around the AEO

10:38:34  3   provision to allow Mr. Howard access if he's not allowed

10:38:39  4   access under the provisions below, and so we don't think

10:38:42  5   that's a reasonable proposal on their side.

10:38:44  6          THE COURT:  So I agree with you.  I will give

10:38:46  7   you a second to rebut that, but I have to say I'm inclined

10:38:49  8   to accept their --

10:38:49  9          MR. SELINGER:  My example is an internal -- and

10:38:53  10  frankly, if Mr. Howard is allowed access under the

10:38:57  11  protective order, I'm fine with your provision, their

10:39:03  12  approach.  My concern was an internal Hormel memo about a

10:39:08  13  meeting they had with Mr. Howard where the reporting what

10:39:12  14  was said, he was neither the author nor the recipient of it,

10:39:17  15  and yet I couldn't show it to him.  I couldn't ask him about

10:39:20  16  it.  That was my concern.

10:39:21  17         THE COURT:  Okay.  Next.  Any other issue in the

10:39:24  18  protective order?

10:39:26  19         MR. O'SHEA:  The remaining issues, Your Honor,

10:39:28  20  revolve around, in Section 2.2, which is confidential

10:39:32  21  information on page 2.  This is just the definitions from

10:39:41  22  Hormel's perspective.  We believe the definition we're

10:39:45  23  proposing is typically seen in a protective order.

10:39:51  24         MR. NIEDERLUECKE:  And I think the other side,

10:39:52  25  plaintiff wants to actually predetermine whether documents

10:39:56   1   were produced under an MCDA.

10:39:59   2           THE COURT:  Right.

10:39:59   3           MR. NIEDERLUECKE:  And that's something that

10:40:01   4   should be resolved as we go through it if there are issues

10:40:04   5   that we have with it.

10:40:04   6           THE COURT:  Agreed.  All right.  Go ahead.

10:40:07   7           MR. SELINGER:  Let me talk to that, Your Honor,

10:40:09   8   because my client has its own set of business records, and

10:40:15   9   some of those include communications from Hormel that were

10:40:19   10  protected under an agreement that expired by 2013 or 2014.

10:40:25   11  Nothing we have is Hormel confidential.

10:40:29   12          I want the ability to use these, some of these

10:40:35   13  documents.  Hormel has told us they're going to file an

10:40:39   14  inter partes review, and under the prosecution bar, counsel,

10:40:45   15  counsel are not prohibited from participating in that.  I

10:40:49   16  want the ability to use my client's business records, or

10:40:55   17  records that came from Hormel but which are no longer

10:40:58   18  protected under an agreement.  Anyway, I want without having

10:41:05   19  to go to Hormel and say, what about this?

10:41:09   20          And one of the things the protective order says

10:41:11   21  is if documents are public, then they can't be designated

10:41:15   22  confidential, so I've pondered just taking my client's

10:41:20   23  documents and making them all public so that there's no

10:41:25   24  doubt.

10:41:25   25          Now, if Hormel wants to designate what it has in

| | |
|---|---|
| 10:41:29 | 1 |
| 10:41:33 | 2 |
| 10:41:38 | 3 |
| 10:41:42 | 4 |
| 10:41:51 | 5 |
| 10:41:52 | 6 |
| 10:41:54 | 7 |
| 10:41:55 | 8 |
| 10:41:56 | 9 |
| 10:41:58 | 10 |
| 10:41:59 | 11 |
| 10:42:01 | 12 |
| 10:42:03 | 13 |
| 10:42:04 | 14 |
| 10:42:05 | 15 |
| 10:42:06 | 16 |
| 10:42:08 | 17 |
| 10:42:09 | 18 |
| 10:42:11 | 19 |
| 10:42:14 | 20 |
| 10:42:16 | 21 |
| 10:42:18 | 22 |
| 10:42:19 | 23 |
| 10:42:20 | 24 |
| 10:42:21 | 25 |

its file confidential, it may -- you know, that's its issue,
but I don't want to be caught in a trap because Hormel
designates the counterpart of a document that we never
designated confidential, or declassified as time ran.  So
that's what this issue is about.

THE COURT:  It sounds very reasonable.  Why do
you object to that?

MR. NIEDERLUECKE:  Well, first of all, when he
talks about the IPR has nothing to do with this lawsuit,
and --

THE COURT:  His rationale, if there is an IPR,
it's a very reasonable approach.  So what do you object
to?

MR. NIEDERLUECKE:  That he publicize all of his
information.

THE COURT:  It's not confidential.

MR. NIEDERLUECKE:  Well, then, that's a
question, Your Honor.  Whether or not any of the documents
that he wants to produce have any confidentiality
obligations with Hormel --

THE COURT:  I mean, he's not even subject right
now to any order in this court.

MR. NIEDERLUECKE:  Correct.  Correct.  And all
we said is --

THE COURT:  Presumably, if he has your

| | | |
|---|---|---|
| 10:42:23 | 1 | documents, he got them pursuant to -- well, I guess there's |
| 10:42:28 | 2 | two ways.  One is the Minnesota litigation.  Is that how he |
| 10:42:32 | 3 | got them? |
| 10:42:32 | 4 | MR. SELINGER:  No. |
| 10:42:32 | 5 | MR. NIEDERLUECKE:  No.  He's talking about |
| 10:42:34 | 6 | documents he had outside of what we produced.  Correct. |
| 10:42:36 | 7 | THE COURT:  Okay. |
| 10:42:37 | 8 | MR. NIEDERLUECKE:  Yes. |
| 10:42:38 | 9 | THE COURT:  So you have not produced them.  So |
| 10:42:39 | 10 | how would he owe any confidential obligation in those |
| 10:42:42 | 11 | documents to you? |
| 10:42:43 | 12 | MR. NIEDERLUECKE:  Based on the business |
| 10:42:45 | 13 | dealings that the parties are in the underlying development |
| 10:42:52 | 14 | and also in other developments. |
| 10:42:53 | 15 | THE COURT:  But I assume that there's something |
| 10:42:55 | 16 | you've got in place that if he did it, he's going to violate |
| 10:42:58 | 17 | some rule, I mean some contract you have with him, or |
| 10:43:01 | 18 | something.  Right? |
| 10:43:01 | 19 | MR. NIEDERLUECKE:  And that's our point.  If he |
| 10:43:06 | 20 | wants to use them and we have an issue of those, we will do |
| 10:43:08 | 21 | one of two things.  If he uses them in the IPR, we'll |
| 10:43:11 | 22 | address that issue with him separate from this case. |
| 10:43:12 | 23 | If he produces something in this case and we |
| 10:43:15 | 24 | say, wait, we think there's some obligation that you should |
| 10:43:18 | 25 | have marked that confidential or AEO, we'll have that |

| | |
|---|---|
| 10:43:20 | 1 |

conversation with him.  But to suggest that this undefined

group of documents, there's no definition.  There wasn't a

production of documents saying, here are Hormel's documents

that we're giving you under this MCDA.  There's no group of

defined documents that that pertains to.

THE COURT:  So then if it doesn't pertain to any

documents in his possession, on what basis would you claim

any documents in his possession are confidential?

MR. NIEDERLUECKE:  I said there's not -- there's

not a definition of these 350 documents were produced to him

under this, under the 2007 MCDA.

MR. O'SHEA:  If I may, Your Honor, what has

already happened is that the -- HIP has already reproduced

every single document from the Minnesota litigation and has

de-designated them to be public, and I think from our

perspective what we're saying is, as we get into the

litigation, there are mechanisms within the proposed

protective order that we're looking at that will allow us to

have a conversation if there is a document that has

confidential information of Hormel's in it that we would

say, hey, we think we need to designate that document

confidential.

THE COURT:  I guess what I'm confused is, I

don't know how you use this litigation as a vehicle to have

your confidential designation of documents imposed on the

10:43:20  1
10:43:24  2
10:43:28  3
10:43:32  4
10:43:40  5
10:43:44  6
10:43:47  7
10:43:51  8
10:43:54  9
10:43:56  10
10:44:01  11
10:44:14  12
10:44:16  13
10:44:20  14
10:44:23  15
10:44:26  16
10:44:28  17
10:44:32  18
10:44:35  19
10:44:38  20
10:44:41  21
10:44:44  22
10:44:44  23
10:44:46  24
10:44:53  25

10:44:59  1    other side.  If you have some pre-existing contract or some

10:45:04  2    other order from a Minnesota case or something else that

10:45:09  3    binds the defendant to your, to accept your confidential

10:45:13  4    designations, I understand that, and I would say, you know,

10:45:17  5    we want to make sure we're not facilitating the breach of

10:45:20  6    those obligations.  But what I understand is, the only

10:45:24  7    contract you've cited, those terms have expired, or they

10:45:28  8    were never -- they didn't cover documents.

10:45:32  9             So what basis do you have to tell another

10:45:34  10   party they've got to designate their own documents

10:45:38  11   confidential?

10:45:38  12             MR. NIEDERLUECKE:  Well, first of all, on that

10:45:42  13   point, Your Honor, what you just explained is exactly what

10:45:45  14   we're asking you to do here.  We're asking you to stay out

10:45:48  15   of the question of whether or not documents that were

10:45:50  16   produced have to be marked confidential.  We have not told

10:45:53  17   them they have to be marked confidential, that he has got to

10:45:56  18   keep every document confidential.  In fact, what we're

10:45:58  19   proposing is the standard that they get the right at first

10:46:02  20   instance to mark documents confidential or not that are from

10:46:05  21   their files, and if we want to challenge that, there's a

10:46:09  22   mechanism here to do that.

10:46:10  23             THE COURT:  Right.

10:46:11  24             MR. NIEDERLUECKE:  That's all.  What this

10:46:12  25   does --

10:46:13    1          THE COURT:  What's this?

10:46:14    2          MR. NIEDERLUECKE:  The addition, what the

10:46:15    3   plaintiff's proposal does, actually, we have you, have the

10:46:19    4   Court prejudge this.

10:46:20    5          THE COURT:  Oh, I see.  Should not.  All right.

10:46:22    6          MR. NIEDERLUECKE:  So, yes.  The Court is

10:46:23    7   prejudging it.

10:46:24    8          THE COURT:  Understood now.  Sorry.

10:46:27    9          MR. NIEDERLUECKE:  I apologize, Your Honor.

10:46:28   10          THE COURT:  No, no, no.  You shouldn't be.  This

10:46:30   11   is the problem with rushing through these things, is I have

10:46:34   12   to, unfortunately.  So hold on.

10:46:36   13          (Pause.)

10:46:43   14          THE COURT:  Yes.  Actually, I've read it.  You

10:46:46   15   did say, you sounded very reasonable, but now that I look at

10:46:49   16   what you are asking me to do, I don't know why in the world

10:46:52   17   I would want to get into telling you or deciding what some

10:46:58   18   mutual confidential disclosure agreement says.

10:47:01   19          MR. SELINGER:  So let me say, I'm not -- we

10:47:05   20   struggled to find -- we were trying to find some compromise,

10:47:11   21   and it's not.  What I want the ability, and counsel -- if

10:47:17   22   documents, if my documents are covered by their designation,

10:47:21   23   then I can't use them in an IPR.  Under the protective

10:47:25   24   order, it's a different proceeding.

10:47:26   25          THE COURT:  Right.  But if your documents -- I

10:47:28  1    thought what you were saying is somehow you were required

10:47:30  2    now to designate them as confidential.  You've got to

10:47:33  3    decide.

10:47:34  4                 MR. SELINGER:  And so that was my concern.  I

10:47:36  5    want -- so all I want the ability to do, and I think Your

10:47:40  6    Honor is getting the point.  They're my documents.  The MCDA

10:47:46  7    expired --

10:47:46  8                 THE COURT:  Well, I'm not telling you whether it

10:47:48  9    expired or not.

10:47:49  10               MR. SELINGER:  Well, but what I don't want to do

10:47:54  11   is, and what Hormel did in the Minnesota litigation and I

10:47:58  12   wasn't involved in it, but they went after Mr. Brown

10:48:03  13   claiming that the complaints he prepared in Delaware, in the

10:48:09  14   two Delaware actions, violated the protective order in the

10:48:15  15   Minnesota case.

10:48:16  16               THE COURT:  I've got a bunch of cases where

10:48:18  17   people are alleging that, similar things.

10:48:20  18               MR. SELINGER:  But specifically, it was based on

10:48:24  19   a document that Hormel had produced and designated

10:48:28  20   confidential, but we had produced our version of it without

10:48:31  21   any designations.

10:48:32  22               THE COURT:  Okay.  So you decide what you want

10:48:34  23   to do in front of the IPR and take your risks like any

10:48:37  24   lawyer would do.

10:48:38  25               MR. SELINGER:  Okay.

| | | |
|---|---|---|
| 10:48:38 | 1 | THE COURT:  I don't understand why I'm supposed |
| 10:48:40 | 2 | to put in a protective order some mechanism to give you |
| 10:48:43 | 3 | carte blanche to do whatever you want to in front of the |
| 10:48:46 | 4 | IPR. |
| 10:48:47 | 5 | MR. SELINGER:  I think I may just publish the |
| 10:48:49 | 6 | documents. |
| 10:48:49 | 7 | THE COURT:  You do what you want, take the risk. |
| 10:48:52 | 8 | MR. SELINGER:  That's fine. |
| 10:48:52 | 9 | THE COURT:  You know. |
| 10:48:53 | 10 | MR. SELINGER:  Yes.  I don't need that language. |
| 10:48:55 | 11 | We'll just -- there's other language. |
| 10:48:57 | 12 | THE COURT:  All right.  So on 2.2, I'm going to |
| 10:48:59 | 13 | accept defendants' proposal and not the plaintiff's, and I |
| 10:49:07 | 14 | don't think I have to articulate why. |
| 10:49:09 | 15 | MR. SELINGER:  No. |
| 10:49:09 | 16 | THE COURT:  I think I've already done it. |
| 10:49:10 | 17 | MR. SELINGER:  Yes. |
| 10:49:11 | 18 | THE COURT:  Do you agree with that? |
| 10:49:12 | 19 | MR. SELINGER:  I do, Your Honor. |
| 10:49:13 | 20 | THE COURT:  Good.  Next. |
| 10:49:17 | 21 | MR. O'SHEA:  Next is 2.6, Your Honor.  That's on |
| 10:49:19 | 22 | the next page, page 3.  Essentially, defendants are |
| 10:49:21 | 23 | proposing standard language and I think plaintiffs are |
| 10:49:23 | 24 | trying to put in some adjectives. |
| 10:49:26 | 25 | I think it would be hard to understand what |

| | |
|---|---|
| 10:49:27 | 1 |
| 10:49:28 | 2 |
| 10:49:30 | 3 |
| 10:49:33 | 4 |
| 10:49:36 | 5 |
| 10:49:40 | 6 |
| 10:49:42 | 7 |
| 10:49:44 | 8 |
| 10:49:44 | 9 |
| 10:49:47 | 10 |
| 10:49:53 | 11 |
| 10:49:56 | 12 |
| 10:50:01 | 13 |
| 10:50:05 | 14 |
| 10:50:06 | 15 |
| 10:50:10 | 16 |
| 10:50:11 | 17 |
| 10:50:12 | 18 |
| 10:50:16 | 19 |
| 10:50:20 | 20 |
| 10:50:35 | 21 |
| 10:50:46 | 22 |
| 10:50:47 | 23 |
| 10:50:49 | 24 |
| 10:50:55 | 25 |

that --

THE COURT:  You've got an uphill climb here, Mr. Selinger.  I tell my clerks, don't use adverbs.  That's what my Judge told me.  And I don't want to be the arbiter of what's extremely, so keep in mind, I've got limited time. Go ahead, but let's be mindful.

MR. SELINGER:  Ten words, ten words or less.

THE COURT:  Yes.

MR. SELINGER:  Trying to distinguish the level required for confidential from attorneys' eyes only, outside counsel.  Frankly, this is another issue.  And I was doing it because in Minnesota, Hormel designated a lot of things, AEOs, so Mr. Howard couldn't see them.  If he's under the protective order, I don't care.

THE COURT:  Okay.  But if he is not under the AEO --

MR. SELINGER:  If he's not, there has to be a distinction, there should be a distinction between documents that are -- that comply with the confidential level and documents that comply with this much higher standard.

THE COURT:  Well, there is a distinction.

MR. SELINGER:  What page, Your Honor?

THE COURT:  Well, are you saying there's no distinction between 2.2, confidential information, and 2.6, highly confidential?

10:50:56   1          MR. SELINGER:  I am saying that there is

10:51:02   2   essentially no difference between those two as a practical

10:51:06   3   matter.  Competitive -- 2.2 is competitively sensitive

10:51:14   4   technical and 2.6 is sensitive technical -- if anything, 2.6

10:51:21   5   is less rigorous than 2.2.

10:51:27   6          MR. O'SHEA:  Your Honor, if I may.  I'm sorry.

10:51:30   7   I will let you go, Jerry.

10:51:31   8          MR. SELINGER:  I'm done.

10:51:33   9          THE COURT:  Yes?

10:51:34   10         MR. O'SHEA:  Your Honor, on 2.6, it's modified

10:51:36   11   by the fact that, and it is different than 2.2 in the way

10:51:39   12   that it says if the producing party reasonably discloses

10:51:44   13   such discovery, he's likely to cause economic harm.

10:51:47   14         THE COURT:  Or competitive disadvantage.

10:51:49   15         MR. O'SHEA:  Right.  And that's a big

10:51:53   16   distinction.

10:51:58   17         MR. SELINGER:  Judge, I don't think that's much

10:52:00   18   of a distinction for any internal document.  I mean, I think

10:52:06   19   one can say with a straight face that pretty much any, any

10:52:09   20   internal document, if given to a competitor, would do that,

10:52:14   21   but it just seems to me there needs to be -- this shouldn't,

10:52:19   22   the distinction between confidential and AEO shouldn't be

10:52:24   23   used as a bludgeon in this case against Mr. Howard.

10:52:28   24         THE COURT:  All right.  Mr. Palapura and Ms.

10:52:32   25   Jacobs, could you please, experienced litigants in this

10:52:40  1    court.  I mean, my sense is that the current versions

10:52:46  2    are typical.  Would you agree that?  Is that your

10:52:52  3    experience?

10:52:53  4              MS. PALAPURA:  Yes, Your Honor, without the

10:52:54  5    modifiers.

10:52:54  6              THE COURT:  No.  That's what I'm getting at.

10:52:56  7              MS. PALAPURA:  Yes.

10:52:57  8              THE COURT:  I know, Ms. Jacobs, in a way it puts

10:53:00  9    you in a bind, but except do you at least agree that this,

10:53:05  10   differentiating the two based on the competitive

10:53:07  11   disadvantage and economic harm is fairly typical in this

10:53:14  12   court?

10:53:14  13             MS. JACOBS:  What I will say, Your Honor, is

10:53:16  14   that what I do see more typically for an AEO is more clear

10:53:20  15   delineation of the types of documents.  Usually you say

10:53:25  16   future product information, patented inventions,

10:53:29  17   forecasting, that usually there's an effort to sort of

10:53:32  18   delineate the types of categories.

10:53:34  19             I agree that probably the adjectives are not too

10:53:38  20   standard, but in a lot of cases there is a concern about

10:53:42  21   over-designation in the AEO category, and so I do see a lot

10:53:46  22   of protective orders written with more careful designation

10:53:51  23   of AEO materials to try to at least avoid the issue.

10:53:54  24             THE COURT:  All right.

10:53:54  25             MS. PALAPURA:  Your Honor, just to add on, one

| | |
|---|---|
| 10:53:57 | 1 |
| 10:54:00 | 2 |
| 10:54:03 | 3 |
| 10:54:07 | 4 |
| 10:54:10 | 5 |
| 10:54:12 | 6 |
| 10:54:17 | 7 |
| 10:54:20 | 8 |
| 10:54:23 | 9 |
| 10:54:26 | 10 |
| 10:54:29 | 11 |
| 10:54:31 | 12 |
| 10:54:33 | 13 |
| 10:54:36 | 14 |
| 10:54:40 | 15 |
| 10:54:43 | 16 |
| 10:54:45 | 17 |
| 10:54:50 | 18 |
| 10:54:54 | 19 |
| 10:54:54 | 20 |
| 10:54:57 | 21 |
| 10:54:59 | 22 |
| 10:55:00 | 23 |
| 10:55:01 | 24 |
| 10:55:03 | 25 |

thing, I appreciate I've seen instances where there might be
sort of categories.  Ultimately, there is a provision if to
the extent plaintiffs believe we are over-designating or not
using the provision properly where they can challenge the
designation.  I mean, I think trying to capture every
instance of what is confidential versus AEO might, you know,
just send us into a spiral.  So ultimately, it just becomes
a ripe issue.  There is a valve mechanism for them to
utilize to bring this to the Court's attention.

THE COURT:  All right.  Okay.  Anything else,
Mr. O'Shea, in the protective order?

MR. O'SHEA:  Last dispute, Your Honor.  It's
2.13.  Essentially, it's on protected material, and really
it's just a difference in the phrasing at the end, protected
material does not include any document that is in the
public domain through no wrongful action of any party.
That's defendants' proposal.  The proposal by HIP seems to
sort of make it hard in practice to understand what that
means.

THE COURT:  Right.  I agree with the defendants,
Mr. Selinger.  I don't want to be policing.

MR. SELINGER:  That's fine.

THE COURT:  So you can live with the defendants'
proposal under 2.13?

MR. SELINGER:  I can.

10:55:03   1        THE COURT:   Okay.   So we'll do that.   I'm going

10:55:05   2   to accept defendants' proposal on the definition of highly

10:55:09   3   confidential as well, although I can see where both -- all

10:55:19   4   of the parties, and the Court included, would have probably

10:55:23   5   benefited by a more specific delineation.

10:55:27   6        On the main point though, I am going to deny the

10:55:33   7   application to have the AEO cover Mr. Howard.   I think the

10:55:39   8   burden rested with Hormel.   It had to demonstrate good cause

10:55:45   9   under Rule 26(c).   They've not demonstrated to my

10:55:49   10   satisfaction that at this stage and probably through the

10:55:52   11   course of this litigation Mr. Howard would be a direct

10:55:54   12   competitor, nor have they demonstrated, given what I will

10:56:02   13   require, is that the prosecution bar extends to cover him as

10:56:04   14   well as Mr. Brown, and therefore the concern about the

10:56:11   15   inadvertent consideration of material that's disclosed here

10:56:18   16   would occur in the PTO or would infect the minds of the

10:56:22   17   participants in the PTO will not be an issue since I will

10:56:27   18   require that the prosecution bar extend it to him and to

10:56:30   19   Mr. Brown.   Okay?

10:56:31   20        MR. SELINGER:   Yes, Your Honor.

10:56:32   21        THE COURT:   All right.   Next issue.

10:56:33   22        MR. O'SHEA:   Next issue, Your Honor, deals with

10:56:36   23   metadata.

10:56:36   24        THE COURT:   And just to be clear, I'm going to

10:56:38   25   make the transcript constitute the order of the Court for

10:56:43  1    those rulings.

10:56:44  2            MR. SELINGER:  Your Honor, may I ask then the

10:56:48  3    amount of money Mr. Howard is said to have made from the

10:56:54  4    sales in business is highly confidential.

10:56:57  5            THE COURT:  So there's a mechanism.  If you are

10:57:00  6    going to order a transcript, which you are, since it's an

10:57:03  7    order -- well, first thing I'm going to do, Mr. Selinger,

10:57:07  8    I'm going to ask you to take the transcript and to revise

10:57:13  9    the proposed order, protective order to reflect the rulings

10:57:18  10   of the Court.  Even though it's their application, you are

10:57:21  11   the plaintiff, so it was a disputed issue.  I'm going to

10:57:24  12   have you do that.

10:57:25  13           MR. SELINGER:  Okay.

10:57:25  14           THE COURT:  Then, secondly, if you do order a

10:57:30  15   transcript, at that point, it's docketed, and there's a

10:57:33  16   90-day period, and there's an order that issues, and you

10:57:35  17   have, I think it's 90 days.  You've got to designate what

10:57:40  18   you want to not be disclosed, and if you don't do it in

10:57:43  19   90 days, it will be disclosed.  So you can do that.

10:57:46  20           MR. SELINGER:  Thank you.

10:57:46  21           THE COURT:  All right.  The next issue,

10:57:47  22   Mr. O'Shea.

10:57:48  23           MR. O'SHEA:  The next issue is a dispute over

10:57:50  24   metadata, Your Honor.  Metadata is very important in

10:57:53  25   litigation.  It provides information about the electronic

10:57:56  1   documents.  Metadata especially is in the context of proving

10:58:01  2   the authenticity of an electronic document.  It's important

10:58:04  3   and especially important in this case where we have disputed

10:58:08  4   inventorship issues.

10:58:10  5             Here in this case, we have metadata.  We have a

10:58:16  6   Delaware default standard on ESI that includes metadata to

10:58:21  7   be included in those productions, date created, date last

10:58:24  8   accessed, date last modified, a dispute that becomes very

10:58:30  9   relevant.

10:58:30  10            Unfortunately, we've not received that metadata.

10:58:33  11            THE COURT:  Let me just interrupt.  You say they

10:58:36  12   don't provide an excuse.  I think they do have an excuse,

10:58:39  13   which is they don't have it.

10:58:40  14            MR. O'SHEA:  I think that's where the issue kind

10:58:42  15   of needs to be focused because they say they don't have it,

10:58:45  16   but in the production, they do provide metadata as far back

10:58:50  17   as 2001.

10:58:51  18            THE COURT:  So why don't you get a 30(b)(6)

10:58:53  19   deposition for their documents person and go to town on

10:58:57  20   questioning them?

10:58:58  21            MR. O'SHEA:  And certainly, Your Honor, we

10:59:00  22   will --

10:59:01  23            THE COURT:  And if they, if it turns out there

10:59:03  24   is evidence that they destroyed metadata, all sorts of

10:59:08  25   adverse findings during the course of this litigation would

| 10:59:11 | 1 | follow. |
| 10:59:13 | 2 | MR. O'SHEA:  Absolutely. |
| 10:59:13 | 3 | THE COURT:  So why is this mature? |
| 10:59:15 | 4 | MR. O'SHEA:  I think one of the concerns we |
| 10:59:17 | 5 | have, it's part of the Delaware standard on ESI.  The |
| 10:59:20 | 6 | parties are to meet and confer about these issues on ESI up |
| 10:59:24 | 7 | front.  One of the questions we asked and the concerns we |
| 10:59:26 | 8 | have is, has the original ESI been preserved in this case, |
| 10:59:29 | 9 | and they won't answer that question. |
| 10:59:31 | 10 | THE COURT:  Okay. |
| 10:59:32 | 11 | MR. NIEDERLUECKE:  And what they did is they |
| 10:59:33 | 12 | just produced the Minnesota files. |
| 10:59:35 | 13 | THE COURT:  This is where we potentially get at |
| 10:59:37 | 14 | least into lack of averments.  So you just said that you had |
| 10:59:40 | 15 | a meet and confer. |
| 10:59:41 | 16 | MR. O'SHEA:  Correct. |
| 10:59:42 | 17 | THE COURT:  And they are refusing to just |
| 10:59:43 | 18 | confirm or deny -- |
| 10:59:46 | 19 | MR. O'SHEA:  Whether the original ESI including |
| 10:59:48 | 20 | the metadata has been preserved or still exists. |
| 10:59:51 | 21 | THE COURT:  Mr. Selinger? |
| 10:59:55 | 22 | MR. SELINGER:  The issue in this case, it's |
| 11:00:01 | 23 | about what metadata existed when this case was filed.  And |
| 11:00:09 | 24 | let me say -- |
| 11:00:10 | 25 | THE COURT:  And when was this case filed |

11:00:11  1    incidentally?

11:00:12  2                  MR. SELINGER:  I believe it was April of 2018.

11:00:13  3                  THE COURT:  Okay.

11:00:14  4                  MR. SELINGER:  What I did, and, again,

11:00:20  5    Mr. Howard may have made some money, but he's not of the

11:00:24  6    size of the defendants.  I initially proposed that we just

11:00:28  7    produce whatever is being produced in the Minnesota case.  I

11:00:31  8    thought we had a deal.  Apparently, we didn't.  But I went

11:00:35  9    ahead and produced those documents anyway.  Had a format

11:00:41  10   problem.  Hormel had required Ringtail in the other case,

11:00:44  11   doesn't use it now.

11:00:46  12                  So what I produced though was the documents,

11:00:52  13   including electronic documents that had been collected.  But

11:00:55  14   not all of the documents from 2007 existed still in

11:00:59  15   electronic form.

11:01:01  16                  And I attached to it -- so what we're

11:01:04  17   complaining about, for example, Your Honor --

11:01:06  18                  THE COURT:  I saw the example, which is you

11:01:07  19   are saying it's a hard copy of the e-mail.  You don't have

11:01:10  20   metadata.  But they are saying you had a meet and confer

11:01:13  21   and you refused to confirm or deny it.  So just help me

11:01:16  22   out.

11:01:16  23                  MR. SELINGER:  No.  What I refused -- the

11:01:18  24   default rules don't require me to talk about what I did for

11:01:23  25   due diligence on the metadata, and I can confirm, we went

| | |
|---|---|
| 11:01:27 | 1 |
| 11:01:30 | 2 |
| 11:01:34 | 3 |
| 11:01:36 | 4 |
| 11:01:39 | 5 |
| 11:01:41 | 6 |
| 11:01:43 | 7 |
| 11:01:44 | 8 |
| 11:01:46 | 9 |
| 11:01:50 | 10 |
| 11:01:53 | 11 |
| 11:01:54 | 12 |
| 11:01:55 | 13 |
| 11:01:56 | 14 |
| 11:01:58 | 15 |
| 11:01:59 | 16 |
| 11:02:00 | 17 |
| 11:02:01 | 18 |
| 11:02:07 | 19 |
| 11:02:13 | 20 |
| 11:02:16 | 21 |
| 11:02:19 | 22 |
| 11:02:23 | 23 |
| 11:02:26 | 24 |
| 11:02:29 | 25 |

1  back and checked, and the documents that we've produced in

2  hard copy were produced in hard copy because that was the

3  only way they were saved.

4           These were 2007.  We have things like that.

5  And --

6           THE COURT:  Well, you've got to find out.

7           MR. SELINGER:  Because you talked to people.

8           THE COURT:  Okay.  So then you've just

9  communicated at least to me at least with respect to those

10  documents that you've done some due diligence and you don't

11  have metadata on it.

12           MR. SELINGER:  That's correct.

13           THE COURT:  Okay.  So did you refuse to tell

14  them that on the telephone?

15           MR. SELINGER:  No.  We told them that.

16           THE COURT:  So --

17           MR. SELINGER:  They are asking a different --

18  what this fight is about is whatever happened to the

19  original collection of documents in the Minnesota case,

20  which is a larger subset than the collection of documents

21  that were actually produced.

22           I have been, Ms. Jacobs and I have been

23  prohibited from access to any of Hormel's documents in the

24  Minnesota case.  So we have gotten the --

25           THE COURT:  You're way off on me.  I mean,

| | |
|---|---|
| 11:02:31 | 1 |
| 11:02:32 | 2 |
| 11:02:32 | 3 |
| 11:02:34 | 4 |
| 11:02:36 | 5 |
| 11:02:36 | 6 |
| 11:02:38 | 7 |
| 11:02:43 | 8 |
| 11:02:45 | 9 |
| 11:02:47 | 10 |
| 11:02:49 | 11 |
| 11:02:51 | 12 |
| 11:02:54 | 13 |
| 11:02:57 | 14 |
| 11:03:00 | 15 |
| 11:03:01 | 16 |
| 11:03:02 | 17 |
| 11:03:03 | 18 |
| 11:03:04 | 19 |
| 11:03:06 | 20 |
| 11:03:07 | 21 |
| 11:03:09 | 22 |
| 11:03:09 | 23 |
| 11:03:10 | 24 |
| 11:03:11 | 25 |

look --

MR. SELINGER:  I'm sorry.

THE COURT:  It's a really simple question.
There was a meet and confer.

MR. SELINGER:  Yes.

THE COURT:  They say that they asked you to
account for metadata on what you've produced and what's out
there.  Right?  And they said you won't give them an answer.

And I've got to say, this is -- I can understand
why they think they didn't get an answer because I have not
gotten an answer.  So what is the answer?

MR. SELINGER:  The answer is with respect --
they gave me examples, and those are the examples I
attached.  And for those documents, those are only preserved
in hard copy.

THE COURT:  Okay.  That's the answer.

MR. SELINGER:  That's the answer.

THE COURT:  That's the answer on that.  What's
the answer for the rest of the documents?

MR. SELINGER:  The same answer.

THE COURT:  What took you so long to just say
that?

MR. SELINGER:  I've said it.

MS. JACOBS:  It was said, Your Honor.

MR. SELINGER:  I've said it, Your Honor.  I'm

11:03:15   1   sorry.  It has been said repeatedly, Your Honor.

11:03:20   2                   THE COURT:  Okay.  So there's no metadata for

11:03:23   3   what you've produced to date.

11:03:25   4                   Have you produced anything other than what you

11:03:27   5   produced in the Minnesota case?

11:03:28   6                   MR. SELINGER:  Yes.  By the way, there's a lot

11:03:30   7   of metadata in our production for the Minnesota case.  This

11:03:34   8   is about a portion of that reproduction that didn't have

11:03:39   9   metadata.

11:03:42   10                  And so --

11:03:43   11                  THE COURT:  And you're saying it doesn't

11:03:44   12   exist?

11:03:45   13                  MR. SELINGER:  That's correct.

11:03:45   14                  THE COURT:  Okay.  He is now on the record.  If

11:03:48   15   you do a 30(b)(6) deposition or through some other means you

11:03:50   16   find out there's metadata --

11:03:52   17                  MR. NIEDERLUECKE:  If I can just -- this is the

11:03:54   18   wrinkle, Your Honor, that you probably have not been brought

11:03:57   19   into.  This lawsuit was anticipated before he sold this

11:04:01   20   company and his assets.  Now his company sold the assets and

11:04:06   21   all of those documents.  So it talks all about his lawsuit

11:04:09   22   that's coming against Hormel.

11:04:11   23                  He gave all of the documents that he had,

11:04:14   24   original documents -- the Minnesota case is still ongoing

11:04:19   25   and he was supposed to be preserving those.  Those have all

11:04:22   1   now gone to a third party, who is barred from helping as

11:04:27   2   part of the agreement.

11:04:28   3              THE COURT:  Right.

11:04:29   4              MR. NIEDERLUECKE:  That's the issue, where are

11:04:30   5   those original documents.

11:04:31   6              THE COURT:  That issue sounds like it needs to

11:04:33   7   be brought up in the Minnesota Court.

11:04:35   8              MR. SELINGER:  Yes.

11:04:35   9              MR. NIEDERLUECKE:  Your Honor, they've been

11:04:36   10  under an obligation since 2006.  Since before they sold the

11:04:39   11  assets, they were under an obligation because they knew they

11:04:43   12  were going to sue us.

11:04:44   13             THE COURT:  Well --

11:04:45   14             MR. NIEDERLUECKE:  So therefore, if they said,

11:04:47   15  hey, third party, you take all of these documents and

11:04:50   16  promise not to get involved, you stay out, but take all of

11:04:52   17  our documents, take all of my documents so I'm only going to

11:04:56   18  produce whatever I had from my litigation file in Minnesota,

11:05:00   19  that appears to be an issue.

11:05:02   20             THE COURT:  So --

11:05:03   21             MR. NIEDERLUECKE:  And we would like to discover

11:05:04   22  that issue.

11:05:04   23             THE COURT:  Okay.  So I would say that you

11:05:08   24  should -- what is the precise application for relief here

11:05:14   25  incidentally?  It is to --

| | |
|---|---|
| 11:05:26 | 1 |
| 11:05:27 | 2 |
| 11:05:28 | 3 |
| 11:05:30 | 4 |
| 11:05:33 | 5 |
| 11:05:37 | 6 |
| 11:05:37 | 7 |
| 11:05:39 | 8 |
| 11:05:39 | 9 |
| 11:05:42 | 10 |
| 11:05:44 | 11 |
| 11:05:47 | 12 |
| 11:05:50 | 13 |
| 11:05:52 | 14 |
| 11:05:54 | 15 |
| 11:05:56 | 16 |
| 11:05:58 | 17 |
| 11:05:58 | 18 |
| 11:06:03 | 19 |
| 11:06:06 | 20 |
| 11:06:09 | 21 |
| 11:06:15 | 22 |
| 11:06:20 | 23 |
| 11:06:27 | 24 |
| 11:06:30 | 25 |

MR. NIEDERLUECKE:  Frankly --

THE COURT:  Wait.

MR. O'SHEA:  Produce the relevant metadata.

THE COURT:  Wait.  Let me just find your --
where is the proposed order?  Do we have a proposed order on
this?

MR. NIEDERLUECKE:  No, Your Honor.  I apologize.

THE COURT:  See, that's an example of a problem.

MR. NIEDERLUECKE:  Yes.

THE COURT:  That's why I came in and said what I
did.  If this dispute had been given concrete form by a
proposed order, it probably would be a lot easier for both
sides to argue and for me to decide.

It sounds like there's an application to compel
them to produce further metadata information.  Is that a
fair summary of what you've asked?

MR. O'SHEA:  Yes.

THE COURT:  Okay.  So in this instance, it's
denied.  It's premature.  And you're free to pursue
discovery.  You are free to pursue the theory that you've
articulated.  And if, in fact, Mr. Howard intentionally
disposed of assets and structured the agreement that
memorialized that sale of assets and had specific
provisions, which were clearly designed to prevent important
information from being discovered in either the Minnesota or

| 11:06:35 | 1 | this case, I think there would be some constructive |
| 11:06:39 | 2 | spoliation arguments you'd have, all sorts of things.  So |
| 11:06:43 | 3 | that's where we are.  Okay? |
| 11:06:44 | 4 | MR. NIEDERLUECKE:  Thank you. |
| 11:06:45 | 5 | MR. SELINGER:  Your Honor, may I just say, |
| 11:06:46 | 6 | there's absolutely no truth to what was said. |
| 11:06:48 | 7 | THE COURT:  I didn't say there was. |
| 11:06:49 | 8 | MR. SELINGER:  Yes. |
| 11:06:50 | 9 | THE COURT:  I said if.  I said, I think the |
| 11:06:51 | 10 | record is really clear. |
| 11:06:53 | 11 | MR. SELINGER:  Okay. |
| 11:06:53 | 12 | THE COURT:  I said if the theory they've |
| 11:06:55 | 13 | articulated turned out to be true, you would have some |
| 11:06:58 | 14 | serious spoliation.  All sorts of issues would follow from |
| 11:07:02 | 15 | that.  But I'm not accepting that as true. |
| 11:07:05 | 16 | MR. SELINGER:  Okay. |
| 11:07:05 | 17 | THE COURT:  This is lawyer argument and I don't |
| 11:07:06 | 18 | want to get involved in whether it's true or not hopefully |
| 11:07:10 | 19 | at any stage. |
| 11:07:11 | 20 | Next. |
| 11:07:12 | 21 | MR. O'SHEA:  The next issue deals with the |
| 11:07:15 | 22 | improper document dump.  They've produced every single |
| 11:07:17 | 23 | document in the Minnesota case. |
| 11:07:19 | 24 | The Minnesota case is different from this case. |
| 11:07:21 | 25 | The Minnesota case was not a patent infringement case.  The |

11:07:25   1    causes of action in that case are not the causes of action

11:07:27   2    that have been asserted in this case, and we looked into it

11:07:30   3    as best we could, some data analytics on our side.

11:07:36   4             They produced a total of over 8900 documents in

11:07:39   5    that case.  Over 5600 documents, Your Honor, were produced

11:07:41   6    after 2010, when the parties were no longer working together

11:07:45   7    and the contract was over.

11:07:46   8             We did a further analysis into those documents.

11:07:49   9    It looks like they've produced eight years worth of company

11:07:51   10   phone records, quotes for equipment like plane drillers that

11:07:58   11   have nothing to do with a patent infringement case.  The

11:08:02   12   problem at its core, Your Honor, is those documents are

11:08:06   13   spread out within potentially relevant documents.

11:08:08   14             THE COURT:  Okay.  I hear you and I definitely

11:08:10   15   don't like document dumps.

11:08:11   16             In the scheme of things, is it true that we're

11:08:14   17   talking less than 60,000 pages?

11:08:19   18             MR. O'SHEA:  Yes.  That's the total they

11:08:21   19   produced.

11:08:21   20             THE COURT:  Okay.

11:08:25   21             MR. O'SHEA:  And I think under the rules, Your

11:08:27   22   Honor, especially Rule 26(g), it requires them to make a

11:08:31   23   reasonable inquiry to say, hey, is there relevant stuff in

11:08:35   24   here?  Okay.  Let's produce it.  If there's not, let's not

11:08:37   25   produce it.  That hasn't been done here.  It's clear on the

11:08:40  1    record they've just said I'm not going to look at it for

11:08:43  2    it's more economical for them to just simply throw it out to

11:08:46  3    us and say, you go figure out what you think is relevant

11:08:50  4    from our perspective, and if we think that is improper, it

11:08:54  5    is right out of the gate in the case, and we just think,

11:08:54  6    let's get discovery under control so that we're not having

11:08:56  7    our client incur costs to review that their client should

11:09:02  8    have done.

11:09:02  9              THE COURT:  All right.

11:09:02  10             MR. SELINGER:  May I respond, Your Honor?

11:09:04  11             THE COURT:  Yes.  Just one second.

11:09:05  12             MR. SELINGER:  Sorry.

11:09:10  13             THE COURT:  Two questions.  Do you agree that

11:09:34  14   the ownership issues that were litigated in the Minnesota

11:09:39  15   case are relevant to this case?

11:09:41  16             MR. O'SHEA:  There is some factual overlap on a

11:09:45  17   time period that is defined.  I would say --

11:09:50  18             THE COURT:  All right.  That's enough.

11:09:51  19             MR. O'SHEA:  Yes.

11:09:52  20             THE COURT:  Second, were you the lawyer or the

11:09:54  21   lawyers in the Minnesota case?

11:09:56  22             MR. O'SHEA:  Yes, Your Honor.  The team in this

11:09:58  23   case is slightly different.  There has been turnover on the

11:10:00  24   associate and paralegal level.

11:10:02  25             THE COURT:  All right.  What would you like to

| | |
|---|---|
| 11:10:04 | 1 |

say?

11:10:05    2              MR. SELINGER:  Three things.

11:10:06    3              First, what we produced from the prior case is

11:10:12    4   not every document that was produced in that case.

11:10:14    5              Second --

11:10:15    6              THE COURT:  Well, what was the difference?

11:10:18    7              MR. SELINGER:  There are some -- there are some

11:10:21    8   modest differences, Your Honor.

11:10:22    9              THE COURT:  Well, how modest?  Are we talking a

11:10:24   10   hundred pages?  Are we looking about 50,000 more documents?

11:10:28   11              MR. SELINGER:  No.

11:10:28   12              THE COURT:  What was the total number of

11:10:29   13   documents produced in the Minnesota case?

11:10:31   14              MR. SELINGER:  The total number was 58,000.

11:10:33   15              THE COURT:  Come on.  Okay.

11:10:34   16              MR. SELINGER:  It's a subset of that, Judge.

11:10:36   17   No.

11:10:37   18              THE COURT:  All right.

11:10:37   19              MR. SELINGER:  And as Your Honor has gleaned --

11:10:41   20              THE COURT:  That was not a great argument to

11:10:42   21   make, but go ahead.

11:10:43   22              MR. SELINGER:  Hormel has already reviewed those

11:10:47   23   documents.

11:10:47   24              THE COURT:  Right.

11:10:48   25              MR. SELINGER:  And this is actually precursor of

| | |
|---|---|
| 11:10:53 | 1 |
| 11:10:56 | 2 |
| 11:10:59 | 3 |
| 11:11:02 | 4 |
| 11:11:07 | 5 |
| 11:11:11 | 6 |
| 11:11:17 | 7 |
| 11:11:22 | 8 |
| 11:11:26 | 9 |
| 11:11:31 | 10 |
| 11:11:37 | 11 |
| 11:11:38 | 12 |
| 11:11:42 | 13 |
| 11:11:46 | 14 |
| 11:11:48 | 15 |
| 11:12:01 | 16 |
| 11:12:10 | 17 |
| 11:12:13 | 18 |
| 11:12:18 | 19 |
| 11:12:24 | 20 |
| 11:12:27 | 21 |
| 11:12:33 | 22 |
| 11:12:38 | 23 |
| 11:12:39 | 24 |
| 11:12:41 | 25 |

1    a relevance fight that we're going to have.

2            Hormel says, well, nothing after 2010 is

3    relevant, but we say that's wrong.  We say this is going to

4    be a -- it's highly relevant to willful infringement under

5    the Supreme Court's totality of the circumstance, and it's

6    also highly relevant for things, objective criteria under

7    obvious and nonobvious.  Long-felt, but unsolved need,

8    failure of others, copying.  The District Court in the

9    Minnesota case found that Hormel had its equipment

10   manufacture copy our invention, and those all happened after

11   2010.

12           As far as phone records, I didn't want to --

13   they are relevant.  They show calls between Hormel and --

14           THE COURT:  All right.  Stop right there.

15   Thanks.

16           I mean, Mr. O'Shea, I hear you.  What do you

17   really want to do at this point?  Let's be honest.  You're

18   not from a small firm.  You guys are fairly capable of

19   handling things.  I don't think it was Mr. Selinger's best

20   day by doing this way or saying that it's only 2,000

21   documents less than or pages less.  And I can tell you, if

22   there are other document dumps, I will be very receptive to

23   your claim.

24           What do you want?  For going forward in

25   litigation, you've established we need to monitor document

11:12:45  1    dumps.

11:12:45  2              MR. O'SHEA:  Right.  Two things.

11:12:46  3              First, I think the point about Mr. Selinger made

11:12:50  4    the comment, well, they are saying there's documents from

11:12:52  5    2010 on.  Irrelevant, and they disagree.  So it's their

11:12:59  6    documents.  They know their documents.  Those are the

11:13:01  7    documents, and tell us what's relevant and produce only the

11:13:03  8    relevant ones.  Instead they're saying, you go figure it out

11:13:06  9    and have to guess what phone record from some --

11:13:09  10             THE COURT:  I think he is going to make an

11:13:11  11   argument that they could be tangentially relevant.

11:13:14  12             MR. O'SHEA:  Eight years worth of phone records.

11:13:16  13             THE COURT:  Do you think any phone records are

11:13:17  14   relevant?

11:13:20  15             MR. NIEDERLUECKE:  No.

11:13:21  16             THE COURT:  The only reason I'm entertaining

11:13:23  17   this is because you had other disputes that seemed

11:13:25  18   worthwhile to the Court's attention.  No more than

11:13:27  19   30 seconds.

11:13:27  20             Do you really need anything at this point other

11:13:30  21   than -- I mean, you've won to a certain extent in persuading

11:13:34  22   me that I probably ought to monitor document dumps going

11:13:38  23   forward.  As a practical matter, is there anything else you

11:13:40  24   really need?

11:13:41  25             MR. O'SHEA:  The only other practical matter, we

| | |
|---|---|
| 11:13:43 | 1 |

have an obligation to look out for costs to our client much
there's hosting fees.  The more documents you put on.

THE COURT:  Is it really that much of a
difference?

MR. O'SHEA:  It is when you start adding to it,
and right now, to start out of the gate when we know that
they just didn't even take a look at them, you guys go look
at 56,000 pages.  To me, that just seems right out of the
gate.  They are throwing their obligations on us and the
costs.  That's unfair.

MR. NIEDERLUECKE:  It's not just reviewing the
documents, Your Honor.  It's about every witness we prepare.
We have phone records that we don't understand why they are
in the case.

They say that there's something in those phone
records, but they have not said to you, we've reviewed every
phone record and decided what's relevant or not for the
points we know.  So we've got to prepare every witness to be
ready for every document that we don't think is relevant,
but for some reason, they've produced it.  And that's really
the issue.  How do we do that?

THE COURT:  Mr. Selinger, do you believe that
the issues in the Minnesota case overlap in full with the
issues in this case?

MR. SELINGER:  I believe the factual

11:14:42  1    underpinnings --

11:14:43  2              THE COURT:  That was a simple question.  Do you

11:14:35  3    believe that the issues in the Minnesota case overlap in

11:14:39  4    full with the issues in this case?

11:14:48  5              MR. SELINGER:  The ultimate contract issues do

11:14:50  6    not overlap as legal issues.

11:14:52  7              THE COURT:  All right.  So I'm going to require

11:14:54  8    you, you can't just do, you can't just produce wholesale the

11:14:58  9    Minnesota documents.  You actually have to go through the

11:15:01  10   discovery requests in this case and you have to determine

11:15:02  11   and produce only what is responsive to the documents.

11:15:06  12             MR. SELINGER:  May I, Your Honor, because there

11:15:08  13   are two parts to this and they've been talking about what's

11:15:10  14   relevant.

11:15:11  15             THE COURT:  I'm not going to hear any more

11:15:12  16   argument on this.

11:15:13  17             MR. SELINGER:  But --

11:15:14  18             THE COURT:  We have our case.  They had a

11:15:16  19   Minnesota case.  There were RFPs propounded in this case.

11:15:20  20   You have to abide by your obligations and you have to, since

11:15:23  21   the cases are not exactly on all point, you have to look at

11:15:26  22   what the RFPs say here and decide whether they're responsive

11:15:29  23   or not, what you produce.

11:15:30  24             MR. SELINGER:  Your Honor, I'm also obligated

11:15:32  25   to produce any documents that we're going to use in our

| | |
|---|---|
| 11:15:34 | 1 |

case and that's what we did.  I mean, they -- the

documents --

THE COURT:  You can't tell me, you've already,

as you've described it, you can't -- I'm not going to hear

any more argument.  I am going to rule that you must respond

to their RFPs the way a lawyer would respond to their RFPs

in this case and that you cannot escape your obligations

under the rules by just wholesale producing everything or

90 percent of everything that's produced in the Minnesota

case and say that that comports with the rules.  So that's

my ruling.

All right.  Next.  Now we turn to HIP's issues.

MR. SELINGER:  Yes, Your Honor.

THE COURT:  Okay.  The first issue.

MR. SELINGER:  Hormel has not complied with

its -- did not comply with its obligations to produce core

technical documents.  Initially, Hormel produced a total of

33 documents.

The only documents they've produced showing

process data, it's a document -- it's three lines of

handwritten data on one day for one version of the baking

product, and that's not a core technical document.  It's the

only one they produced.

THE COURT:  Okay.

MR. SELINGER:  So we complained, and they then,

| 11:17:32 | 1 | |
| 11:17:41 | 2 | |
| 11:17:47 | 3 | |
| 11:17:48 | 4 | |
| 11:17:51 | 5 | |
| 11:17:57 | 6 | |
| 11:18:02 | 7 | |
| 11:18:08 | 8 | |
| 11:18:13 | 9 | |
| 11:18:18 | 10 | |

11:18:18   11          THE COURT:  Right.  So I was very sympathetic to

11:18:21   12   you.  I've read your letter.

11:18:22   13          MR. SELINGER:  Okay.

11:18:22   14          THE COURT:  And so I was pretty sympathetic to

11:18:25   15   your cause and frankly skeptical that these would be the

11:18:28   16   only documents they would have.

11:18:29   17          Do you have anything else you want to add,

11:18:31   18   really?

11:18:31   19          MR. SELINGER:  No.

11:18:32   20          THE COURT:  All right.  So what is the response?

11:18:33   21          MR. NIEDERLUECKE:  First of all, he didn't show

11:18:35   22   you the pages.  Those 33 documents are over a thousand

11:18:40   23   pages, and I believe in our response, we explained some of

11:18:42   24   that.

11:18:42   25          THE COURT:  All right.

| | | |
|---|---|---|
| 11:18:43 | 1 | MR. NIEDERLUECKE:  And, in fact, what we gave |
| 11:18:44 | 2 | them, and we have to remember, what is it that they need to |
| 11:18:47 | 3 | have, which is the information they need to produce what |
| 11:18:50 | 4 | they've already produced, which is their infringement |
| 11:18:53 | 5 | contentions.  Correct. |
| 11:18:55 | 6 | We gave them -- |
| 11:18:56 | 7 | THE COURT:  I wasn't persuaded by that.  I mean, |
| 11:18:58 | 8 | they have to do what they have to do with what you give |
| 11:19:01 | 9 | them. |
| 11:19:01 | 10 | MR. NIEDERLUECKE:  Right. |
| 11:19:02 | 11 | THE COURT:  I mean, we can go through -- |
| 11:19:04 | 12 | incidentally, I kind of feel like I'm repeating myself the |
| 11:19:06 | 13 | way I talked to Mr. O'Shea.  You're going to have an |
| 11:19:08 | 14 | opportunity to depose people and if you find out that there |
| 11:19:10 | 15 | are documents that weren't produced to you that are |
| 11:19:12 | 16 | relevant, I'm going to be very receptive to adverse |
| 11:19:15 | 17 | inferences that should be drawn.  But I've said this, I |
| 11:19:20 | 18 | think Ms. Jacobs heard it yesterday before, I'm a big |
| 11:19:26 | 19 | believer that you have got to follow the rules, and I am not |
| 11:19:30 | 20 | going to hesitate to impose adverse inferences, to preclude |
| 11:19:35 | 21 | evidence from being introduced by parties that don't play by |
| 11:19:40 | 22 | the rules. |
| 11:19:40 | 23 | If it gives you any comfort, and maybe it's |
| 11:19:42 | 24 | sufficient to have you withdraw this application, I can tell |
| 11:19:47 | 25 | you in confidence, if there were documents that were |

11:19:49   1   withheld in response to this that ends up being produced or

11:19:54   2   types of those documents that are brought up to defend a

11:19:57   3   claim of infringement and that would suggest that there were

11:20:02   4   other documents that weren't so good, you will be able to be

11:20:06   5   heard for an application to preclude the presentation of

11:20:11   6   testimony and for adverse inferences to be drawn.

11:20:14   7          Does that assuage you at this point?

11:20:17   8          MR. SELINGER:  My concern is this, Your Honor,

11:20:19   9   and that is helpful, but it's my burden to prove

11:20:22   10  infringement.  And if they don't produce anything else, then

11:20:29   11  I'm stuck with that record.  I've got to depose their

11:20:32   12  witnesses with that record.

11:20:34   13         Now, if what Your Honor is suggesting is that I

11:20:37   14  can do 30(b)(6) on the type of documents that they've

11:20:42   15  maintained --

11:20:44   16         THE COURT:  Yes.

11:20:44   17         MR. SELINGER:  We've got a checklist.

11:20:45   18         THE COURT:  Of course, you can do that.  I don't

11:20:47   19  know why people don't do that as a matter of course.  That

11:20:50   20  was my experience.

11:20:51   21         MS. JACOBS:  Your Honor, the difference, and we

11:20:53   22  did supply a form of order with the documents.  This is not

11:20:56   23  a case where they say we've given you everything.  They

11:20:59   24  concede they have not given us everything, and these are the

11:21:01   25  things that we've articulated the basis in the sense of

11:21:05    1    correspondence on here's why.

11:21:07    2               In the order, we've related the particular

11:21:09    3    documents.  We're asking for the particular claim

11:21:12    4    limitations.  It really goes beyond, usually, you don't have

11:21:16    5    to make a proffer --

11:21:17    6               THE COURT:  Right.

11:21:18    7               MS. JACOBS:  -- to get core technical documents.

11:21:21    8               THE COURT:  I did think this order was very

11:21:23    9    helpful in the sense it was very, very specific.  Yes.

11:21:25   10               MS. JACOBS:  So the issue isn't do these exist.

11:21:28   11    We know maybe there are a few that don't, but we know.  I

11:21:31   12    mean, I think there was an example in the letter of we know

11:21:35   13    with specificity that one group of documents exist because

11:21:37   14    we got screen shots showing a menu drop-down, where we don't

11:21:44   15    have the menu.

11:21:45   16               So it's not a situation where they are saying,

11:21:47   17    look, we gave you everything.  They know they have not given

11:21:51   18    us everything, and what they are basically saying is, but

11:21:54   19    you should be satisfied with this.

11:21:56   20               THE COURT:  Mr. Niederluecke --

11:21:58   21               MS. PALAPURA:  Your Honor --

11:21:59   22               THE COURT:  Sorry.

11:22:01   23               MS. PALAPURA:  Obviously, being in Delaware,

11:22:03   24    we've gone through the situation in many other cases before.

11:22:06   25    The core technical documents is not meant to be a full

| | |
|---|---|
| 11:22:09 | 1 |
| 11:22:11 | 2 |
| 11:22:14 | 3 |
| 11:22:17 | 4 |
| 11:22:22 | 5 |
| 11:22:23 | 6 |
| 11:22:25 | 7 |
| 11:22:28 | 8 |
| 11:22:33 | 9 |
| 11:22:37 | 10 |
| 11:22:40 | 11 |
| 11:22:41 | 12 |
| 11:22:43 | 13 |
| 11:22:45 | 14 |
| 11:22:47 | 15 |
| 11:22:48 | 16 |
| 11:22:49 | 17 |
| 11:22:52 | 18 |
| 11:22:54 | 19 |
| 11:22:54 | 20 |
| 11:22:56 | 21 |
| 11:22:59 | 22 |
| 11:23:02 | 23 |
| 11:23:04 | 24 |
| 11:23:07 | 25 |

production of all of your technical documents.  The
substantial completion date is I believe in January of
2019.  So these are meant to be the documents that will
put plaintiff on notice of how our system operates, the
accused product operates.

                With that, they're able to put initial
infringement contentions, and as Your Honor is aware, this
is a cycle that we go through, and once they get additional
information, once we've had a chance to respond in full to
RFPs, they're going to get additional information.

                So I think --

                THE COURT:  Will they get it before they have an
opportunity to amend their infringement contentions?

                MS. PALAPURA:  Yes.  Typically, what we do in
our cases --

                THE COURT:  Part of the problem is, I was going
to talk to you about that.  That's why I had you come in
here, too, is to talk about scheduling.

                MS. PALAPURA:  Right.

                THE COURT:  Is it built in?  And I think we're
going to get rid of a lot of the dates.

                MS. PALAPURA:  We originally had followed Judge
Sleet's form order, so I don't think he had a particular
date for final infringement contentions, so that's something
we might need to do as well.

11:23:12    1          MR. NIEDERLUECKE:  Yes.

11:23:12    2          MS. PALAPURA:  I'm trying to make the point,

11:23:14    3    this initial production of core technical documents is not

11:23:16    4    meant to be a fulsome check every document that involves our

11:23:20    5    product, our procedures, everything they need.  This is to

11:23:23    6    be able to provide them with the information to help put

11:23:26    7    that initial infringement contention together.

11:23:28    8          THE COURT:  So I hear you, but I will say this.

11:23:31    9    Where I'm sympathetic, when you are talking temperatures,

11:23:34   10    and that seems that core -- and I did notice that you had

11:23:36   11    some temperatures, but I mean, it looks like --

11:23:39   12          MR. NIEDERLUECKE:  This is a full run.  This

11:23:41   13    is -- so what we did, we produced six different examples of

11:23:46   14    shifts, one full eight-hour shift where we produced

11:23:51   15    temperatures, steam flows, cook times, oxygen levels.  So we

11:23:51   16    produced it.

11:23:56   17          This is the data that comes out of the, out of

11:23:59   18    the oven, and this is what we have.  So what we said is,

11:24:02   19    here's the data that we get from real time runs, because

11:24:06   20    that was one of their complaints.

11:24:08   21          THE COURT:  Right.

11:24:09   22          MR. NIEDERLUECKE:  We want to see real time.  We

11:24:11   23    gave them those real time runs.  I don't understand, and

11:24:13   24    they certainly -- you know, there's nothing that's not

11:24:16   25    within the data we gave them that would prohibit or limit

| | |
|---|---|
| 11:24:19 | 1 |
| 11:24:21 | 2 |
| 11:24:23 | 3 |
| 11:24:26 | 4 |
| 11:24:29 | 5 |
| 11:24:31 | 6 |
| 11:24:34 | 7 |
| 11:24:37 | 8 |
| 11:24:40 | 9 |
| 11:24:43 | 10 |
| 11:24:45 | 11 |
| 11:24:48 | 12 |
| 11:24:52 | 13 |
| 11:24:52 | 14 |
| 11:24:53 | 15 |
| 11:24:54 | 16 |
| 11:24:57 | 17 |
| 11:25:00 | 18 |
| 11:25:03 | 19 |
| 11:25:04 | 20 |
| 11:25:06 | 21 |
| 11:25:09 | 22 |
| 11:25:12 | 23 |
| 11:25:15 | 24 |
| 11:25:16 | 25 |

1    them from being able -- there's only three claims in this

2    patent.   There's only one patent in the case.   It's not

3    about whether they are going to add new claims.   It really

4    is about, you know, we're going to produce stuff.

5             One of the issues we had, frankly, Your Honor,

6    is, we couldn't agree on an ESI order and we were

7    negotiating it, and just a week-and-a-half ago they said,

8    we're done.   We're taking the default.

9             So we have not been able to process our data

10   because we didn't know how to process it.   So we just

11   started last week going through all the data.   We collected

12   all the data and we were waiting to get an ESI order in

13   place to begin.

14             THE COURT:   Okay.

15             MR. NIEDERLUECKE:   I notice from the categories

16   they identify, there are some of those categories in there.

17   Absolutely.   We're going to be producing documents if

18   they're responsive on that.   There are other ones that we,

19   may have issue with the relevance.

20             But it's premature now.   Let's produce our

21   documents, and if they have stuff they believe is there and

22   we didn't produce it, we can have those discussions, but it

23   just seems premature at this point.

24             MS. PALAPURA:   I mean, my fear with the proposed

25   order is very much to that, is prejudging that, A, we have

| | |
|---|---|
| 11:25:20 | 1 |
| 11:25:21 | 2 |
| 11:25:24 | 3 |
| 11:25:28 | 4 |
| 11:25:32 | 5 |
| 11:25:35 | 6 |
| 11:25:39 | 7 |
| 11:25:41 | 8 |
| 11:25:44 | 9 |
| 11:25:49 | 10 |
| 11:25:49 | 11 |
| 11:25:52 | 12 |
| 11:25:54 | 13 |
| 11:25:57 | 14 |
| 11:26:00 | 15 |
| 11:26:02 | 16 |
| 11:26:04 | 17 |
| 11:26:07 | 18 |
| 11:26:10 | 19 |
| 11:26:14 | 20 |
| 11:26:17 | 21 |
| 11:26:20 | 22 |
| 11:26:24 | 23 |
| 11:26:25 | 24 |
| 11:26:26 | 25 |

1   all of these documents that they've listed.

2              B, that we somehow concede that all of these

3   documents are relevant to the issues in this case.  So I

4   think it's sort of just, the line between what is, you know,

5   the core technical, which is upfront production versus what

6   are we in the normal course of this discovery, you know,

7   where we still have until January for even document

8   production and a few months after that for, you know,

9   completion of fact discovery, sort of this upfront push for

10  documents.

11             And we're not saying that they can't, you know,

12  once they get additional information, supplement their

13  infringement contentions.  And frankly, we have not had a

14  chance to fully review what we received yesterday.

15             So to the extent we look at them and say, look,

16  these contentions are deficient, that's sort of the

17  discussion we then have and say, and if there's information

18  they are saying, we didn't have this, that's why we couldn't

19  say the following, that's something, again, I think between

20  two competent sets of law firms here, we should be able to

21  work that out.  But it's just this idea that somehow we did

22  not abide by the schedule for core technical documents,

23  which we believe we did.

24             THE COURT:  Okay.

25             MS. JACOBS:  Your Honor, if I could just say.

| | |
|---|---|
| 11:26:28 | 1 |
| 11:26:29 | 2 |
| 11:26:31 | 3 |
| 11:26:33 | 4 |
| 11:26:33 | 5 |
| 11:26:35 | 6 |
| 11:26:41 | 7 |
| 11:26:44 | 8 |
| 11:26:46 | 9 |
| 11:26:50 | 10 |
| 11:26:54 | 11 |
| 11:26:57 | 12 |
| 11:27:01 | 13 |
| 11:27:02 | 14 |
| 11:27:04 | 15 |
| 11:27:07 | 16 |
| 11:27:11 | 17 |
| 11:27:14 | 18 |
| 11:27:17 | 19 |
| 11:27:17 | 20 |
| 11:27:19 | 21 |
| 11:27:20 | 22 |
| 11:27:23 | 23 |
| 11:27:24 | 24 |
| 11:27:25 | 25 |

THE COURT:  Yes.

MS. JACOBS:  This is not just about core technical documents, and we were clear about that in our letter.

What we have here are requests that were served on July 9th, asking for this information, request 13, documents sufficient to show or describe the accused process.  Request 15, documents sufficient to show the specification, capacity, sizes, et cetera.

This is not just, you know, so what I'm hearing now is that you can wait until January, and this isn't just about ESI.  This is --

THE COURT:  It's not going to work with the hearing, because right now I was inclined to keep your Markman date.  Okay.  So I don't think we can wait until January to get those types of documents.

Now, that said, I wanted to -- is there anything else you want to bring up as far as an application?  No.  Right?

MS. JACOBS:  Well, we have our form of order.

THE COURT:  No, no.  Right.  But there are no other issues.  Right?  That's the only issue left?

MS. JACOBS:  That's the only issue.

THE COURT:  It's whether to grant your order or modify it in some form.

11:27:27    1              MS. JACOBS:  Right.

11:27:27    2              MR. SELINGER:  Yes.

11:27:28    3              THE COURT:  And I've heard both sides.  These

11:27:30    4    are the disputes people don't like to get engaged in as

11:27:33    5    judges.

11:27:36    6              So before I rule, let's talk about maybe the

11:27:40    7    scheduling order.  Okay?

11:27:42    8              So for starters, we're going to need you to

11:27:47    9    submit a revised scheduling order that will incorporate my

11:27:53   10    procedures and policies and which will get rid of some,

11:27:58   11    probably some deadlines.  Well, you can keep the deadlines

11:28:05   12    that are in here that are not in my order.

11:28:13   13              And, Ms. Palapura, I think you were here when it

11:28:15   14    was pointed out to me that there's an error in my order.

11:28:19   15              MS. PALAPURA:  Yes.

11:28:19   16              THE COURT:  So I fixed that.  The order has

11:28:21   17    been revised as of October 9th.  Fixed the word limitations.

11:28:25   18    I also fixed, or rather added a paragraph about compendiums.

11:28:29   19    Take a look about that if you want.  Basically, it's an

11:28:32   20    invitation if you want to submit with your courtesy copies

11:28:34   21    the key cases.  Not the standard cases, but if you have

11:28:39   22    something that you are mentioning a case a lot, you are

11:28:42   23    really relying on it, you would provide that case.

11:28:46   24              All right.  Then I would like to keep your

11:28:50   25    Markman date.  Actually, I don't like to keep it, but I will

| | |
|---|---|
| 11:28:53 | 1 |
| 11:29:00 | 2 |
| 11:29:03 | 3 |
| 11:29:07 | 4 |
| 11:29:11 | 5 |
| 11:29:16 | 6 |
| 11:29:20 | 7 |
| 11:29:25 | 8 |
| 11:29:27 | 9 |
| 11:29:31 | 10 |
| 11:29:33 | 11 |
| 11:29:37 | 12 |
| 11:29:43 | 13 |
| 11:29:46 | 14 |
| 11:29:48 | 15 |
| 11:29:50 | 16 |
| 11:29:52 | 17 |
| 11:29:55 | 18 |
| 11:29:56 | 19 |
| 11:29:57 | 20 |
| 11:29:58 | 21 |
| 11:30:00 | 22 |
| 11:30:02 | 23 |
| 11:30:04 | 24 |
| 11:30:10 | 25 |

keep it, just to keep the case moving.  It will be my fourth
Markman hearing that month, and I think there are two others
to be scheduled, so I hope you can narrow the terms that
will be in dispute.

Then, Ms. Palapura, I hear you about the
distinction between core and other documents.  I also hear
Ms. Jacobs about they've got regular RFPs that have been
propounded since July.  I guess in a patent case, that
doesn't sound like it's that out of control probably, but I
think you guys should be able to respond.

So let me ask you this:  If I were to impose the
order that has been proposed but change the date, what is a
realistic date and yet a date that acknowledges that we need
to move the case forward.

So instead of giving you five business days, how
many business days would it take for you to respond to this
order?

MR. NIEDERLUECKE:  And go through our document
production?

THE COURT:  Yes.

MR. NIEDERLUECKE:  And respond?  I would imagine
by the end of November we'll have our --

THE COURT:  End of November.

MR. NIEDERLUECKE:  How many -- I mean, we're
going through -- we are on it right now, Your Honor.

| | | |
|---|---|---|
| 11:30:13 | 1 | The other thing I would add if you did sign that |
| 11:30:15 | 2 | order, part of our answer would be some of those documents |
| 11:30:19 | 3 | in there do not exist and we've told them. |
| 11:30:21 | 4 | THE COURT: It's only to the extent they exist I |
| 11:30:23 | 5 | would be entering such an order, so I'm not worried about |
| 11:30:26 | 6 | that. |
| 11:30:26 | 7 | MR. NIEDERLUECKE: Yes. |
| 11:30:29 | 8 | MR. O'SHEA: I think, Your Honor, just so the |
| 11:30:31 | 9 | record is clear, again, we just started processing this data |
| 11:30:34 | 10 | last week, which entails culling down a lot of data so that |
| 11:30:41 | 11 | we're in a position to review manageable data. |
| 11:30:45 | 12 | MR. NIEDERLUECKE: Yes. |
| 11:30:46 | 13 | MR. O'SHEA: And that's a process. That takes |
| 11:30:47 | 14 | time. It just doesn't happen overnight. |
| 11:30:49 | 15 | The other things that I will add is on their |
| 11:30:51 | 16 | side, they have one custodian, David Howard. |
| 11:30:55 | 17 | THE COURT: So the sheets you've pointed out, |
| 11:30:59 | 18 | the temperatures -- |
| 11:31:00 | 19 | MR. NIEDERLUECKE: Yes, Your Honor. |
| 11:31:01 | 20 | THE COURT: You are basically saying that's a |
| 11:31:03 | 21 | sample. Right? You've got a lot of other documents just |
| 11:31:05 | 22 | like that? |
| 11:31:05 | 23 | MR. NIEDERLUECKE: No. They don't exist. |
| 11:31:07 | 24 | THE COURT: Okay. You've produced all of those |
| 11:31:08 | 25 | documents that exist? |

| | |
|---|---|
| 11:31:09 | 1 |
| 11:31:11 | 2 |
| 11:31:12 | 3 |
| 11:31:13 | 4 |
| 11:31:17 | 5 |
| 11:31:18 | 6 |
| 11:31:20 | 7 |
| 11:31:27 | 8 |
| 11:31:29 | 9 |
| 11:31:29 | 10 |
| 11:31:31 | 11 |
| 11:31:36 | 12 |
| 11:31:39 | 13 |
| 11:31:43 | 14 |
| 11:31:45 | 15 |
| 11:31:47 | 16 |
| 11:31:51 | 17 |
| 11:31:55 | 18 |
| 11:31:57 | 19 |
| 11:31:58 | 20 |
| 11:32:00 | 21 |
| 11:32:02 | 22 |
| 11:32:05 | 23 |
| 11:32:10 | 24 |
| 11:32:12 | 25 |

1    MR. NIEDERLUECKE:  No.  What I mean is --

2    THE COURT:  You created them?

3    MR. NIEDERLUECKE:  They're not a document we

4  can -- we normally have.  They're data that's there.

5  So --

6    THE COURT:  I've got to say, that's why I opened

7  up by saying I was very sympathetic to plaintiff's letter.

8  You don't keep that type of information during the regular

9  course of business?

10    MR. NIEDERLUECKE:  It's not in documents.  It's

11  in data.  And what we've told them and what we've done so

12  far for the core documents to say, here are samples across

13  time of what the conditions of the oven are.

14    THE COURT:  But it's in data form.

15    MR. NIEDERLUECKE:  I don't know how they had to

16  do it, but they had to go out and extract this.  So I don't

17  know how -- I don't understand how it's kept.  So they have

18  to go, and for each --

19    MR. O'SHEA:  It's not --

20    MR. NIEDERLUECKE:  For each portion, they have

21  to extract.  I don't understand the basis for it.  But the

22  question isn't, I don't think he wants the question to be,

23  and every day we're going to go to trial to decide if that

24  day's run falls within the conditions of this patent for a

25  method.  These are examples of what we're doing.

11:32:17   1   Presumably, a sample of those show the condition in which

11:32:21   2   this process is used.  And what you have to get back to,

11:32:27   3   Your Honor, there really are only, you know, a few key

11:32:29   4   elements here.  What's the temperature?  What is the oxygen

11:32:33   5   level?  What is the fan speed and the speed of the stuff

11:32:37   6   coming through?  There's not questions about, what size is

11:32:41   7   the oven?

11:32:42   8          THE COURT:  I agree, but that's why you think in

11:32:44   9   fairness to him that, you know, you would want to have the

11:32:46   10  full data set of what your runs have been with the

11:32:49   11  temperature and the wind or the fan and all of that.

11:32:52   12          MR. SELINGER:  Your Honor, if I may just

11:32:54   13  respond, the method claims are a little more subtle it

11:33:00   14  sounds.  It's not, is there a temperature anywhere.

11:33:04   15          So the first limitation is creating an

11:33:09   16  essentially air-free environment by introducing super heated

11:33:15   17  steam.

11:33:18   18          So there are a number of -- and it's a

11:33:20   19  limitation on its face that's pretty clear, but how you

11:33:23   20  measure that, there are a number of different ways to

11:33:26   21  determine that.  They say, here is some data, but we're

11:33:30   22  talking about an oven that's 27 feet long, 16 feet wide, and

11:33:35   23  15 feet high.  So it's not like your oven at home.

11:33:39   24          And so --

11:33:41   25          THE COURT:  Well, I have a pretty big oven.

|          |    |
|----------|----|
| 11:33:42 | 1  |
| 11:33:45 | 2  |
| 11:33:50 | 3  |
| 11:33:53 | 4  |
| 11:33:56 | 5  |
| 11:34:00 | 6  |
| 11:34:04 | 7  |
| 11:34:05 | 8  |
| 11:34:12 | 9  |
| 11:34:18 | 10 |
| 11:34:19 | 11 |
| 11:34:25 | 12 |
| 11:34:28 | 13 |
| 11:34:35 | 14 |
| 11:34:39 | 15 |
| 11:34:44 | 16 |
| 11:34:47 | 17 |
| 11:34:50 | 18 |
| 11:34:53 | 19 |
| 11:35:00 | 20 |
| 11:35:01 | 21 |
| 11:35:02 | 22 |
| 11:35:04 | 23 |
| 11:35:06 | 24 |
| 11:35:09 | 25 |

MR. SELINGER:  How you do it is, so we've asked for other technical questions, what are you measuring? Where are the documents that show how you're measuring this? He's alluding to the fact -- one way to figure out how you're pushing air out is basic geometry.  How big is the box?  How much steam do you have to put in under what pressure to move the air out?

What they want to do is limit us to one specific way to do an analysis with the data that we think is suspect.

Two points.  What we asked for was in the order, the same runs for each of the two plants on the same day once a month from early December until today, but going to the custodian comments, the documents that we're looking for here probably aren't custodian documents.  These are stored -- they are engineering documents stored someplace.

THE COURT:  All right.  Hold up for a second.

The Minnesota document dump, right, that was in response to RFPs presumably you propounded when?

MR. O'SHEA:  2015.

MR. NIEDERLUECKE:  Are you talking about -- I don't think they were in response to anything.  I just think they dumped them.  I don't think they were trying to respond to our document requests.  They just said, here's our dump.

| | |
|---|---|
| 11:35:10 | 1 |
| 11:35:12 | 2 |
| 11:35:13 | 3 |
| 11:35:16 | 4 |
| 11:35:18 | 5 |
| 11:35:19 | 6 |
| 11:35:20 | 7 |
| 11:35:25 | 8 |
| 11:35:27 | 9 |
| 11:35:29 | 10 |
| 11:35:31 | 11 |
| 11:35:36 | 12 |
| 11:35:41 | 13 |
| 11:35:47 | 14 |
| 11:35:49 | 15 |
| 11:35:53 | 16 |
| 11:35:55 | 17 |
| 11:35:57 | 18 |
| 11:35:58 | 19 |
| 11:36:00 | 20 |
| 11:36:01 | 21 |
| 11:36:02 | 22 |
| 11:36:03 | 23 |
| 11:36:05 | 24 |
| 11:36:07 | 25 |

THE COURT:  Have you gotten any documents in response to your RFPs?

MR. NIEDERLUECKE:  A few.  For the sale.

MR. O'SHEA:  Asset sale, printouts from the website.

MR. SELINGER:  The --

THE COURT:  I have to say, so the Minnesota documents were not responsive to anything?  Were they responsive to initial disclosures?

MR. NIEDERLUECKE:  I'll sure some of the documents in there were responsive to our RFPs.  So, yes, we propounded RFPs.  They dumped, just dumped the hole Minnesota file on us.  I think they essentially acknowledged, they didn't go through and try to do the relevance.  So they did give us their sale documents because we specifically asked for the sale documents of this company and maybe a couple other documents.

MR. O'SHEA:  The sale documents have nothing to do with the Minnesota.

THE COURT:  Right.

MR. O'SHEA:  That was after the litigation.

MR. NIEDERLUECKE:  Sorry.

THE COURT:  I have to say, maybe it's my fault. I understood that the complaint about the document dump was that instead of responding to your RFPs, they were

| | |
|---|---|
| 11:36:10 | 1 |
| 11:36:13 | 2 |
| 11:36:14 | 3 |
| 11:36:15 | 4 |
| 11:36:18 | 5 |
| 11:36:18 | 6 |
| 11:36:19 | 7 |
| 11:36:22 | 8 |
| 11:36:24 | 9 |
| 11:36:29 | 10 |
| 11:36:31 | 11 |
| 11:36:33 | 12 |
| 11:36:34 | 13 |
| 11:36:34 | 14 |
| 11:36:36 | 15 |
| 11:36:38 | 16 |
| 11:36:41 | 17 |
| 11:36:50 | 18 |
| 11:36:51 | 19 |
| 11:36:51 | 20 |
| 11:36:54 | 21 |
| 11:36:59 | 22 |
| 11:37:00 | 23 |
| 11:37:01 | 24 |
| 11:37:04 | 25 |

1    basically, here's the Minnesota documents.  Now you have

2    everything.

3               MR. O'SHEA:  That's exactly right.

4               THE COURT:  Well, then that's what my question

5    is.

6               MR. O'SHEA:  Right.

7               THE COURT:  Did they respond?  So I said the

8    Minnesota documents that were provided in response to your

9    RFPs, when were those RFPs propounded?

10              MR. O'SHEA:  They were propounded in I belive

11   July or August.

12              THE COURT:  Around the same time you propounded

13   your interrogatories, your RFPs.  Correct?

14              MR. SELINGER:  A few weeks later.

15              THE COURT:  When could you respond to their RFPs

16   without just dumping the Minnesota documents on them?

17              MR. SELINGER:  May I --

18              THE COURT:  Could you just try to answer the

19   question?

20              MR. SELINGER:  I'm trying to.  We have -- since

21   2017, HIP has relatively few new documents, and we've

22   produced many of those.

23              THE COURT:  So you've got to go through the

24   Minnesota documents to figure it out.  Right?  So how long

25   would it take you to do that?

11:37:05   1        MR. SELINGER:  That is our set of records.

11:37:08   2        THE COURT:  Okay.  So how long will it take to

11:37:10   3   go through that set of records to produce, to respond to the

11:37:12   4   RFPs?

11:37:13   5        MR. SELINGER:  A few weeks.

11:37:15   6        THE COURT:  All right.  Can you be more

11:37:18   7   specific?

11:37:18   8        MR. SELINGER:  I'm trying to -- this is

11:37:24   9   October 12th.

11:37:25  10        THE COURT:  Can you get it done by the end of

11:37:26  11   November?

11:37:27  12        MR. SELINGER:  Oh, way before.  I'm willing -- I

11:37:34  13   was -- most of the requests have to do with --

11:37:37  14        THE COURT:  Can you get it done by

11:37:39  15   November 15th?

11:37:40  16        MR. SELINGER:  Absolutely.

11:37:41  17        THE COURT:  All right.  If I make him produce,

11:37:44  18   go through his Minnesota documents and get you what you are

11:37:47  19   entitled to and not more by November 15th, can you respond

11:37:52  20   to what's in their order by November 15th?

11:37:55  21        MR. NIEDERLUECKE:  Can we respond?  And --

11:37:57  22        THE COURT:  To the extent the documents exist.

11:37:59  23        MR. NIEDERLUECKE:  And should we be looking for

11:38:01  24   these documents as they respond to their document

11:38:04  25   production, because that's one of the points here, Your

| | |
|---|---|
| 11:38:07 | 1 |

Honor.  This wasn't tied to any request.

| | |
|---|---|
| 11:38:08 | 2 |

       THE COURT:  All right.  So, Ms. Jacobs, would

you prefer that they get you by November 15th the documents

that are requested in your order?  I mean, you know, part of

it is, again, you can't escape your RFP obligations.  You

have to keep going.

       MR. SELINGER:  I think.

       MS. JACOBS:  I think, Your Honor, our RFPs do

cover those.

       THE COURT:  I'm sure they do.  My question is,

you may have RFPs that cover other documents, too.  And what

I'm trying to do is prioritize this for you.  What I'm

trying to think is a road here that we might get some

agreement on is, you have to produce -- you can't just

rely on the Minnesota documents.  You've got to go through

them.

       MS. JACOBS:  Right.

       THE COURT:  If you can get that done by

November 15th, is which a priority.  It's not a full

response to their RFPs.

       MS. JACOBS:  Right.

       THE COURT:  I tell them, they've got to respond

to the things that are in your order by November 15th.

       MS. JACOBS:  Right.

       THE COURT:  That might be a way to kind of get

| | | |
|---|---|---|
| 11:39:00 | 1 | agreement on both sides. |
| 11:39:01 | 2 | MS. JACOBS:  Yes. |
| 11:39:02 | 3 | THE COURT:  Is that acceptable? |
| 11:39:03 | 4 | MS. JACOBS:  I think if -- |
| 11:39:04 | 5 | THE COURT:  They still have their obligation to |
| 11:39:06 | 6 | respond to all your other RFPs. |
| 11:39:09 | 7 | MS. JACOBS:  Correct, your Honor. |
| 11:39:09 | 8 | THE COURT:  Right. |
| 11:39:10 | 9 | MS. JACOBS:  We think the order is within the |
| 11:39:12 | 10 | scope of the RFPs. |
| 11:39:14 | 11 | THE COURT:  I get that.  It's probably less than |
| 11:39:16 | 12 | the full scope. |
| 11:39:16 | 13 | MS. JACOBS:  Yes. |
| 11:39:17 | 14 | THE COURT:  That is all I'm saying. |
| 11:39:17 | 15 | MS. JACOBS:  Yes. |
| 11:39:17 | 16 | THE COURT:  They have to still respond to the |
| 11:39:20 | 17 | remainder of the full scope, but they are going to |
| 11:39:23 | 18 | prioritize this and get these to you by November 15th. |
| 11:39:23 | 19 | MS. JACOBS:  Very good. |
| 11:39:25 | 20 | THE COURT:  Will that work for you? |
| 11:39:25 | 21 | MR. SELINGER:  Your Honor, and the answer is, if |
| 11:39:28 | 22 | that's what the Court wants.  My problem is I went ahead and |
| 11:39:33 | 23 | I thought we had an initial agreement where I could do what |
| 11:39:36 | 24 | we did.  We didn't, apparently. |
| 11:39:39 | 25 | THE COURT:  I'm really helping you here.  Why |

11:39:41  1   aren't you --

11:39:41  2              MR. SELINGER:  Because I'm not getting -- I

11:39:44  3   mean, I had the document requests out first.  I haven't

11:39:48  4   gotten anything under them.

11:39:49  5              THE COURT:  It sounds like they were both in

11:39:51  6   July.

11:39:51  7              MR. SELINGER:  They were both a couple weeks.

11:39:53  8   But I'm just, I'm just puzzled by not being -- I will meet

11:40:00  9   the November 15th.

11:40:01  10             THE COURT:  All right.  You can have until

11:40:03  11  November 30th.  He said he can get you those documents by

11:40:05  12  November 30th.

11:40:06  13             MR. SELINGER:  Okay.

11:40:06  14             THE COURT:  So I was going to make it

11:40:08  15  November 30th.  You said, no, I want to do it earlier.  You

11:40:10  16  probably saw where I was going.

11:40:12  17             MR. SELINGER:  Can I get the documents in the

11:40:13  18  order by November 15th and everything else by November

11:40:17  19  30th?

11:40:17  20             THE COURT:  Well, no:  Don't you have a document

11:40:21  21  completion date?

11:40:22  22             MR. NIEDERLUECKE:  Yes.

11:40:22  23             THE COURT:  When is that?

11:40:23  24             MS. PALAPURA:  January.

11:40:24  25             THE COURT:  So you basically, I'm prioritizing

| | |
|---|---|
| 11:40:27 | 1 |

this for you, and you've got to prioritize the Minnesota

documents.

                    MR. SELINGER:  Okay.  In that case --

                    MS. JACOBS:  Well, Your Honor, I think that is

fine for the order to be November 15th.  What I would just

ask is for, I understand what you are saying, but we would

ask is for the remaining documents to be on a rolling basis

as opposed to getting a document dump at the date of

completion in January.

                    THE COURT:  I agree.  I agree.  But to the

extent you want a priority, they've got to focus on

these.

                    MS. JACOBS:  Yes, Your Honor.

                    THE COURT:  You need to, you have obligations to

continue.

                    MS. PALAPURA:  Yes.  Sorry to interrupt.  Part

of it was because we were trying to do ESI negotiation,

figuring out how are we going to produce documents, what

metadata, et cetera.

                    MR. O'SHEA:  How to process.

                    MS. PALAPURA:  Since the negotiation on how to

process electronic documents blew up suddenly and we just

all decided to follow the default, we're sort of starting,

like, pretty much last week is whether we sort of came to

that, to that conclusion.  So it's not as though we were

11:41:28    1    sort of intentionally not responding or holding back.

11:41:31    2                    THE COURT:  Okay.

11:41:31    3                    MS. PALAPURA:  We just assumed, we're going to

11:41:33    4    work with those negotiations.

11:41:34    5                    THE COURT:  All right.

11:41:35    6                    MS. PALAPURA:  Then we're going to start sort of

11:41:37    7    the review and production and prioritize the core technical

11:41:39    8    because we had that deadline.

11:41:41    9                    THE COURT:  All right.  I accept that.

11:41:42   10             All right.  Here's what I'm going to do then.

11:41:44   11    I'm going to take the proposed order and I'm going to sign

11:41:47   12    it.

11:41:52   13             Now, we've got in brackets a couple ones.  We've

11:41:57   14    got paragraph 2.  How do you want to address that?  I'm

11:42:05   15    going to change it to say technical documents no later than

11:42:09   16    November 30th.

11:42:10   17                    MR. SELINGER:  Those brackets were for the

11:42:11   18    Court's assistance.  They can disappear.

11:42:18   19                    THE COURT:  Okay.  Cross them out.

11:42:23   20                    MS. JACOBS:  They can stay there.

11:42:24   21                    MR. SELINGER:  The Court's pleasure.

11:42:31   22                    THE COURT:  November 15th, which I didn't even

11:42:35   23    look at which day of the week it is.

11:42:39   24                    MS. PALAPURA:  The 30th?

11:42:40   25                    THE COURT:  If 15th.

| | | |
|---|---|---|
| 11:42:42 | 1 | MR. O'SHEA:  The 15th. |
| 11:42:45 | 2 | THE COURT:  This is the 15th.  He has to get you |
| 11:42:48 | 3 | the Minnesota by 15th.  You have to keep doing your normal |
| 11:42:52 | 4 | document production, but everybody is going to focus on |
| 11:42:54 | 5 | this, and you're going to focus on the Minnesota -- |
| 11:42:57 | 6 | MR. SELINGER:  Yes, Your Honor. |
| 11:42:58 | 7 | THE COURT:  -- by November 15th.  And then I'm |
| 11:43:05 | 8 | going to just -- well, it sounds like, I will just leave the |
| 11:43:11 | 9 | bracketed language in there.  It's just giving you a |
| 11:43:13 | 10 | heads-up what patents are relevant.  Right? |
| 11:43:20 | 11 | MR. NIEDERLUECKE:  As long as that's not some |
| 11:43:22 | 12 | judicial determination, Your Honor, yes. |
| 11:43:24 | 13 | THE COURT:  All right.  Actually, then, I will |
| 11:43:26 | 14 | just cross it out. |
| 11:43:49 | 15 | MS. JACOBS:  So then the 15th is a Thursday, so |
| 11:43:51 | 16 | that should be fine. |
| 11:43:52 | 17 | THE COURT:  All right. |
| 11:43:53 | 18 | MR. NIEDERLUECKE:  Your Honor -- |
| 11:43:53 | 19 | THE COURT:  Just one second. |
| 11:44:03 | 20 | (Pause.) |
| 11:44:23 | 21 | THE COURT:  All right.  Unfortunately, I |
| 11:44:25 | 22 | wrote on this, so I will file an order which I will sign |
| 11:44:29 | 23 | and I will add no later than November 15th, 2018.  All |
| 11:44:33 | 24 | right? |
| 11:44:33 | 25 | MR. NIEDERLUECKE:  That is fine.  Can I ask -- |

| | | |
|---|---|---|
| 11:44:34 | 1 | THE COURT:  Go ahead. |
| 11:44:35 | 2 | MR. NIEDERLUECKE:  -- one thing, your Honor. |
| 11:44:36 | 3 | THE COURT:  Sure. |
| 11:44:37 | 4 | MR. NIEDERLUECKE:  Can you at least put in the |
| 11:44:38 | 5 | beginning here, to the extent such documents exist within |
| 11:44:42 | 6 | the custody and control? |
| 11:44:43 | 7 | THE COURT:  Yes.  I am happy to do that. |
| 11:44:45 | 8 | MR. NIEDERLUECKE:  Because I think there are |
| 11:44:46 | 9 | certain of these requests we won't have any documents. |
| 11:44:48 | 10 | THE COURT:  I will amend it to say, "To the |
| 11:44:50 | 11 | extent such documents exist." |
| 11:44:53 | 12 | MS. PALAPURA:  And, Your Honor, one additional |
| 11:44:55 | 13 | point.  Since we did not have an input into how the topics |
| 11:44:59 | 14 | on these are composed or the types of documents, there are |
| 11:45:02 | 15 | some that we don't believe may be relevant, so I want to be |
| 11:45:05 | 16 | able to preserve our right to object to anything that may or |
| 11:45:08 | 17 | may not be relevant to the claims of this case. |
| 11:45:14 | 18 | MS. JACOBS:  Your Honor, they could have replied |
| 11:45:17 | 19 | on that. |
| 11:45:17 | 20 | THE COURT:  I think you waived that by not -- I |
| 11:45:20 | 21 | mean, they had this submitted with their -- it was submitted |
| 11:45:23 | 22 | with your opening? |
| 11:45:24 | 23 | MS. JACOBS:  It was. |
| 11:45:26 | 24 | MR. O'SHEA:  They have not, as the rules |
| 11:45:27 | 25 | require, put what RFP and what.  They have not met their |

| 11:45:33 | 1 | burden.   Their burden is, here's the RFP, here's why it's |
| 11:45:36 | 2 | relevant.   They just put a proposed order with a litany of |
| 11:45:39 | 3 | documents that they'd like to get.   It's not our burden to |
| 11:45:42 | 4 | say, hey, we think this one relates to this, but it's not |
| 11:45:44 | 5 | relevant.   That's their burden. |
| 11:45:46 | 6 | MS. PALAPURA:   Space limitations, we didn't get |
| 11:45:49 | 7 | into each thing, but in our letter, we did say that many of |
| 11:45:52 | 8 | the requests were irrelevant. |
| 11:45:55 | 9 | MS. JACOBS:   And, Your Honor, we proffered |
| 11:45:57 | 10 | Request No. 13 and 15 are -- and I can hand them to Your |
| 11:46:02 | 11 | Honor -- are comprehensive in asking for documents |
| 11:46:06 | 12 | sufficient to show the accused process, documents sufficient |
| 11:46:10 | 13 | to show a variety of things.   We've made that proffer. |
| 11:46:15 | 14 | MS. PALAPURA:   I believe we probably responded |
| 11:46:18 | 15 | with our response, objections, including relevance to those. |
| 11:46:22 | 16 | So -- |
| 11:46:23 | 17 | MR. SELINGER:   Your Honor, we think these are |
| 11:46:25 | 18 | important. |
| 11:46:25 | 19 | THE COURT:   I understand.   I would like you to |
| 11:47:05 | 20 | walk through -- I'm finding it hard as I read these to |
| 11:47:09 | 21 | understand why they would not be relevant. |
| 11:47:10 | 22 | MR. NIEDERLUECKE:   Sure. |
| 11:47:11 | 23 | THE COURT:   Just to the introduction.   I mean, |
| 11:47:13 | 24 | can you find one in here that doesn't look relevant to you? |
| 11:47:15 | 25 | MR. NIEDERLUECKE:   Well, hazardous.   Right off |

`11:47:18`  1    the start, Your Honor.  Hazardous analysis critical to the

`11:47:22`  2    plant.  What does that have to do with the question of

`11:47:26`  3    whether or not we infringe their patent?  That has to do

`11:47:29`  4    with things like salmonella, with listeria.  It's looking at

`11:47:37`  5    how you handle things.  Is there metal in there?  I mean,

`11:47:40`  6    there's just nothing that they need to use that for to

`11:47:43`  7    determine anything in this case.

`11:47:44`  8            THE COURT:  I assume that there could be in

`11:47:46`  9    there indicia of temperature, of the order in which the

`11:47:52`  10   manufacturing process is conducted.  I mean, and how does it

`11:47:59`  11   harm you to turn that over when it has been a very, very

`11:48:01`  12   specific concrete request?

`11:48:03`  13           MR. NIEDERLUECKE:  We can turn that over, Your

`11:48:05`  14   Honor.

`11:48:05`  15           THE COURT:  I mean, that's why I'm getting

`11:48:07`  16   at -- I understand.  This is very, very specific, it seems

`11:48:11`  17   to me.

`11:48:12`  18           MR. NIEDERLUECKE:  And, Your Honor, remember,

`11:48:14`  19   this is -- we are looking at this in terms of core technical

`11:48:19`  20   documents and the idea that maybe there's something in a

`11:48:20`  21   document that may pertain --

`11:48:22`  22           THE COURT:  I'm no longer looking into core

`11:48:24`  23   technical documents, no.

`11:48:26`  24           MR. NIEDERLUECKE:  So that's where we pointed it

`11:48:27`  25   out, Your Honor.

| | |
|---|---|
| 11:48:27 | 1 |
| 11:48:29 | 2 |
| 11:48:32 | 3 |
| 11:48:35 | 4 |
| 11:48:38 | 5 |
| 11:48:40 | 6 |
| 11:48:41 | 7 |
| 11:48:41 | 8 |
| 11:48:43 | 9 |
| 11:48:46 | 10 |
| 11:48:53 | 11 |
| 11:48:53 | 12 |
| 11:48:54 | 13 |
| 11:48:56 | 14 |
| 11:48:58 | 15 |
| 11:48:59 | 16 |
| 11:49:00 | 17 |
| 11:49:02 | 18 |
| 11:49:03 | 19 |
| 11:49:03 | 20 |
| 11:49:05 | 21 |
| 11:49:06 | 22 |
| 11:49:09 | 23 |
| 11:49:10 | 24 |
| 11:49:11 | 25 |

1        THE COURT:  Well, that's fair.  I'm with you.

2  Ms. Palapura made the point.  It was a good point.  I'm not

3  faulting you from saying we've provided the core technical

4  documents.  I'm not.  I'm trying to look for a way to go

5  forward.  I'm trying to give you something and I'm trying to

6  give them something.

7        MR. NIEDERLUECKE:  Certainly.

8        THE COURT:  Okay.  I gave you the Minnesota

9  stuff.  When I came in here, I felt bad for you, but I was

10  inclined to say, you're a big firm.  So is Potter Anderson.

11  You can handle it.

12        MR. NIEDERLUECKE:  I understand, Your Honor.

13        THE COURT:  Again, I went your way.

14        MR. NIEDERLUECKE:  I will go through these very

15  quickly.

16        Number two, Your Honor --

17        THE COURT:  Do it with the idea of really -- not

18  core technical documents.

19        MR. NIEDERLUECKE:  Right.

20        THE COURT:  Are these not relevant to the case?

21        MR. NIEDERLUECKE:  Documents reflected the

22  temperature of the cooking medium exiting.  I think that's

23  the temperatures that we're giving on the samples.

24        THE COURT:  Yes.

25        MR. NIEDERLUECKE:  Yes.  I think we've already

11:49:11   1    done that.

11:49:12   2              Four I think hits on --

11:49:13   3              THE COURT:  Except you can't just give them a

11:49:15   4    sampling of the documents.

11:49:16   5              MR. NIEDERLUECKE:  Number four hits that I

11:49:17   6    think, Your Honor.

11:49:18   7              THE COURT:  Okay.

11:49:18   8              MR. NIEDERLUECKE:  So three, evidence, locations

11:49:21   9    of the sensors within the ovens.  I don't know if we have

11:49:23  10    that information.

11:49:24  11              THE COURT:  Look --

11:49:25  12              MR. NIEDERLUECKE:  I get it.

11:49:26  13              THE COURT:  I already have given you almost two

11:49:28  14    hours.  Don't waste time on telling me something that you

11:49:31  15    might not have.  If you think something that says, look,

11:49:33  16    this is incredibly burdensome or unfair and irrelevant,

11:49:36  17    quickly just tell me.  They all look relevant to me.

11:49:39  18              MR. NIEDERLUECKE:  The one I want to be sure of,

11:49:40  19    Your Honor, is number four really lays out their request for

11:49:43  20    a lot of this, which is the process data.

11:49:46  21              THE COURT:  Yes.

11:49:47  22              MR. NIEDERLUECKE:  They want one, they want a

11:49:50  23    sample every month.

11:49:51  24              THE COURT:  Right.

11:49:51  25              MR. NIEDERLUECKE:  We don't have it all the way

| | |
|---|---|
| 11:49:53 | 1 |
| 11:49:56 | 2 |
| 11:49:59 | 3 |
| 11:50:02 | 4 |
| 11:50:04 | 5 |
| 11:50:08 | 6 |
| 11:50:11 | 7 |
| 11:50:14 | 8 |
| 11:50:15 | 9 |
| 11:50:15 | 10 |
| 11:50:16 | 11 |
| 11:50:17 | 12 |
| 11:50:21 | 13 |
| 11:50:25 | 14 |
| 11:50:28 | 15 |
| 11:50:30 | 16 |
| 11:50:33 | 17 |
| 11:50:37 | 18 |
| 11:50:38 | 19 |
| 11:50:38 | 20 |
| 11:50:39 | 21 |
| 11:50:41 | 22 |
| 11:50:41 | 23 |
| 11:50:42 | 24 |
| 11:50:46 | 25 |

1   back to December 26th.  I want to make sure we need to

2   produce a sample of the data we produced every month for

3   each location for each oven, so we will do that.

4             THE COURT:  All right.  And his point is,

5   these documents don't pre-exist, but actually, this is not

6   just asking for documents.  It's asking for the process

7   data.  So if it's on the computer, you've got to give it to

8   them.

9             MR. NIEDERLUECKE:  Right.

10            THE COURT:  Okay.

11            MR. NIEDERLUECKE:  And the process data.  But my

12   point, Your Honor, we will produce, we will grab the first

13   of the month whatever, every month we'll give them.  And

14   apparently, what Mr. O'Shea is saying right now, we don't

15   have the software to do that.  We've had to be manually

16   extracting that from some files.  That's how we produced

17   those apparently.  So it will take either manual extraction

18   of this.

19            THE COURT:  Okay.

20            MR. NIEDERLUECKE:  Somebody sitting down and

21   literally doing that.

22            THE COURT:  All right.

23            MR. NIEDERLUECKE:  Unless they --

24            THE COURT:  Hold on just one second.  Are you

25   okay with that?

| | |
|---|---|
| 11:50:47 | 1 |

**MR. SELINGER:**  I do.  It if takes a little

11:50:49   2   longer for that, Your Honor, I'm assuming he's saying the

11:50:52   3   amount of time.

11:50:52   4   **THE COURT:**  You're on the same page.

11:50:54   5   **MR. NIEDERLUECKE:**  Yes.

11:50:54   6   **THE COURT:**  That's great.  Let's go onto the

11:50:56   7   next point.

11:50:57   8   **MR. SELINGER:**  And I think in number, these will

11:50:59   9   fall --

11:51:00   10   **THE COURT:**  That's my sense, because they keep

11:51:02   11   referring back to number 4.

11:51:03   12   **MR. SELINGER:**  Measurement, temperature range I

11:51:07   13   think is already in there.  Internal meeting input ratings.

11:51:10   14   I don't know if we have that.

11:51:12   15   Okay.  A lot of this goes back to their

11:51:14   16   calculation.  Steam generator.  If we have it, we can

11:51:19   17   produce that.

11:51:21   18   I think most of these will be covered by the

11:51:25   19   documents reflecting the three interior volume.  When you

11:51:29   20   get into the dimensions of the oven itself, I'm not sure how

11:51:33   21   that is relevant.

11:51:34   22   **THE COURT:**  As it was explained to me, it sounds

11:51:37   23   pretty relevant, so I just have to say right now, I know

11:51:39   24   enough to say in my mind, that would be relevant, because of

11:51:43   25   the size of the oven and the steam that's being injected.

| | |
|---|---|
| 11:51:47 | 1 |

Is it injected, I guess, the steam?

MR. SELINGER:  It's pumped in.

THE COURT:  Pumped in.  That's injected, so,
yes.

MR. NIEDERLUECKE:  Yes.  And --

THE COURT:  All right.  So they look pretty
relevant.

MR. NIEDERLUECKE:  I've asked that.  I can't
wait to see what limitation they apply to because that's
where --

THE COURT:  You can always get this transcript
and you can bring it back and say, take advantage of that if
they made a statement like that.

All right.  Actually, so I'm going to enter
this order that was provided to me.  I wasn't given an order
on the Minnesota docs, but I think the oral transcript
reflects that HIP is obligated to go through the Minnesota
documents and to produce by November 15th all of the
documents there in that are responsive to an outstanding
RFP.

MS. JACOBS:  Your Honor, I just think we need,
because it's responsive to an RFP and that would be
called for by our disclosures of what we would want to rely
on.

THE COURT:  Oh, sure.

| | | |
|---|---|---|
| 11:52:55 | 1 | MS. JACOBS:  We don't just produce in response |
| 11:52:59 | 2 | the documents that we would rely upon. |
| 11:53:00 | 3 | THE COURT:  Correct.  I guess I just assume |
| 11:53:02 | 4 | there's always an RFP that says you have to produce |
| 11:53:05 | 5 | anything you're going to rely on.  Anyway, that's a good |
| 11:53:08 | 6 | point.  Thank you for making it.  It was kind of you to make |
| 11:53:11 | 7 | it. |
| 11:53:12 | 8 | MS. JACOBS:  Thank you. |
| 11:53:12 | 9 | THE COURT:  The scheduling order. |
| 11:53:14 | 10 | MS. JACOBS:  Yes. |
| 11:53:15 | 11 | THE COURT:  Wait, yes. |
| 11:53:16 | 12 | MS. JACOBS:  Yes. |
| 11:53:17 | 13 | THE COURT:  You are going to submit using all of |
| 11:53:21 | 14 | the discovery limitations and dates that are currently in |
| 11:53:23 | 15 | effect.  We're going to keep the March Markman date.  I'm |
| 11:53:28 | 16 | not going to promise you about all the other dates, but you |
| 11:53:30 | 17 | should assume all of the dates apply. |
| 11:53:33 | 18 | I don't know.  Were there summary judgment dates |
| 11:53:35 | 19 | in here? |
| 11:53:36 | 20 | MS. JACOBS:  I apologize.  I believe there was. |
| 11:53:39 | 21 | THE COURT:  Don't be surprised if those dates |
| 11:53:41 | 22 | change.  I will do my very best to keep what I can, but |
| 11:53:44 | 23 | we'll plan on the Markman.  I think that's the most |
| 11:53:46 | 24 | consequential date. |
| 11:53:48 | 25 | MS. PALAPURA:  Can I bring something to your |

11:53:48    1    attention, Your Honor?

11:53:48    2          THE COURT:  Yes.

11:53:49    3          MS. PALAPURA:  I believe we used Judge Sleet's

11:53:51    4    form order, so under his procedure, it was a letter briefing

11:53:53    5    for summary judgment.  So we will work it out.

11:53:56    6          THE COURT:  Yes.  Follow my procedure.

11:53:57    7          MS. JACOBS:  Yes.

11:53:57    8          THE COURT:  Great.  Anything else?  Have a good

11:54:00    9    weekend, everybody.

11:54:53    10         (Counsel respond, "Thank you, Your Honor.")

11:54:59    11         (Conference concluded at 11:55 a.m.)

11:54:59    12             -  -  -

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25