```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                   IN AND FOR THE DISTRICT OF DELAWARE

 3                             - - -

 4
        HIP, INC.,                    :   CIVIL ACTION
 5                                     :
                        Plaintiff,    :
 6                                     :
            vs.                       :
 7                                     :
        HORMEL FOODS CORPORATION,     :
 8      HORMEL FOOD CORPORATE         :
        SERVICES LLC, OSCEOLA FOOD,   :
 9      LLC, ROCHELLE FOODS, LLC,     :
        and DOLD FOODS, LLC,          :
10                                     :
                        Defendants.   :   NO. 18-615-CFC
11

12                             - - -

13                                 Wilmington, Delaware
                                   Tuesday, April 9, 2019
14                                 9:00 o'clock, a.m.

15                             - - -

16      BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.

17                             - - -

18      APPEARANCES:

19
                   MORRIS, NICHOLS, ARSHT & TUNNELL LLP
20                 BY:  KAREN JACOBS, ESQ.

21
                             -and-
22

23

24                                 Valerie J. Gunning
                                   Official Court Reporter
25
```

```
 1   APPEARANCES (Continued):

 2
                   PATTERSON + SHERIDAN LLP
 3                 BY:  JERRY E. SELINGER, ESQ.
                        KYRIE CAMERON, ESQ. and
 4                      GRANT DAVIS, ESQ.
                        (Dallas, Texas)
 5

 6                      Counsel for Plaintiff

 7

 8                 POTTER, ANDERSON & CORROON LLP
                   BY:  BINDU A. PALAPURA, ESQ.
 9

10                         -and-

11
                   FREDRIKSON & BYRON P.A.
12                 BY:  KURT J. NIEDERLUECKE, ESQ. and
                        LAURA L. MYERS, ESQ.
13                      (Minneapolis, Minnesota)

14
                        Counsel for Defendants
15

16                         -  -  -

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3              (Proceedings commenced in the courtroom at

 4     9:00 a.m.)

 5

 6              THE COURT:  All right.  Please be seated.  Good

 7     morning.

 8              (Counsel respond, "Good morning, Your Honor.")

 9              THE COURT:  Ms. Jacobs?

10              MS. JACOBS:  Good morning, Your Honor.

11              THE COURT:  Good morning.

12              MS. JACOBS:  Karen Jacobs from Morris, Nichols,

13     Arsht & Tunnell for the plaintiff, HIP, and I have here with

14     me today Jerry Selinger, Kyrie Cameron, and Grant Davis from

15     Patterson + Sheridan.

16              Mr. Selinger will be presenting today, and I

17     would just like to point out that for Ms. Cameron and

18     Mr. Davis, this is their first Markman hearing.

19              THE COURT:  Okay.  Welcome.

20              Ms. Palapura, how are you?

21              MS. PALAPURA:  Good, Your Honor.  Good morning.

22     Bindu Palapura on behalf of the defendant, Hormel.

23              With me today from Fredrikson & Byron, Kurt

24     Niederluecke, and Laura Myers.

25              THE COURT:  All right.  Great.  Thank you.
```

1          All right.  Mr. Selinger?

2          MS. JACOBS:  Your Honor, before we begin the

3    presentations, may we just ask, it's our understanding that

4    Your Honor doesn't want to hear about indefiniteness at this

5    stage, but we wanted to check to see, so tailoring the

6    presentations, whether or not we should touch upon it in our

7    presentation.

8          THE COURT:  I'm not going to rule on it.  I

9    mean, I find sometimes it just comes up, but I'm not here to

10   have an indefiniteness hearing.  At one point I want to ask

11   you, you basically briefed it, so can I go ahead and rule on

12   it?  I think I first need to make the claim construction.

13   It seems to me that my decision about indefiniteness is

14   going to hinge ultimately on the claim construction.

15         MS. JACOBS:  Your Honor, HIP did not raise it.

16   It was raised by Hormel and HIP responded.

17         THE COURT:  Right.

18         MS. JACOBS:  It's our view that it's premature

19   and raised in fact issues.  Of course, we'll tailor our

20   presentation as to how Your Honor really wants to address

21   it.

22         THE COURT:  I don't know that I've answered it

23   directly, but it's claim construction.  If somebody starts

24   touching on indefiniteness, we'll see where it goes.

25         As you know, I'm probably going to take the

1    argument where I'm actually focused.  I've read the briefs,

2    I've read the patents, I've read the attachments, and I'm

3    ready to go.

4              MS. JACOBS:  Are there particular terms that

5    Your Honor would like us to focus on for purposes of this

6    presentation?

7              THE COURT:  No.  One thing while you're here,

8    and, Ms. Palapura, I will say, because I'm going to revise

9    my order again and based on this case.  You know, I noticed

10   it was hard to do the brief, to go through the briefing,

11   because you all cited to the appendix to the joint claim

12   construction chart, but you also had exhibits attached to

13   the briefing.  I've actually spoken with Judge Andrews about

14   this last night.  I think I'm going to get rid of the

15   appendix filed with the joint claim construction charts

16   because I don't think other judges even look to it.  They

17   look to the briefing.

18             This is the first case where I've had where

19   people go back and cite to that and, frankly, it's hard to

20   find.  We had a hard time finding some of the pages, and I'm

21   trying to think even what's the value of it.  And I noticed,

22   you know, everybody just disregards the order, because the

23   order says only put intrinsic evidence with the joint claim

24   construction chart, but you all, like everybody, attach

25   extrinsic evidence exhibits.

1              So I would be interested in both of you thinking

2       about that, and I'm thinking I'm going to revise the order

3       later this week to just dispense with that.  Maybe think

4       about it and I will talk to you at the end of the hearing.

5              And so I've got some specific questions about

6       the record.  You can point me to the record, Mr. Selinger,

7       but not on specific terms.

8              MS. JACOBS:  Okay.  Thank you, Your Honor.  May

9       we hand up our slides?

10             THE COURT:  Please.

11             (Ms. Jacobs handed slides to the Court.)

12             THE COURT:  Who is going to do the argument for

13      the defense?

14             MS. PALAPURA:  Mr. Niederluecke.

15             MR. NIEDERLUECKE:  I am, Your Honor.

16             THE COURT:  All right.  And it's

17      Mr. Niederluecke?

18             MR. NIEDERLUECKE:  Niederluecke.

19             THE COURT:  Niederluecke.  Oh, my goodness.  It

20      sounds like not lucky.  All right.  Mr. Selinger, let's go.

21      Good morning.

22             MR. SELINGER:  Good morning, Your Honor.  May it

23      please the Court, let me first answer the question you asked

24      Ms. Jacobs about indefiniteness briefly.

25             The way the briefing played out was sort of

1    upside down, if you will.  The patent owner is not normally

2    the one that has to go first, the patent owner of the

3    patents.  In terms of indefiniteness and validity, the

4    burden is on the other side.  And the way this played out,

5    Hormel raised for the first time in an expert declaration

6    and surreply a new argument that frankly should have been

7    raised earlier, and I think it's unfair.  So my answer to

8    Your Honor is, I mean, the briefing is sort of done, but I

9    think it needs to be redone so that the party with the

10   burden of proof is going first and so that I have a chance

11   to respond to its expert's new argument.

12              THE COURT:  Okay.

13              MR. SELINGER:  With that, let me start with the

14   preambles, and obviously, the parties have a disagreement.

15   Our position is that the preambles are substantive

16   limitations.  Hormel disagrees.  The joint claim

17   construction charts showed that we didn't identify any term

18   in the preamble as needing extra construction, which means

19   they all have plain and ordinary meanings.

20              Hormel's only position is that a term resembling

21   pan-fried bacon was indefinite.  Unlike what happens, and

22   I've seen a lot of cases, Hormel did not propose an

23   alternative construction, so it, in my view, it's confined

24   to plain and ordinary meaning for --

25              THE COURT:  What is the essence of the

1   invention?

2              MR. SELINGER:  The essence of the invention,

3   Your Honor, is a process for cooking baking of a certain

4   quality, a higher quality than previously could be made by

5   linear ovens or microwave ovens in commercial quantities.

6              THE COURT:  All right.  So it's not to produce a

7   bacon that resembles pan-fried bacon product?

8              MR. SELINGER:  No, it is.  That's the quality.

9              THE COURT:  You didn't say that.  I just asked

10  you --

11             MR. SELINGER:  That was the high quality, Your

12  Honor.

13             THE COURT:  All right.  What is a cooking

14  medium?

15             MR. SELINGER:  A cooking medium, in this case,

16  it's steam.  It could be something other than steam.

17  Superheated steam.  But it's --

18             THE COURT:  Well, give me the precise medium.

19  This word is throughout.  Nobody has defined it for me.

20  It's repeated throughout the patent.  What is the cooking

21  medium?

22             MR. SELINGER:  The cooking medium is the --

23  is the gas that is used to indirectly cook the bacon slices

24  as they spiral upward through the spiral oven on the

25  conveyor.

1          THE COURT:  Is the cooking medium consistent

2     throughout the chamber?

3          MR. SELINGER:  It's the same material throughout

4     the chamber.

5          THE COURT:  Bacon grease?

6          MR. SELINGER:  Bacon grease will drop as the

7     baking occurs.

8          THE COURT:  Right.  So is that part of the

9     cooking medium?

10         MR. SELINGER:  It's not.  It's separate from the

11    cooking medium.

12         THE COURT:  So the cooking medium is just the

13    steam?

14         MR. SELINGER:  Superheated steam, yes.

15         THE COURT:  Okay.

16         MR. SELINGER:  So --

17         THE COURT:  Actually, let's go to claim 2.  I'm

18    good on this.

19         MR. SELINGER:  Okay.  Let's go back to claim 2.

20    Yes.

21         THE COURT:  When I say claim 2, sorry.  I am

22    pretty good on the limitation.  Let's go to the next term,

23    disputed term.  Sorry.

24         MR. SELINGER:  All right.  Substantially

25    air-free/ oxygen-free environment.  We're on slide 3, Your

1    Honor.

2              Let's go to our next slide, please.  Let's go to

3    the next slide.

4              So the claims use the word substantially with no

5    numbers in them.  The intrinsic evidence repeatedly uses the

6    phrase substantially.  There was no disclaimer in the

7    specification or prosecution history of amounts greater than

8    one percent, and no extrinsic evidence is necessary.

9              And so the specification, slide 42, shows in the

10   preferred embodiments the phrase, substantially eliminate

11   the air.

12             Let's go to the next slide.

13             THE COURT:  So is the air different than the

14   oxygen?

15             MR. SELINGER:  The oxygen -- oxygen is about

16   20 percent of the air, and so one of the claims talks about

17   substantially eliminating the air as claim 1, and then the

18   other is substantially eliminating the oxygen.  And so, yes,

19   oxygen and air are two different things.

20             THE COURT:  So how do you have something without

21   air?  In a vacuum?

22             MR. SELINGER:  Pardon me?

23             THE COURT:  Substantially air-free environment,

24   is it like a vacuum?

25             MR. SELINGER:  No.  Again, you have this very

1    large box, and superheated steam is introduced into the box

2    under pressure, and superheated steam forces most of the air

3    out of this box, which is the spiral oven.

4              THE COURT:  And you're left with steam?

5              MR. SELINGER:  Yes.

6              THE COURT:  And just help me out.  Basic science

7    I'm just not that good at.

8              So steam doesn't have air in it?

9              MR. SELINGER:  Not superheated steam.  It's

10   going to be moisture.  Now, at a purely academic level,

11   Your Honor, one could take water and break it down into

12   hydrogen and oxygen, but that's not what we're dealing

13   with here.

14             THE COURT:  Okay.  So when we get to the second

15   claim 3 -- not the second, but when we get to claim 3, then

16   we're now talking substantially oxygen-free?

17             MR. SELINGER:  Yes.

18             THE COURT:  But it's the same thing.  You've got

19   steam, but doesn't it consist of oxygen and hydrogen?

20             MR. SELINGER:  It does, but at the compound, not

21   separate.

22             THE COURT:  All right.

23             MR. SELINGER:  So that's not what the patent

24   teaches.  That's not what the patent discloses.  It's the

25   steam is used to push out, I think the language in the claim

1    is air that otherwise would be in the chamber.

2                THE COURT:  Right.  So in the prosecution

3    history, they talk about the complete elimination, right, of

4    air or oxygen.  Correct?

5                MR. SELINGER:  So at one point, the argument --

6    so the answer is, that phrase I think was used in a

7    declaration, but in the context of a claim which talks about

8    substantially eliminating, and there's what I consider to be

9    a hypothetical that starts even if, and it was even if

10   complete elimination of air was desired, there would still

11   be some residual air left in part because of instrument

12   inaccuracies and in part because of instrument placement, in

13   part because it's -- this is a big box and it's not

14   completely air-free.

15               THE COURT:  I guess what I'm trying to

16   understand is this.  I'm wondering if there's a way to

17   bridge the gap between you all, and by that I mean, isn't

18   the idea here is you're supposed to inject this high steam,

19   high temperature steam, and essentially it just takes over.

20   It takes over the space, the airspace and the space that

21   would have oxygen existing by itself, and you don't want to

22   say completely because of the reality that you can't aim,

23   you cannot completely eliminate it.  And I'm just wondering

24   whether or not -- I don't find your alternative to be very

25   helpful.  I'm with you on the one percent.

```
 1                    I don't see anything about numeric parameters
 2      being injected into the discussion, but, you know, something
 3      I thought we should maybe be talking about substantially
 4      air-free is about or approximately zero percent air, or
 5      about or approximately zero percent oxygen.  There's no
 6      numerical definition, but it just recognizes the reality
 7      that seems to me that was in the prosecution history.
 8                    MR. SELINGER:  If I --
 9                    THE COURT:  Could you live with that?  Could you
10      live with if we just say you say no construction is
11      necessary, but substantially air-free would be about or
12      approximately zero percent air in the cooking medium?
13                    MR. SELINGER:  I apologize, Your Honor.  Let me
14      just...
15                    THE COURT:  Take your time.
16                    How about the defense?  Could you live with
17      that?
18                    MR. NIEDERLUECKE:  Your Honor, we still think
19      while that is better than -- it's a little better
20      explanation, we still have a problem with the approximately
21      with no understanding or bounds around that because we're
22      afraid that the plaintiffs are just going to come back and
23      argue, well, you know, any number is about a hundred percent
24      when you go from zero to a hundred, and that's not the
25      framework we're working in.
```

```
 1                    It's the intent to completely eliminate the air,

 2     and it's the recognition --

 3                    THE COURT:  Yes, but even completely eliminate,

 4     you'd have to admit that there's no instrument that can

 5     guarantee there is the complete -- I mean, you have to have

 6     a vacuum.  Right?  We don't have a vacuum here.  So why

 7     aren't you good with at or about zero percent?

 8                    MR. NIEDERLUECKE:  Your Honor, as our expert

 9     explained who designed these systems, he explained

10     consistent with the explanation that was provided when they

11     said they wanted a hundred percent, but they can't quite get

12     there.  It's their language that was in there, and our

13     expert explained consistent with that, that any of the

14     inaccuracies they're talking about, and they have one

15     percent in their own statement, would all fall within that

16     one percent.

17                    So our expert explains that these inaccuracies

18     they talk about in designing these systems that could allow

19     a very small amount of air to leak, or could be

20     instrumentality, is all within one percent.  So we do have

21     that.

22                    THE COURT:  Well, you'll have to show me where

23     the one percent is.  I didn't see that.

24                    MR. NIEDERLUECKE:  Sure.

25                    THE COURT:  Go ahead.
```

```
 1              MR. SELINGER:  In fact, Your Honor, let me point
 2   to slide 46, and this is actually the language on which
 3   Hormel relies.
 4              But what it says is, even if complete
 5   elimination is targeted, there would be some minor
 6   inconsequential amount of air or oxygen due to a variety of
 7   things.  Small leak or oxygen trapped or instruments that
 8   are limited by a certain accuracy.  That accuracy alone is
 9   the plus or minus one percent.
10              THE COURT:  Well, it says, for example.
11              MR. SELINGER:  Yes.
12              THE COURT:  It doesn't even say it's plus or
13   minus one percent.  It's an example.
14              MR. SELINGER:  That's right.  Then it goes on
15   and talks about other, other ways that inaccuracies can be
16   introduced also, not perfectly calibrated or mounted in a
17   less than optimal location.
18              THE COURT:  All right.  So here's what I'm going
19   to do.  Let's move on to the next term.  I'm with you on
20   this term, but I think I would prefer to do something about
21   at or about, about or five to zero percent.  So when you
22   sit down, you can think about whether that's acceptable to
23   you.
24              I'm okay about adding some description here to
25   give some meaning to substantially.  I don't like yours.
```

1    It's too broad.  And I will let them make their argument.

2              MR. SELINGER:  All right.

3              THE COURT:  But right now I'm in your camp on

4    that.  Let's go to the next one.

5              MR. SELINGER:  Thank you.

6         So the next is -- the next term is contacting

7    the bacon, and that's on slide 51.  Again, let's go to the

8    next slide.

9              Again, this also is a limitation where there's a

10   dispute about reading specific numbers into the claim.  The

11   claims recite a specific numerical flow limitation.

12             Hormel points to a paragraph that describes "an

13   inventive process," but that paragraph does not have a

14   numerical limitation.  And that paragraph is consistent with

15   the description in the summary of the invention and in the

16   abstract.

17             So let's go back to slide 50 --

18             THE COURT:  So I agree with you on this one.

19             MR. SELINGER:  Okay.

20             THE COURT:  So let's go to the next one.  So

21   preheating the bacon slices.  This one I'm struggling with

22   the cooking medium issue.  So we're on four.

23             MR. SELINGER:  We're on four.  Just try to catch

24   up.

25             THE COURT:  That's all right.

```
1              MR. SELINGER:  And so let's go to the first --
2       the next slide.  Okay.
3              So we're on slide 64, Your Honor, and preheating
4       can be by, but is not limited to, superheated steam.
5              The column in the specification describes two
6       sources, a preconditioning and then a pretreating, and --
7              THE COURT:  You treat them the same though in
8       the prosecution history, pretreating and --
9              MR. SELINGER:  We don't have a claim to the
10      preconditioning, but we treat preheating and preheating the
11      same.
12             THE COURT:  Right.
13             MR. SELINGER:  And I don't think there's a
14      disagreement that the pretreating and preheating are used
15      the same way.
16             THE COURT:  Right.
17             MR. SELINGER:  Correct.  And --
18             THE COURT:  By the way, what does cooking mean?
19             MR. SELINGER:  What does cooking mean?
20             THE COURT:  Yes.
21             MR. SELINGER:  I think in the context of this
22      patent, it means heating bacon to a point where it is able
23      to be cooked if one wants to eat it then without reheating
24      it.  I have to admit, I hadn't thought about that.
25             THE COURT:  How do you cook something to make it
```

```
1   pre-cooked?  Isn't pre-cooked before cooking?

2             MR. SELINGER:  In this case, we're talking --

3   and I think the answer is in some context, that's correct.

4   I don't think that's the case here.  What we're talking

5   about here is making massive quantities of bacon that are

6   essentially done and you can eat them without heating them

7   up and not get sick.

8             The reality is, when they get sold to retailers,

9   they get sold to fast foot chains, and they put them on the

10  grill for ten seconds or twenty seconds, depending on who is

11  doing the cooking so they're hot again.  But they're edible

12  without any of the risks of food poisoning that one can get

13  from eating undercooked pork.

14            And so the example here is, I would expect

15  describes preheating by using superheated steam.  But

16  nothing in the spec limits an intention to restrict the

17  claim scope to that single embodiment, in the patent.  It

18  contemplates changes in modifications.

19            A person of ordinary skill in the art would

20  understand that pretreating with superheated steam is a form

21  of preheating the bacon.  I don't think that's in dispute.

22  But nothing requires limiting the step of preheating to that

23  specific way.

24            THE COURT:  Now, why does this matter?  They

25  microwave their bacon?
```

1           MR. SELINGER:  What Hormel does in part is,

2   before they put the bacon in the microwave, they pre-heat

3   it -- before they put their bacon in the spiral oven, they

4   pre-heat it in a microwave.  The bacon is frozen, and if you

5   warm it up a little bit in bulk, it cooks a little better.

6   So that's what they're doing.

7           THE COURT:  But just help me out.  I'm trying to

8   figure out the big picture here.  Right?  It's a dependent

9   claim, so am I right that to find them infringing claim 2,

10  you've first got to find they infringe claim 1?

11          MR. SELINGER:  That's correct.

12          THE COURT:  So why does this matter?

13          MR. SELINGER:  In the scheme of things, it's

14  more about invalidity, Your Honor, than anything else,

15  because Hormel is going to say all of the claims are

16  invalid, but they've got different prior art, additional

17  prior art for, that they combine with prior art for the

18  independent claims for the dependent claims.  So that's why

19  it matters.  It's a tradeoff here.

20          THE COURT:  So it's harder for them to

21  invalidate claim 2 than claim 1?

22          MR. SELINGER:  In my opinion, yes.

23          THE COURT:  All right.  And then when you look

24  at the language of column 6, I think it was, you know,

25  column 6.

1          MR. SELINGER:  Six or eight.

2          THE COURT:  I think it was six, line 25.

3   There's a discussion of the alternative embodiment.  Sorry.

4   It's eight.  Yes.  I'm getting mixed up.  So it's eight

5   around line 46.

6          MR. SELINGER:  Yes.

7          THE COURT:  Now, that's the only discussion in

8   the written description about the alternative embodiment.

9   Correct?

10          MR. SELINGER:  Yes, that's correct.

11          THE COURT:  And give me an idea of how this

12   looks physically.  So I see the diagram and you've got the

13   conveyor belt or something bringing the bacon into the

14   cooking chamber.  But, first of all, how big is that?

15   That's big.  Right?

16          MR. SELINGER:  The example I gave the first time

17   we were in chambers was twenty-something feet by

18   fifteen feet by sixteen feet.

19          THE COURT:  Now, you're describing the chamber

20   at that point though.  Is that right?

21          MR. SELINGER:  That's the shell, the spiral oven

22   shell.  The conveyor belt takes up most of it, it's in it.

23   There's --

24          THE COURT:  Right.  But before the conveyor

25   belt -- I mean, it's a continuous loop.  Right?  But

1    before -- if you turned it on, there's part of it outside

2    the chamber?

3             MR. SELINGER:  The conveyor belt starts outside

4    the chamber.

5             THE COURT:  All right.

6             MR. SELINGER:  That's correct.

7             THE COURT:  Now, what kind of room is that in?

8             MR. SELINGER:  It's a very big one.  We're

9    talking --

10            THE COURT:  Is it a self-enclosed -- in other

11   words, the microwaving is done in another room and then the

12   microwaved bacon is brought and put on the conveyor belt, or

13   how does it work?

14            MR. SELINGER:  There are going to be some big

15   boxes.  They're going to have a spiral oven, big boxes, and

16   then in front of that you're going to have in this case a

17   microwave oven that is used to warm bacon before -- before

18   it goes into --

19            THE COURT:  The separate piece of equipment?

20            MR. SELINGER:  The separate piece of equipment.

21            THE COURT:  Okay.

22            MR. SELINGER:  And then there's a slicer.

23   There's probably a growth slicer, because we're talking

24   about large pieces.

25            THE COURT:  All right.  I'm just trying to go

1    back because of the time.

2            If I wasn't going to use a microwave to do the

3    preheating or the pretreating, right, where do I get that

4    done?

5            MR. SELINGER:  You can do that using other kinds

6    of equipment.  You can use an IR heater.  You can use an

7    electric heater.

8            THE COURT:  Where is that done?  Is it on the

9    conveyor belt?

10            MR. SELINGER:  It's before the conveyor belt.

11            THE COURT:  Before you put it on the conveyor

12    belt?

13            MR. SELINGER:  That's right.

14            THE COURT:  Okay.  All right.

15            MR. SELINGER:  Your Honor obviously knows these,

16    so let's -- and the last thing I want to point out is on

17    slide 70, claim 31 was amended, and it was -- the Court is

18    aware when a claim is amended, additions are underlined and

19    deletions are strike-throughs.  So this is how the claim is

20    amended to become claim 2, by further comprising the step of

21    preheating the bacon prior to entering and the Examiner let

22    it in.  There's nothing in the claim language that requires,

23    I don't believe, that the preheating be done in the spiral

24    oven.

25            THE COURT:  So I agree with you.  It's not that

1    it requires it.  I'm kind of -- you know, the way I

2    understand the law is then, since there's nothing in it,

3    there has got to be a clear limitation --

4              MR. SELINGER:  Yes.

5              THE COURT:  -- somewhere, and there isn't.

6              MR. SELINGER:  Correct.

7              THE COURT:  I'm with you on that.  But, on the

8    other hand, I will say, what bothers me is I read that

9    paragraph and it says, in addition, in an alternative

10   embodiment of the inventive method, can optionally be

11   pre-treated prior to entering the spiral oven and contacting

12   the raw slices with dry, i.e., superheated steam.  It

13   bothers me there.  I'm just wondering, it is a clear

14   indication, is it not, that that's all they were thinking

15   about?  That you achieved this pretreating by using the

16   superheated dry steam?

17             MR. SELINGER:  That was a specific embodiment

18   Mr. Howard was thinking of at the time.

19             THE COURT:  Right.

20             MR. SELINGER:  But as we point out, that wasn't

21   intended to be limiting.

22             THE COURT:  Right.

23             MR. SELINGER:  It was an alternative embodiment,

24   and there is the language at column 9, lines 20 through 27.

25   Presently preferred embodiments have been described,

1    numerous changes and modifications will be apparent to those

2    of ordinary skill in the art.

3              And so while it is a single embodiment, there's

4    no clear, clear and unequivocal indication that that is

5    limited to superheated steam.

6              THE COURT:  So, but you know what kind of

7    bothers me as well is you just, to your credit, to be

8    candid, when I said what's the real issue here, and you say

9    it's invalidity.  So it seems ironic to say the least that

10   you would uphold claim 2 because there's this microwave

11   possibility out there that the inventor didn't even think

12   of.  So I mean that seems to be very bizarre that we would

13   uphold a patent when based on a theory that wasn't even in

14   the head of the inventor.

15             MR. SELINGER:  Well, let me be clear, because

16   it's not -- there's a side issue here.  In 2006, Mr. Howard

17   drew a sketch that specifically showed a microwave is part

18   of the flow.  That's not in this case at this point.  But to

19   your Honor's --

20             THE COURT:  Mr. Howard?

21             MR. SELINGER:  The inventor.

22             THE COURT:  So the real inventor.  Not the one

23   you're trying to sue?

24             MR. SELINGER:  That's right.  That dispute

25   actually -- the dispute I just described is actually in the

1    other case.

2              THE COURT:   In the other case.

3              MR. SELINGER:   But on the point of invalidity,

4    invalidity is not going to turn on microwave.   It's going to

5    turn on --

6              THE COURT:   Pretreating, preheating?

7              MR. SELINGER:   Preheating.   And if the claim

8    is --

9              THE COURT:   So then why does it matter?   Why

10   do we have to worry about microwave?   Like, why do you

11   really --

12             MR. SELINGER:   I'm not trying to read microwave

13   in here.   I'm just trying not to limit.

14             The other --

15             THE COURT:   That's true.   That's the more

16   accurate way to state it, but I'm also wondering, who cares?

17   Whether they used a microwave or not to infringe claim 2,

18   they've got to infringe claim 1.

19             So let's say, let's just take for argument's

20   sake.   Let's just say I said, you know what, it doesn't

21   cover microwave, so where are we?   What is the difference as

22   a practical matter in this case?

23             MR. SELINGER:   As a practical matter, it would

24   still have this little tradeoff on invalidity and

25   noninfringement.   And let me add one other thing.

```
 1               THE COURT:  I thought you just said it didn't.

 2     You said the microwave, it's the pretreating, not the

 3     microwave that goes to invalidity.

 4               MR. SELINGER:  Well, the microwave doesn't apply

 5     for invalidity, but if Your Honor construes the claim as not

 6     limited to superheated steam, which is the construction we

 7     proposed --

 8               THE COURT:  Correct.

 9               MR. SELINGER:  -- then it's going to cover more

10     broadly, and broader prior art would be applicable.  If Your

11     Honor construes it more narrowly --

12               THE COURT:  Wait.  You don't want broader prior

13     art because that makes it easier to invalidate the patent.

14               MR. SELINGER:  That's the case.

15               THE COURT:  So I'm confused why you want to

16     make, why you are fighting this battle.  Tell me, why are

17     you fighting the battle?

18               MR. SELINGER:  Two reasons.  Again, it's an

19     additional basis for infringement and it's an additional

20     hurdle for invalidity.

21               THE COURT:  But as a practical matter, you have

22     to infringe claim 1.  So if they infringe claim 1, whether

23     they're using pretreating or not, they infringe claim 1, why

24     are we litigating whether they infringe claim 2?

25               MR. SELINGER:  Because they've got all sorts of
```

1    defenses, invalidity defenses to claim 1, and not all of

2    those defenses may equally fit as to claim 2.

3              THE COURT:  Okay.  Hold on a second.

4              All right.  So your point is they would just

5    invalidate claim 1 and all you're left with is claim 2?  So

6    that's why you're litigating?

7              MR. SELINGER:  Correct.

8              THE COURT:  All right.

9              MR. SELINGER:  So there's no confusion in the

10   record, Your Honor, let me also say, we believe Hormel is

11   using a steam curtain with superheated steam in addition to

12   the microwave.

13             THE COURT:  Okay.

14             MR. SELINGER:  That's not a today fight.

15             THE COURT:  All right.  Let's quickly go to the

16   last thing.  Now, this is the cooking medium issue I was

17   trying to get to.  Maintaining a cooking and browning

18   temperature of the superheated vapor cooking medium.

19             MR. SELINGER:  Yes.

20             THE COURT:  All right.  So are there

21   thermometers throughout this 20-foot, whatever it is,

22   cooking chamber?

23             MR. SELINGER:  From what we've seen with Hormel,

24   there are not.  There may be one or two.  We're in the

25   process of getting views, but it's not completely -- it's

1    not completely an instrument with thermometers.

2              So very briefly, first, they are not construing

3    it grammatically correctly.  Which heat at 325 modifies the

4    heating element, not maintaining a temperature.  Correctly

5    read, we believe the claims require that the heating

6    elements heat the cooking medium to at least 325 as the

7    medium passes over the heating elements.

8              The specification --

9              THE COURT:  I got confused on it.  That's why I

10   asked where the temperatures are.  As it passes over.  I

11   mean, it's in this big chamber.  The bacon is moving up the

12   spiral?

13             MR. SELINGER:  Yes.

14             THE COURT:  Right?  The medium is moving because

15   it's injected in.  Is it injected in once and then you close

16   off the chamber and heat it, or, no, it keeps getting

17   injected constantly, hot stuff?

18             MR. SELINGER:  Some may be added, but the way

19   this works, the superheated steam is initially injected.

20   And if you look at colored figure, you'll see there's

21   heating elements at the top.  There are fans.  There are

22   nozzles.  And there's some arrows that show the flow.  So

23   it's being recirculated for the most part.  To the extent

24   there's some leakage, and I think there often is, you can

25   add a little bit more.  But the bulk of it is being

```
 1    recirculated.

 2              THE COURT:  So where would you measure it?

 3              MR. SELINGER:  I would measure at 14, which was

 4    heating elements, and that's consistent with what the

 5    specification describes in slide 81.  The electrical heating

 6    elements 14 will preferably be tightly controlled at the

 7    desired setpoint, and the setpoint is the temperature using

 8    a thyristor or similar device.

 9              THE COURT:  What's a thyristor?

10              MR. SELINGER:  It is a type of temperature

11    controlled rheostat.  It's a variable resistor.

12              THE COURT:  All right.  Thank you.

13              MR. SELINGER:  Thank you.

14              MR. NIEDERLUECKE:  Good morning, your Honor.

15              THE COURT:  Good morning.

16              MR. NIEDERLUECKE:  Kurt Niederluecke, Fredrikson

17    & Byron.

18              I will switch it over here.  Your Honor, may I

19    approach and provide slides?

20              THE COURT:  Yes.

21              (Mr. Niederluecke handed slides to the Court.)

22              MR. NIEDERLUECKE:  Your Honor, we're not able to

23    do the defense presentation with the switching.

24              THE COURT:  There you go.

25              MR. NIEDERLUECKE:  There we go.  Bindu is a
```

1     pro.

2               Your Honor, I will start just very quickly and

3     explain how the system works in Hormel's system.

4               Hormel's system starts with a bacon slicer.  Big

5     slabs of bacon come in.  They get sliced up.  They got laid

6     onto a conveyor.  That conveyor goes through a number of

7     microwaves.  Then it goes on the conveyor.  It's then

8     transferred to a second conveyor, which then moves into an

9     oven which cooks, and then after that, it moves into another

10    conveyor which moves into a chilling oven or chilling,

11    spiral chiller, which chills the bacon back down.  So

12    there's a number of separate elements to that.

13               THE COURT:  But the patent is covering the

14    middle?

15               MR. NIEDERLUECKE:  The patent covers the oven

16    itself and that's it.  And one of the things about this

17    oven, you see the picture that's in the example.

18               THE COURT:  Well, in fairness, incidentally, I

19    don't think you can dispute, claim 2 covers some preheating.

20    You might dispute whether it's microwave or not.  That is

21    talking about before it gets to cooking.

22               MR. NIEDERLUECKE:  It's talking about, and I

23    will explain it, it's talking about before it gets to the

24    cooking chamber.  There's the oven, the spiral oven, and

25    it's defined differently, and then there's the chamber

 1    within the oven.

 2              THE COURT:  Why don't you show me the

 3    difference, then show me a diagram.

 4              MR. NIEDERLUECKE:  Certainly.  I don't think I

 5    have it in my slides because he has it in his.

 6              THE COURT:  Well, let's look at the figure.

 7              MR. NIEDERLUECKE:  At the figure, Your Honor --

 8              THE COURT:  Actually, do you mind if he uses the

 9    figure?

10              MR. SELINGER:  Absolutely, Your Honor.

11              THE COURT:  Thank you.  Okay.  So it's in a

12    chamber?

13              MR. NIEDERLUECKE:  So the oven itself is tan.

14    It includes everything.

15              THE COURT:  All right.  Hold up.  Yes, it's tan.

16    All right.

17              MR. NIEDERLUECKE:  The chamber is what they've

18    colored -- in their picture, the chamber is what they've

19    colored in yellow.

20              THE COURT:  Okay.

21              MR. NIEDERLUECKE:  So the chamber is within the

22    oven, but it's not the oven itself.  The oven contains a

23    number of things.

24              So --

25              THE COURT:  So the oven is the elements, and

1    you're saying the chamber --

2                MR. NIEDERLUECKE:  The spiral, the spiral are

3    the conveyor into the oven, and then it moves into the

4    cooking chamber where it's -- where the medium is intended

5    to contact the bacon.  So the cooking medium --

6                THE COURT:  You agree that's the definition of

7    medium Mr. Selinger gave?

8                MR. NIEDERLUECKE:  I agree the medium as defined

9    in this patent is superheated steam.

10               THE COURT:  Yes.  Okay.

11               MR. NIEDERLUECKE:  As defined in this patent,

12   the medium is superheated steam.  Because it's a cooking

13   medium, it's superheated steam that is contacting the bacon

14   as it's going up.

15               THE COURT:  Yes.

16               MR. NIEDERLUECKE:  That's the definition, and we

17   all agree with that.

18               And when you look at these ovens, you have a big

19   spiral inside of a square.  A rectangular box, actually.  I

20   think ours are about 12 by 30.

21               And in this example, you see the heating

22   elements up above.  For example, in Hormel's system, you

23   have the spiral going up, and then about 10, 12 feet away,

24   you have not electrical heating elements, but you have fluid

25   heat transfer pipes.

1                   And so the air actually goes out of this heating

2      area that's in yellow, travels over to another area in which

3      pipes assist to keep the temperature up.

4                   THE COURT:  Oh, are the pipes inside the oven?

5                   MR. NIEDERLUECKE:  They're inside the oven, but

6      they're not inside the chamber.

7                   THE COURT:  And the chamber --

8                   MR. NIEDERLUECKE:  The cooking --

9                   THE COURT:  Separated off?  Are the elements

10     inside the chamber?

11                  MR. NIEDERLUECKE:  Are the elements?  The

12     heating elements?

13                  THE COURT:  Yes.

14                  MR. NIEDERLUECKE:  No.  They're spaced quite a

15     ways away in this --

16                  THE COURT:  But they are in the oven?

17                  MR. NIEDERLUECKE:  They're in the oven, yes.

18                  THE COURT:  Okay.

19                  MR. NIEDERLUECKE:  That part of it is in the

20     oven but it's not in the chamber.

21                  THE COURT:  What is in the chamber?

22                  MR. NIEDERLUECKE:  In the chamber is a big

23     spiral conveyor that just goes up, and air is pushed

24     through, down through that chamber.

25                  THE COURT:  What about the pipe?  Are any pipes

1    in the chamber?

2              MR. NIEDERLUECKE:  I think the pipes are

3    probably just like the pipes that bring the steam in.  They

4    are not in the chamber -- I couldn't tell you exactly.  The

5    pipes come very near the chamber.

6              THE COURT:  Okay.

7              MR. NIEDERLUECKE:  Whether or not technically

8    they fall within what we define as the chamber.

9              THE COURT:  What is 18?

10             MR. NIEDERLUECKE:  18 is a fan.

11             THE COURT:  All right.

12             MR. NIEDERLUECKE:  18 is a fan in the chamber in

13   this example.

14             THE COURT:  It's in the chamber though?

15             MR. NIEDERLUECKE:  That fan is in the chamber,

16   yes.

17             THE COURT:  All right.

18             MR. NIEDERLUECKE:  And so that's -- 18 is

19   assisting with the airflow.

20             THE COURT:  Okay.  And your point, the

21   pretreating --

22             MR. NIEDERLUECKE:  So, Your Honor, the

23   preheating --

24             THE COURT:  Yes.

25             MR. NIEDERLUECKE:  And let me get back --

```
 1                    THE COURT:  Is prior to entering the chamber?
 2                    MR. NIEDERLUECKE:  Correct.  First of all --
 3                    THE COURT:  So, in other words, it doesn't
 4    matter.  It could still be in the oven?
 5                    MR. NIEDERLUECKE:  In fact, it has to be in the
 6    oven, Your Honor, and I will explain that.
 7                    THE COURT:  Why does it have to be in the
 8    oven?
 9                    MR. NIEDERLUECKE:  Well, if we go to slide 49,
10    Your Honor.  If you could turn to slide 49.
11                    I don't know how to go directly to it with my
12    clicker, so I apologize.
13                    THE COURT:  That's all right.
14                    MR. NIEDERLUECKE:  But we'll get there.  So
15    slide 49, Your Honor.  Remember, claim 2 as you brought up,
16    claim 2 is a dependent claim.  And your question is a good
17    one.  It's why do they want to expand claim 2?  In fact, if
18    they're worried about invalidity, they shouldn't want to,
19    but I assume they need it --
20                    THE COURT:  Wait, wait.  Take me through it.
21    If they're worried about invalidity, they shouldn't want
22    to?
23                    MR. NIEDERLUECKE:  If they're worried about
24    invalidity, they shouldn't want to seek an expanded
25    definition, because that's going to make claim 2 more likely
```

1    invalid.

2             THE COURT:  Okay.

3             MR. NIEDERLUECKE:  They're expanding claim 2 in

4    the hopes -- we have we have an IPR.

5             THE COURT:  No.  But their point is that --

6    isn't their point that he's saying there's more prior art

7    related to claim 1, so he has got a better chance of

8    defeating your invalidity argument with respect to claim 2.

9    Therefore, he wants to make sure you infringe claim 2.

10            MR. NIEDERLUECKE:  Yes.

11            THE COURT:  That's where we are.  Right?

12            MR. NIEDERLUECKE:  He wants to thread the

13   needle.  The goal is to thread the needle.

14            THE COURT:  Okay.  Well, in fairness to him, I

15   mean --

16            MR. NIEDERLUECKE:  Yes.

17            THE COURT:  All right.

18            MR. NIEDERLUECKE:  Understandably.  But here's

19   the point on the second part about where this has to occur,

20   Your Honor.  It can't just be anywhere prior.

21            THE COURT:  So tell me.  I want to hear that.

22   Where in claim 2 does it say it has got to be inside the

23   oven?

24            MR. NIEDERLUECKE:  Well, let's look.  If we look

25   on slide 49, claim 2 is dependent on claim 1.  Right.

1                    THE COURT:  Right.

2                    MR. NIEDERLUECKE:  So we start with claim 1.

3       And it says, claim 2 talks about optionally pretreating or

4       preheating, as we've agreed.

5                    THE COURT:  Right.

6                    MR. NIEDERLUECKE:  Claim 1 says that the process

7       for continuously cooking and browning slices in a spiral

8       oven.

9                    THE COURT:  So that is key for you?

10                   MR. NIEDERLUECKE:  That's key.

11                   THE COURT:  All right.  Now, where is that?

12                   MR. NIEDERLUECKE:  That's in -- it's in the

13      preamble of one.

14                   THE COURT:  So if it's in the preamble for one,

15      isn't the preamble limiting?

16                   MR. NIEDERLUECKE:  It's not.  That's if you

17      agree the preamble is limiting.

18                   THE COURT:  You're telling me it's limiting.

19                   MR. NIEDERLUECKE:  I'm telling you --

20                   THE COURT:  You're telling me it's limiting so I

21      can interpret claim 2.  That's my point.

22                   MR. NIEDERLUECKE:  I'm going to explain.  I'm

23      going to go to the limiting, non-limiting.

24                   THE COURT:  We're on it.

25                   MR. NIEDERLUECKE:  Right.  We are in part.  So

1    it's in a spiral oven.

2             THE COURT:  So you want to read a limitation,

3    you want to read the preamble to limit as far as in the

4    spiral oven, but it's not limiting with the other terms?

5             MR. NIEDERLUECKE:  You know what, Your Honor, it

6    depends on how you want to read it.  The spiral oven is a

7    limiting term within the body of the claim, and I'm going to

8    go through.

9             And I know, you think I'm talking out of both

10   sides of my mouth, and I'm not, and I will explain when I

11   get back to that term about limiting.

12            THE COURT:  Okay.

13            MR. NIEDERLUECKE:  Okay.  But if you decide that

14   those structural terms that are in there such as a spiral

15   oven and a cooking chamber, if you find that they are

16   limitations, then this limitation that has to happen in a

17   spiral oven will be a limitation.

18            The other paint that we're --

19            THE COURT:  I totally agree with you.  You're

20   telling me not to read a limitation.  So if I don't read the

21   preamble as limiting, how do I read claim 2 to be limited to

22   in an oven?

23            MR. NIEDERLUECKE:  If you, other than what

24   they've described and disclosed in their patent, which I'm

25   going to go through in the former part of that, this is why

1   you would limit it strictly to in an oven.

2           THE COURT:  Okay.

3           MR. NIEDERLUECKE:  Okay.

4           THE COURT:  Let's go back to claim 1.

5           MR. NIEDERLUECKE:  You see that claim 2 talks

6   about the cooking chamber, not the oven.  So it has to be

7   within the oven, but before you get to the cooking chamber.

8           THE COURT:  Yes.  So it makes sense to me it's

9   limiting.  So let's quickly do the limiting.

10          So this is one example.  Right?  You've got an

11  antecedent basis for a spiral oven.  There are other terms

12  that you've asked me to construe, or that are, rather, there

13  are other terms, right, structural terms that have an

14  antecedent basis in the preamble.

15          Do you agree with that?

16          MR. NIEDERLUECKE:  Yes.

17          THE COURT:  Okay.

18          MR. NIEDERLUECKE:  I don't want to disrupt

19  you.  Just so we can get off that last term, I don't know

20  if you want to come back to it.  I want to make one comment.

21          THE COURT:  What term?  On the preheating?

22          MR. NIEDERLUECKE:  On the preheating.  Just one

23  comment.

24          THE COURT:  Go ahead.

25          MR. NIEDERLUECKE:  Your Honor, you made the

1    comment about how you feel like there's very limited

2    information in the specification about it, but it doesn't

3    say it's limiting, and you're looking for a disclaimer.

4              There doesn't have to be a disclaimer, Your

5    Honor.  The claim has to be read in light of the

6    specification, so it's about what one of ordinary skill in

7    the art would understand in light of the specification.

8              The specification is very clear.  It defines

9    what he is talking about, what he was thinking about in

10   preheating.  It was preheating.  It was superheated steam.

11   It's very clear there's no alternatives explained.  That's

12   the only thing that's provided.

13             And so in light of the specification when you

14   read it together, it makes very clear, and I think that is

15   what Your Honor is feeling, makes very clear --

16             THE COURT:  You shouldn't infer by my questions

17   what I'm feeling, because frankly, if you want to know, I'm

18   reading the case law and it says, now, you've got to have a

19   pretty explicit disclaimer, and I don't see any explicit

20   disclaimer.  It strikes me, that's the way I read the case

21   law, which I have to apply the case law.

22             My questions went to, it does strike me as

23   ironic and perhaps even somewhat unfair that you could

24   essentially not have even a conception of the particular

25   embodiment and yet it's covered by the patent.

```
 1              MR. NIEDERLUECKE:  Right.
 2              THE COURT:  The Federal Circuit says, as far as
 3    I can tell, it's not a problem, and there's actually --
 4    there's reservation language, if you will, in column 9 which
 5    basically says, we may not be thinking of all the
 6    embodiments, but there's others out there.
 7              Let's just do this.  Let me just ask you on
 8    this.  Let's suppose on the maintaining and temperature,
 9    you've got maintaining a temperature of at least 325 degrees
10    Fahrenheit throughout the cooking chamber.  What about -- I
11    mean, how would you even measure that?
12              MR. NIEDERLUECKE:  How will you measure that?
13              THE COURT:  Yes.
14              MR. NIEDERLUECKE:  You'd have measurement, you'd
15    have temperature probes in your cooking chamber.
16              THE COURT:  And how many would you need?  You
17    know, would you need -- you just have one?
18              MR. NIEDERLUECKE:  Hormel has two.
19              THE COURT:  But --
20              MR. NIEDERLUECKE:  One in the upper portion and
21    one in the lower portion, Your Honor.  That's an
22    infringement issue, Your Honor, as to how they are proven.
23    There's evidence to tell them whether or not we do, because
24    we measure that constantly throughout the cooking process.
25    So that's an infringement question on how we do that.  The
```

```
1    question here is, is what do these claims mean?
2              THE COURT:  No, no.  It seems to me it's
3    relevant.  For instance, if you only had one temperature
4    gauge in these things, it's right next to the elements, I
5    think that would be strongly corroborative of the
6    interpretation of the plaintiff's claim.
7              MR. NIEDERLUECKE:  Well, for example, we have
8    two that are right in the chamber, so it's corroborative
9    art, but I don't think that you can -- I don't know that the
10   Court can use that to substantiate this.  But if it did, we
11   have two that are in the cooking chamber.
12             The point here is, you're maintaining, and you
13   brought it up.  It's what is this cooking chamber and what
14   is the cooking medium?  And I think we agree.  The cooking
15   medium is this 100 percent superheated steam that contacts
16   the bacon.  Where does it contact the bacon?  It contacts
17   the bacon in the cooking medium.
18             THE COURT:  But you agree that the temperature
19   is going to fluctuate within the cooking chamber.  Right?
20             MR. NIEDERLUECKE:  I expect it -- it would vary
21   as the steam goes --
22             THE COURT:  Goes down.
23             MR. NIEDERLUECKE:  Goes through the bacon.  I
24   would imagine --
25             THE COURT:  So it's coming in the top.  Right?
```

1           MR. NIEDERLUECKE:  Yes.

2           THE COURT:  So it would be hotter up there than

3    it's going to be at the bottom.  Right?

4           MR. NIEDERLUECKE:  Correct.  Correct, Your

5    Honor.  Correct.  And I think, you know, when you look at

6    what happened here in terms of this claim, the applicant was

7    very clear in terms of what he was saying, and the Examiner

8    understood that they made the amendment to put this in so

9    that the temperature of the steam in the oven would be at

10   least 325.  So it could be 325 in the lower, it could be 350

11   in the upper portion.  It could be 400 in the lower, 450 in

12   the upper, whatever those temperatures are.  The key is, it

13   has to be at least 325, and the reason is because there was

14   a rejection over a piece of prior art that talked about

15   temperatures that were lower than that for browning and with

16   steam, which is much lower than the temperatures of at least

17   325 for browning with steam.

18           So the point is, everyone understood that to

19   brown with steam, you have to be at 325.  That means during

20   the time that that cooking medium, which we all agreed to,

21   is contacting that bacon, which we agreed to, that has to be

22   at least 325.  It could be as high as you want to go.

23           But the whole point of these modifications and

24   the explanations that were provided are to differentiate it.

25   I think if I heard right, their suggestion is that the 325

1   actually talks about the temperature of the electric

2   elements, and there is nothing in the claims, there's

3   nothing in the specification, there's nothing in the file

4   history that suggests that.  This is talking about the

5   temperature of the cooking medium, and that you have to heat

6   it to 325.

7               THE COURT:  Isn't there something though

8   persuasive about the idea that both for writing patents,

9   interpreting them, and I should say in addition in

10  determining infringement, that you have something that's

11  measurable, and it makes sense to say, we're going to have a

12  temperature criterion to have it measurable, and it's

13  measurable if you measure the temperature of the steam as

14  it's being injected as opposed to figuring out where in

15  the chamber, place the temperatures.  You know, you want

16  throughout.  So if you have ten temperature gauges, are they

17  all ten that have to be 325 or more?  If you only have two,

18  is that good enough?  If you only have one whereas if you

19  know you're putting steam in at 325, it's really very easy

20  to determine.

21              MR. NIEDERLUECKE:  Two things, Your Honor.

22  Number one, and I want to make sure we're clear.  When we

23  talk about putting steam in, that's not what we're talking

24  about here.  This is talking about after the steam comes in.

25              THE COURT:  The medium.

1          MR. NIEDERLUECKE:  It's the medium that's in

2    there, and it will -- you need to keep it heated, so that

3    while steam is in there, it stays up to that temperature,

4    that 325.  So that's the air that goes out, comes over

5    here gets heated and comes back around and then goes back

6    in.

7          Does that make sense?  So it actually goes out

8    to another area.

9          THE COURT:  The medium goes out?

10         MR. NIEDERLUECKE:  Well, the medium is in there.

11         THE COURT:  Yes.  I thought the medium never

12   leaves?

13         MR. NIEDERLUECKE:  Well, the medium actually

14   travels -- when it's contacting the bacon, that's when it's

15   the cooking medium.

16         THE COURT:  All right.

17         MR. NIEDERLUECKE:  Now that superheated steam,

18   you can call it something else at this point if you want,

19   goes out of that spiral.  It's just a big spiral.  It goes

20   out of that spiral, goes over to another part of the oven,

21   which in his example is above.

22         In ours, it goes a ways down through the other

23   end of oven.  And there, there are heating elements that

24   provide -- so it picks up heat there.

25         THE COURT:  It goes back in.

```
1              MR. NIEDERLUECKE:  It goes back in again.

2              THE COURT:  It's only the medium when it's going

3    through the bacon?

4              MR. NIEDERLUECKE:  Right, because that's a

5    cooking medium.  Out here it's not cooking anything until it

6    gets into here.  That's the point.  That's why it has to be

7    325.  Whether you measure it in one place, whether you

8    measure it in ten places, if we have one measurement in

9    there, it is going to go down to what is that measure?  We

10   have two, it is going to come down to those.

11             The point is, when you are cooking the bacon,

12   what's made clear by the invention is that you have to cook

13   it at a temperature of at least 325.  The Patent Examiner

14   got that.  The Patent Examiner identified lower temperatures

15   that would otherwise invalidate.  And they brought this

16   claim in, this limitation to make clear.

17             And so the point on slide 56, which he makes --

18   their construction, which actually says nothing about how

19   hot the temperature is when it's actually cooking, that's

20   the problem we have here.  What they want to say is, it's

21   the heating element.  That doesn't tell us anything about

22   the cooking and it certainly doesn't differentiate from the

23   prior art.

24             THE COURT:  So that means, too, if I didn't want

25   to infringe this the patent, I could do exactly what it
```

1   says, inject with steam at 315, the oven would never get

2   hotter than 315 and I wouldn't infringe.

3               MR. NIEDERLUECKE:   Correct.

4               THE COURT:   Okay.

5               MR. NIEDERLUECKE:   Just like that piece of prior

6   art though.

7               THE COURT:   Well, a piece of prior art is 160 to

8   225.

9               MR. NIEDERLUECKE:   Correct.

10              THE COURT:   Let's quickly move.

11              MR. NIEDERLUECKE:   Okay.

12              THE COURT:   We've got to watch the time.

13              MR. NIEDERLUECKE:   Okay.

14              THE COURT:   I've got you on this one.   Let's go

15   to the preamble.

16              MR. NIEDERLUECKE:   Yes.

17              THE COURT:   I don't know how you avoid that

18   there aren't substantive limitations on an antecedent base.

19              MR. NIEDERLUECKE:   There is antecedent basis,

20   Your Honor.

21              THE COURT:   So you're just going to go and look

22   at this language which I find very confusing, to be candid,

23   when it comes to stating the purpose of the invention.

24   Right?

25              MR. NIEDERLUECKE:   Yes.   Right.   You know, Your

1   Honor, I think when you talk about the structure of the

2   limitations that are in there, they're in the claim.

3                THE COURT:  Right.

4                MR. NIEDERLUECKE:  So whether you want to call

5   the preamble limiting or whether you want to call it not

6   limiting -- sorry, apologize.  Again, I'm not a pro at

7   this.

8                But whether you're talking about limiting or not

9   limiting, it really doesn't matter, because they're in the

10  claim itself.  There's nothing additional.  Our point on

11  that --

12               THE COURT:  All right.  Then why don't you just

13  agree to that?

14               MR. NIEDERLUECKE:  The agreement of literally

15  the structural, a spiral oven --

16               THE COURT:  No.  Agree that the preamble is

17  limiting.

18               MR. NIEDERLUECKE:  It's not, Your Honor.  In a

19  whole, it's not, and I will turn to the law, Your Honor.

20  It's TomTom versus Adolph.

21               The preamble has two things in it.  It provides

22  an antecedent basis, and we don't dispute that, to certain

23  structural terms.

24               THE COURT:  All right.

25               MR. NIEDERLUECKE:  We don't think they're

1    limiting because the structural terms appear in the claims.

2    We don't need to.  The case law explains that.  Even if Your

3    Honor says I'm going to find those limiting, it's not going

4    to matter in the case.

5                 THE COURT:  Okay.

6                 MR. NIEDERLUECKE:  But even if an antecedent

7    basis is enough, you can't say the whole preamble is

8    limiting.

9                 THE COURT:  Well, you don't dispute that to

10   produce a pre-cooked bacon product resembling a pan-fried

11   bacon product, that is the purpose of the invention.

12   Right?

13                MR. NIEDERLUECKE:  No.

14                THE COURT:  What is the purpose of the

15   invention?

16                MR. NIEDERLUECKE:  The purpose of the invention

17   is to run the methods to have improved bacon.

18                THE COURT:  Resembling a pan-fried bacon

19   product.

20                MR. NIEDERLUECKE:  That's what they say is the

21   intended use of this method.  It's a method, and there's an

22   intended use to it.

23                THE COURT:  Yes.

24                MR. NIEDERLUECKE:  And that's the intended use.

25                THE COURT:  So that's the purpose?

```
 1                    MR. NIEDERLUECKE:  Right.

 2                    THE COURT:  What's the purpose?  I'm confused.

 3                    MR. NIEDERLUECKE:  An intended use would show,

 4    it would be one purpose, yes.

 5                    THE COURT:  Okay.

 6                    MR. NIEDERLUECKE:  So that's the purpose.

 7                    THE COURT:  So what's the purpose?

 8                    MR. NIEDERLUECKE:  Correct.

 9                    THE COURT:  So now we're all on the same page --

10    you, Mr. Selinger and me.

11                    MR. NIEDERLUECKE:  Yes.

12                    THE COURT:  So why is it limiting?

13                    MR. NIEDERLUECKE:  Because an intended use is

14    not -- it's only a rare instance that intended uses are

15    limiting.

16                    THE COURT:  Intended use when there's an

17    antecedent basis.

18                    MR. NIEDERLUECKE:  And that's why I refer you to

19    the TomTom case, Your Honor, from the Federal Circuit, where

20    they had exactly the situation where they had the antecedent

21    basis and they found the entire preamble limiting.

22                    The Federal Circuit reversed and said, even if

23    you have an antecedent basis for some structure, it doesn't

24    turn the whole preamble into a limitation, and the intended

25    use, the purpose --
```

```
 1              THE COURT:  Why does it matter?  If I say it's
 2     limiting, what does it do?
 3              MR. NIEDERLUECKE:  Well, first of all, Your
 4     Honor, if you say it's limiting, I think we win the case.
 5              THE COURT:  Well, this is my whole point.  I
 6     don't understand why you all are taking the positions you
 7     are.  Why are you fighting me finding it's limiting?
 8              MR. NIEDERLUECKE:  Frankly, Your Honor, I'm not
 9     trying to fight that hard.
10              THE COURT:  Well, then, let's move on.
11              MR. NIEDERLUECKE:  I will be honest.  If we move
12     on to indefiniteness --
13              THE COURT:  Well, we'll get to that in a day.
14     But I mean, I just don't understand why you're fighting this
15     battle.
16              MR. NIEDERLUECKE:  Because legally, the
17     statement, the intended statement, the intended use is not
18     limiting.
19              THE COURT:  Okay.
20              MR. NIEDERLUECKE:  And Your Honor has to
21     construe these claims as a matter of law, and I want -- I'm
22     trying to make sure you do it right to give you as much as I
23     intend, because I'm here as somebody who wants -- I don't
24     want you to say, I believe Mr. Niederluecke and the Federal
25     Circuit said I was totally wrong.
```

1          THE COURT:  How is the Federal Circuit going to

2   even reverse me if you are not going to appeal it?  You just

3   said you win if I construe it that way.  So you're not going

4   to appeal it.

5          MR. NIEDERLUECKE:  Fair enough.  If you find it

6   indefinite, I will not appeal.

7          THE COURT:  All right.  Let's just do the next

8   term.

9          MR. NIEDERLUECKE:  Your Honor, I want to talk --

10  so if you do find it all indefinite --

11         THE COURT:  Yes.  Let's keep going on.  Look, I

12  hear you on indefiniteness.  I don't know why they're

13  arguing, frankly, it is limit limiting, because it exposes

14  them.

15         I've been struggling with this in chambers.  You

16  both kinds of confuse me on this.  Let's move on.  We don't

17  have much time.  We've already passed the hour.

18         MR. NIEDERLUECKE:  Can I just say, Your Honor,

19  to on point, you indicate, and you are right, we fully

20  briefed, we have all experts in.  This is ripe.  If we

21  don't decide this now, it's going to have to come up.  We're

22  going to have to decide it later.  It has already been

23  briefed.

24         THE COURT:  All right.  Let's go.

25         MR. NIEDERLUECKE:  All right, Your Honor.  With

```
 1   regard to -- shall we go to air-free?  I would --
 2               THE COURT:  Yes.  Let me just ask about
 3   substantially air-free.
 4               MR. NIEDERLUECKE:  Yes.
 5               THE COURT:  I don't see the numeric -- is the
 6   only numeric thing you can point to the plus or minus one
 7   percent when it gives it as an example?
 8               MR. NIEDERLUECKE:  We have that in our expert
 9   declaration.
10               THE COURT:  Are those the only two things?
11               MR. NIEDERLUECKE:  Well, but we have that, and I
12   want to explain the context of what you saw in their papers
13   come in because I think it's important.  Your Honor, you
14   know, you were throwing out different possibilities, you
15   know, about our approximately.  I said I still have problems
16   with that.  I still think there should be a limitation,
17   because we have to have some certainty here.
18               THE COURT:  Right.
19               MR. NIEDERLUECKE:  But at or about zero
20   oxygen --
21               THE COURT:  Yes.
22               MR. NIEDERLUECKE:  That might be -- I think
23   that's closer to what we're going to see.
24               THE COURT:  All right.  So can you live with
25   that?
```

1          MR. NIEDERLUECKE:  I can live with that more

2     than the -- yes.  I mean, that's more definite, I think.  I

3     still think there should be a limitation, and if I can just

4     spend two minutes quickly walking through this.

5          THE COURT:  Go ahead.

6          MR. NIEDERLUECKE:  So here we go.  Sorry.  I

7     apologize.

8          THE COURT:  All right.

9          MR. NIEDERLUECKE:  So just to explain how this

10    came up.  In an Examiner interview, this is what they said

11    to the Examiner.  So this was a nine-year process, by the

12    way, Your Honor.  This patent took nine years to get.  Okay.

13    And this came up at the very end.  Finally, they come up

14    with this and they said to the Examiner, no.  We just want

15    to get a very specific type of oven, air or oxygen-free

16    environment using superheated vapor cooking medium.  That's

17    what they told the Patent Examiner before they had one ever

18    those interviews, which I hate, because you don't know what

19    happens.

20         So they do that, and then the Examiner says, the

21    applicant argued that the bacon was cooked in a superheated

22    vapor, no oxygen, and goes on.  And another talks about when

23    they had another interview, talked about the temperature

24    being entirely superheated steam, and suggested they could

25    make an amendment, had to be a partial pressure.  They get

there, and this is when this language comes in, Your Honor.
After they have an interview, they put in a response, they
amend their claims, and they explain how they said it's
hypothetical.  No.  This is them explaining and modifying
it, and this is where they go through and they say,
basically, we want a hundred percent steam, but we
understand there are, and they use the terms even minor and
inconsequential amounts of air and oxygen might still be
present, minor and inconsequential.  They go on and talk
about minor and inconsequential air might be detected, which
are limited by certain accuracies.  For example, plus or
minus one.

            Our expert looked at this.  Our expert said, you
know what?  Those minor and inconsequential ones that you
might get because maybe there's not a perfect seal on one of
the walls, all of that would fall at or less than one
percent.  You would be able to keep that certainly well
within one percent.  Somebody of ordinary skill in the art
would understand that.

            This explanation was given along with then this.
This is part of the same document.  The claim process, when
they talk about an air-free environment, and they
differential Hwang, which was part of the prior art, that it
can't eliminate all of the air.

            So it's important to understand, this is right

1     at the end, they just couldn't get anything.  Right at the

2     end they say, completely air-free.  We want completely

3     air-free.  Hwang can't get completely air-free.  And so

4     that's what our invention is, Your Honor.

5               And so it's important to understand, because

6     approximately comes in in dealing with this explanation,

7     where they were charging 100 percent, where they did

8     explain that these types of inconsequential elements of

9     air, that maybe you would find some molecules of air in

10    there --

11              THE COURT:  Hold up.  Mr. Selinger, have you

12    thought about the at or approximately zero percent?

13              MR. SELINGER:  Yes, Your Honor.

14              THE COURT:  Can you live with it?

15              MR. SELINGER:  I would ask the Court to delete

16    at because that's inconsistent.

17              THE COURT:  Sorry.  About or approximately zero

18    percent.

19              MR. NIEDERLUECKE:  I think it was at least or.

20    At least what I said, at or about.

21              THE COURT:  Well, I wrote it down.  Regardless

22    of whether I misstated it, what I was thinking of writing,

23    substantially air-free, substantially oxygen-free, meaning

24    about approximately zero percent air, or in the case of

25    oxygen, about or approximately zero percent oxygen.

1          Can you live with that, Mr. Selinger?

2               MR. SELINGER:  May I have ten seconds to confer?

3               THE COURT:  Ten seconds.  Sure.

4               (Pause while counsel conferred.)

5               MR. SELINGER:  Your Honor, as long as it's not

6    at.

7               THE COURT:  I said it's about or approximately

8    zero percent.

9               MR. SELINGER:  Then, yes, we can live with that

10   construction.

11              THE COURT:  Okay.  Why can't you live with that?

12   That's better than what you've proposed, an environment with

13   less than one percent.  About --

14              MR. NIEDERLUECKE:  Do you think --

15              THE COURT:  About or approximately zero percent.

16   Right?  I mean --

17              MR. NIEDERLUECKE:  So that's better than the one

18   percent limitation, Your Honor?

19              THE COURT:  You don't think it is?

20              MR. NIEDERLUECKE:  If Your Honor thinks it is,

21   then I think it is.

22              THE COURT:  It's the jury that's going to make

23   the call.  My point is, this is where I think you're both

24   arguing about nothing.  I mean, to me, it is the most

25   accurate certainly of anything that has been offered so

1    far about what substantially air-free means.  I mean,

2    basically --

3              MR. NIEDERLUECKE:  Your Honor, the Court has --

4    if we could just do about a hundred percent -- about zero

5    percent.

6              THE COURT:  No.  I'm going to go about or

7    approximately.  So you're not willing to just agree?  That's

8    fine.  That's your position.

9              MR. NIEDERLUECKE:  Your Honor, unless it's our

10   understanding that that can't be below 99 percent,

11   one percent.

12             THE COURT:  No, I'm not saying that.

13             MR. NIEDERLUECKE:  I won't agree, but I

14   certainly understand the Court's ruling.

15             THE COURT:  Okay.  All right.  Be careful what

16   you -- when you take extreme positions, they can come back

17   to bite you, because there's nothing in this patent that

18   goes above 90 percent.  The only reference to one percent is

19   the example one percent.  You know what --

20             MR. NIEDERLUECKE:  Can I --

21             THE COURT:  We don't have any more time.  You've

22   got to go to the next term.  I already said we're passed the

23   hour I set.

24             MR. NIEDERLUECKE:  Thank you, Your Honor.  Your

25   Honor, I think I will let the record stand on the

1    contacting.

2              THE COURT:  Be in contact?

3              MR. NIEDERLUECKE:  Yes.

4              THE COURT:  All right.

5              MR. NIEDERLUECKE:  On the speed.

6              THE COURT:  All right.  So then what else?  Is

7    that it?

8              MR. NIEDERLUECKE:  I think that basically covers

9    it.  My only comments on the preheating, your Honor, it

10   can't be done in a vacuum.  It has been made very clear that

11   you have to read it in light of the specification.  And the

12   idea you just read the claims and ignore the specification,

13   I understand there's a disclaimer, but that's one part.  But

14   the first thing you have to do is understand how the term

15   would be read by one of ordinary skill in the art, and

16   that's part of what the Court has to do, and I think when

17   you look at it with the only paragraph that talks about it,

18   and the paragraph said this, preheating with superheated

19   steam.  It doesn't say preheating, for example, superheated

20   steam.  It gives us a specific type.  The fact that

21   microwavable is even here is only because they found out we

22   microwave beforehand.  That's why this came out.  We've been

23   in litigation.  They found out, they added.  They wanted to

24   bring it in.

25              THE COURT:  Okay.

```
1              MR. NIEDERLUECKE:  Your Honor, unless Your Honor

2     has any other questions.  And, Your Honor, you know, if it

3     makes the Court -- if I can have ten seconds to make the

4     Court's job easier, can I just confer with counsel real

5     quick?

6              THE COURT:  Yes.  If you want to tell me whether

7     you are willing to accept about or approximately zero

8     percent to interpret that, I will give you that chance.

9              MR. NIEDERLUECKE:  Thank you, Your Honor.

10             (Pause while counsel conferred.)

11             MR. NIEDERLUECKE:  Your Honor, taking your sage

12    advice, we would be willing to agree with that.

13             THE COURT:  All right.  That's good.  So I'm

14    going to adopt that.  We'll have folks come in and we'll

15    hear whether it's about or approximately zero percent air,

16    about or approximately zero percent oxygen.

17             Okay.  All right.  That claim is interpreted.

18    Why don't you all come back at 11:00 o'clock and I'm going

19    to have a decision on at least some of the terms, if not all

20    of the terms.

21             MR. NIEDERLUECKE:  Thank you, Your Honor.

22             MR. SELINGER:  Your Honor, may I have just two

23    minutes?

24             THE COURT:  You may have two minutes.

25             MR. SELINGER:  Very quickly, claim 2 is an
```

1    additional step in the process.  It doesn't need to be

2    limited to the equipment of claim 1.  Claim 1 doesn't

3    address preheating.

4            Second, it's not a claim construction issue, but

5    there are some comments made.  I want to be clear.

6    Mr. Howard actually did have possession of more than the

7    one.  That's just what's disclosed in the spec.

8            As far as the notice of allowability slides, the

9    notice of allowability, our slide 77, which I glossed

10   through, is, in the summary of invention, it talks about

11   average of 325, and that's the consistent theme, is the

12   average.

13           Slides 82 and 86 are the notice of allowability

14   slides and 82, 82 is the one where the actual notice of

15   allowability and it's passing over.  As far as the other

16   documents counsel pointed to in 83, 4, 5 and 6, all of those

17   involve claim language of substantially.

18           The arguments may be more absolute, but the

19   claim language --

20           THE COURT:  I thought we resolved substantially.

21           MR. SELINGER:  Okay.  In that case, I will sit

22   down.

23           THE COURT:  All right.

24           MR. SELINGER:  Thank you, Your Honor.

25           THE COURT:  All right.  I will see you all at

```
 1    11:00.

 2                    (Recess taken.)

 3                        -   -   -

 4                    (Proceedings resumed after the recess.)

 5                    THE COURT:  All right.  Please be seated.

 6                    All right.  I've read the briefs carefully.  I

 7    read them before you came in today and from oral argument

 8    and the presentations, and I went back in the last

 9    40 minutes and reviewed carefully the slides, and I'm

10    prepared to rule from the bench.

11                    So let's deal first with whether the preamble is

12    limiting.  And I have read the TomTom case, and let me just

13    say, just from somebody who was a great books major and

14    spent a lot of time in philosophy courses and went to

15    graduate school on philosophy, I find it very, very

16    difficult to discern a consistent thread in TomTom or the

17    other Federal Circuit cases on this subject matter.  On the

18    one hand, the Federal Circuit instructs that a preamble

19    that's necessary to give life, meaning and vitality to the

20    claims is limiting.  On the other hand, there's certainly

21    language in the case, including TomTom, that a purpose or

22    intended use recited in the claim is not limiting.  And I

23    don't know how you distinguish something that gives meaning

24    and vitality from a purpose, so I will just do the best I

25    can.
```

1          I'm going to go with plaintiff's position on the

2    preamble, that it is limiting, first, because there are

3    terms for which the preamble gives an antecedent basis, the

4    spiral oven, the cooking chamber, the conveyor, the spiral

5    pattern.  And I note the irony that the defense in

6    interpreting the disputed term five wants me to deem it, the

7    preamble limiting, but doesn't want me to talk about this

8    first issue.  So I think there's no question.

9          I think TomTom, I think the defense is correct,

10   that it is saying you need to, just because there's an

11   antecedent basis for one limitation or one term that's in

12   the preamble doesn't mean the entire preamble is limiting,

13   but I think the language "to produce a pre-cooked sliced

14   bacon product resembling a pan-fried bacon product" is

15   necessary to give life, meaning and vitality to the claim,

16   and therefore I think under TomTom, the better reading is

17   that the preamble is limited.

18         And I will say, lastly, that I was comforted in

19   my decision by the defense position that if I adopt the

20   limitation position of the plaintiffs, the defendant thinks

21   it wins the case, and I mean, I have to say, and this goes

22   to both sides, I mean, this is what perplexes me about why

23   are we here anyway, so that's where I am on the first

24   disputed term.

25         The next term is no longer disputed I'm happy to

1    report, and the record will reflect, because both sides have

2    agreed that substantially air-free environment should be

3    construed as about or approximately zero percent air, and

4    that substantially oxygen-free environment can be construed

5    as, "about or approximately zero percent oxygen."  It's a

6    rarity in this case that we have agreement, so we should

7    embrace it when we have it, and that's how we'll construe

8    that term.

9            The third term is, "contacting the bacon slices

10   with a superheated vapor cooking medium circulating in the

11   spiral oven so as to not displace each bacon slice from its

12   respective position in the conveyor."

13           I agree with the plaintiff, that no construction

14   of this term is necessary.  As the Federal Circuit explained

15   in Thorner against Sony Computer Entertainment America, 669

16   F.3d, 1362, the words of the claim are generally given their

17   ordinary and customary meaning as understood by a person of

18   ordinary skill in the art when read in the context of the

19   specification and prosecution history.  And the only two

20   exceptions are, "first, when a patentee acts as its own

21   lexicographer, and, second, when the patentee disavows the

22   full scope of the claim term either in the specification or

23   during prosecution."  And I understand the specification

24   there to refer to the written description of the patent, not

25   a defined intention.

1          The standard for disavowal of a claim is

2    "exacting," according to the Federal Circuit in Thorner.

3    The patentee may demonstrate intent to deviate from ordinary

4    and custom meaning of a claim term by including in the

5    specification expressions of manifest exclusion or

6    restriction, representing a clear disavowal of claim scope,

7    and that again is taken from Thorner.

8          It is not enough that the only embodiments or

9    all the embodiments contain a particular limitation.  To

10   constitute disclaimer, there must be a clear and

11   unmistakable disclaimer, and all of that is quoted from

12   Thorner.

13         I therefore agree with HIP, that no construction

14   is necessary for this term.  Hormel does not really argue

15   that the term is unclear, just that the specification, the

16   written description defines with mathematical specificity

17   the flow velocity as necessary "so as to not displace each

18   bacon slice."  But the two numbers that Hormel asked me to

19   incorporate into the definition are not used in the written

20   description to clearly limit claim scope.  Indeed, one of

21   the numbers, 20 feet per second, is explicitly described as

22   preferred in the written description.  Therefore, because

23   HIP did not clearly disclaim the scope of the claim language

24   at issue, I agree that the language should be given its

25   plain and ordinary meaning and that no further construction

1    of this term is necessary.

2              So we next turn to the term, "preheating the

3    bacon slices."  It's undisputed that the parties agree

4    preheating and pretreating are the same, or to be used in

5    the same manner, rather.

6              Now, here, I think the best construction is the

7    alternative construction offered by plaintiffs, and that is,

8    "heating the bacon slices before they are delivered into the

9    cooking chamber."  And I'm informed in part here by again

10   the defense correctly pointing out that the preamble

11   distinguishes between the cooking chamber and the oven --

12   not the oven.  Rather, it just distinguishes.  So I will

13   adopt that construction.

14             The last term is "maintaining a temperature of

15   the cooking chamber," and "maintaining a cooking and

16   browning temperature of a superheated vapor cooking medium."

17   And on this one I'm going to entertain about five minutes of

18   followup argument because here is what I find to be

19   dispositive.  I'm either going to say no construction is

20   necessary or I will listen to alternative constructions

21   proposed by either counsel.  But it seems to me the key to

22   this term is looking at the language of the claims which is

23   where we start with the Federal Circuit law.  And it is

24   referring, I think the key is the last clause of the, or I

25   shouldn't say the last clause, but the clause, "which heat

1     the superheated vapor cooking medium, which is in 3D, or in

2     1D, which heat the superheated vapor cooking medium to a

3     temperature of at least 325 degrees Fahrenheit."  It seems

4     to me the focus is on the elements and what they do, and

5     that that is the best way to construe these terms.

6              Now, I can either then say no construction is

7     necessary, but I'm willing to entertain alternatives.

8              How about from the defense?  Do you want to go

9     first?

10             MR. NIEDERLUECKE:  Certainly, Your Honor.  And,

11    Your Honor, I think the which is talking about the -- I

12    agree that the which is speaking of the heating elements,

13    but then you have to move on to look at --

14             THE COURT:  I don't want to reargue it.  So, in

15    other words, I don't want to start over.

16             If you want to propose -- I don't want to, for

17    instance, reargue your position, maintaining a temperature

18    of at least 325 degrees throughout the chamber.  If you have

19    an alternative to propose, I will listen to you.

20             MR. NIEDERLUECKE:  Your Honor, I would say if we

21    said maintaining a cooking and browning temperature of

22    superheated cooking medium.  I'm trying to think on the fly

23    here, Your Honor.  I think the important thing is in claim 1

24    that it's during Step D, which is the cooking.  It talks

25    about maintaining that temperature, and that's what is being

1   referred to in that latter part.  And so I'm trying to make

2   clear in what I think is an unclear claim that that

3   temperature of 325 is the temperature within.

4            If the Court is uncomfortable with the variation

5   within the oven, then if we change the maintaining an

6   average temperature of 325 throughout the cooking chamber of

7   at least 325, which I think addresses their concerns of the

8   average being in there, so that if there is variation, at

9   least it's the average.  That's certainly while I think the

10  limitation in the latter part of the prosecution limited the

11  language necessarily to get over the art, I think that may

12  be a way to at least alleviate what I see as the Court's

13  concerns about variability within the cooking chamber.

14           So we could maintain a temperature of --

15  maintain an average temperature of at least 325 degrees in

16  the cooking chamber.

17           THE COURT:  All right.  So let's see.  Mr.

18  Selinger, could you accept an average?

19           MR. SELINGER:  Not in this context, Your Honor,

20  and the reason is because it, the claim language is passing

21  over, and so it's -- oh, I'm sorry.

22           So the proper context, Your Honor, in looking at

23  slide 74, is bypassing over one or more heating elements,

24  and the heating elements heat superheated, so on, to that

25  temperature.  So I believe the most appropriate construction

```
 1    is plain and ordinary meaning, no construction necessary.
 2              THE COURT:  All right.  I think it's a poorly
 3    written limitation.  What I understand about it is, and this
 4    is not my formal definitive construction, but I will just
 5    tell you where I'm going to come from and then I will make a
 6    decision.
 7              It seems clear to me the focus is as I
 8    mentioned, where that which clause is on the element.  The
 9    elements need to heat the vapor, if you want to call it
10    that, to a temperature such that during Step B, the
11    temperature is at least 325 degrees Fahrenheit.
12              You know, it seems to me that could be
13    established by an expert who would say that if you heat, the
14    elements heated to X degrees, you can conclude from that
15    that during Step B in the chamber, the temperature is at
16    least 325 degrees.  I guess another way to do it would be to
17    have temperature probes throughout the chamber and then
18    measure them and then we'd fight over whether it's the
19    average or not.
20              So I find the term a bit confusing.  To some
21    extent, I think you're both right, and I think the focus is
22    going to be on the elements, the heating elements, rather.
23    But, I mean, I guess because you couldn't reach an
24    agreement, as I think about it, I told defense counsel not
25    to reargue, but I think we need some precision, so I'm going
```

```
 1     to go with the defendants' proposed construction.  Have to

 2     maintain a temperature of at least 325 -- actually, except

 3     I'm going to delete "throughout."  Maintain a temperature of

 4     at least 325 degrees Fahrenheit in the cooking chamber.

 5                    Are there any questions?

 6                    MR. SELINGER:  Not from the plaintiff, Your

 7     Honor.

 8                    MR. NIEDERLUECKE:  Your Honor, my only question

 9     is with regard to the -- are the -- the limitation on

10     preamble.  We have fully briefed --

11                    THE COURT:  I'm going to get to that in a

12     second.

13                    MR. NIEDERLUECKE:  Thank you.  That's fine.

14                    THE COURT:  So what I'm going to first do, I'm

15     going to ask, Ms. Jacobs, the plaintiff, if you could put

16     together a written order that just reflects the construction

17     that I've just articulated.  It just needs to say, Proposed

18     order for the reasons articulated at today's hearing, the

19     Court adopts the following constructions of the disputed

20     terms, and then just set forth the disputed term.  And I

21     guess even disputed, and then, in addition, just put the

22     second claim that was disputed is no longer disputed.

23                    Can you do that, please?

24                    MS. JACOBS:  Yes, Your Honor.

25                    THE COURT:  Thank you.
```

1          All right.  Now, so there are three things I

2    want to talk about then going forward.  So one is

3    indefiniteness.

4          All right.  So, Ms. Jacobs, I guess I'm going to

5    anticipate, you're going to say we need some factual

6    background, but I really wonder whether we need, if we do

7    need it, how much we need, and it seems to me that there are

8    serious questions about indefiniteness that I have, and why

9    not let's address them.

10         This is one of the more contentious cases I've

11   seen, and if we can address that issue, I'm normally not in

12   favor of piecemeal dispositive motion briefing, but I'm

13   wondering if we shouldn't just put to the fore

14   indefiniteness.

15         MS. JACOBS:  Your Honor, a few thoughts about

16   that.  For one thing, and Mr. Selinger alluded to this

17   earlier.  There's really two issues.  One, it's, of course,

18   the burden of proof, and the fact that you would have the

19   defense go first and with the appropriate burdens.  I do

20   think that in this particular case, that it's a very

21   factually heavy argument about what one skilled in the art

22   would understand, and there are competing expert

23   declarations here, but there are also, had we gotten to the

24   slide deck on indefiniteness, you would have seen, you know,

25   there's probably 20 or 30 excerpts from Hormel documents

1    showing how they understand the term.

2            So I do think it's in this case unusually

3    factually intensive in terms of the expert testimony, and

4    the expert declarations here were focused on claim

5    construction primarily.  I certainly think we would want an

6    opportunity to do a fulsome expert discovery directed to

7    indefiniteness.

8            So I think those are just -- it's not the

9    typical case where you can just sort of on the four corners

10   of the patent decide whether there's an indefiniteness

11   issue.

12           THE COURT:  Well, so let me just give you an

13   example just to play this out.  I didn't read the expert

14   declarations.  So this came up in a Markman hearing the

15   other day, and the Federal Circuit is really clear that I

16   can decide this based on the intrinsic evidence, I don't

17   need to look at the extrinsic evidence.  And, Ms. Palapura,

18   as well, you might have been here at that hearing.

19           That's how I read the briefs.  So I'm telling

20   parties, look, I guess if you want to create your record for

21   the Federal Circuit or whatnot, you attach all the expert

22   declarations you want.  But in a Markman hearing, unless I

23   feel I don't even understand the background technology or I

24   need to go to an expert, I'm not doing that.  So with that

25   caveat, right?

```
1                    MS. JACOBS:  Yes.

2                    THE COURT:  I mean, you know, resembling a

3        pan-fried bacon product.

4                    MS. JACOBS:  Okay.  So here, Your Honor --

5                    THE COURT:  Let's talk about how that --

6                    MS. JACOBS:  So that's why it's important

7        particularly here to have expert testimony, because we're

8        not talking about the layman's view.  We're talking about

9        people in the food industry.

10                   THE COURT:  Right.

11                   MS. JACOBS:  Who are testing, who are, you know,

12       who are making decisions about these issues.  We're not

13       talking about how you and I as a layman might look at a

14       piece of bacon in a frying pan.

15                   THE COURT:  Right.

16                   MS. JACOBS:  We're looking at it from the

17       viewpoint of one skilled in the art.

18                   THE COURT:  Right.  I get that.

19                   MS. JACOBS:  That's why in this instance,

20       expert testimony really could be helpful given that

21       perspective.

22                   THE COURT:  I agree, it could be.  On the other

23       hand, it's probably not that -- it doesn't take much for us

24       to explore what experts would say about this.  So why not

25       raise it now?  And I'm saying you briefed it.  They have the
```

1    burden.

2            I mean, you are prepared -- I'm pointing now to

3    the defense.  You are prepared to tee this up now.  Correct?

4            MR. NIEDERLUECKE:  Yes.

5            THE COURT:  It would be your only shot.

6            MR. NIEDERLUECKE:  Yes.  And I was fine --

7            THE COURT:  With the briefs as they are?

8            MR. NIEDERLUECKE:  With the briefs as they are.

9    The experts have already opined.  They did spend a lot of

10   time.

11           THE COURT:  Well, and so then he has got the

12   burden of clear and convincing evidence.  He's content with

13   his brief.  I give you the opportunity to submit whatever

14   you want.

15           MR. SELINGER:  May I have one minute with

16   counsel, Your Honor?

17           THE COURT:  Yes.

18           (Pause while counsel conferred.)

19           MS. JACOBS:  I think a couple of things, Your

20   Honor.  One is they had a surreply declaration.  Again, the

21   focus --

22           THE COURT:  You're going to get to respond.

23           MS. JACOBS:  Okay.

24           THE COURT:  That's what I'm saying.  In a way,

25   it's better.  He is content with his briefs and you get the

1    last word.  I let you brief it, and then I decide.

2              And the only thing I am going to do is, because

3    it would be a summary judgment motion, I would want to

4    integrate the facts.

5              MS. JACOBS:  Right.  I think the only thing I

6    would add, Your Honor, is we would want some opportunity in

7    that declaration to supplement because it was claim

8    construction, it was indefiniteness.

9              THE COURT:  No.  I'm giving it to you.  That's a

10   given.

11             MS. JACOBS:  All right.  And depositions.

12             We're content with that, Your Honor.  I think I

13   would just point out from a case schedule perspective, fact

14   discovery closes in July, so we're not that far off from the

15   normal -- where we would be in the schedule in any event, so

16   by the time we got through the various things, I'm not sure

17   that we would be that far off.

18             But as long as we have an opportunity, as Your

19   Honor is saying, to supplement with our expert to put in

20   additional materials and an opportunity for depositions.

21             THE COURT:  So depositions.  You know, if fact

22   discovery doesn't end until July, then they'll have expert

23   discovery, and what do we really need?

24             MR. SELINGER:  Your Honor, if I may ask, Your

25   Honor made a comment about the summary judgment fact

```
 1    section, and that is something neither side has to have

 2    done.

 3                 THE COURT:  I know that.  I said that's the one

 4    thing, I would require the defense to do that.

 5                 MR. SELINGER:  Okay.  And they would lead, then

 6    we would respond?

 7                 THE COURT:  Well, they would have to put in a

 8    statement of concise facts, and so undisputed facts such

 9    that I can decide summary judgment in their favor on

10    indefiniteness.  So they're already done with the briefing.

11    You don't need to do a summary judgment standard.  I know

12    what that is.

13                 MR. NIEDERLUECKE:  Your Honor, just to be clear,

14    when I said I was good with the briefing, I meant the

15    parties both -- we've fully briefed this.  They had their

16    original brief.

17                 THE COURT:  Yes, yes, but --

18                 MR. NIEDERLUECKE:  I apologize, Your Honor.  I

19    didn't mean to interrupt.

20                 THE COURT:  So you're saying you are not good

21    with full briefing?  You want a chance to fully brief it if

22    they're going to get a chance to write another brief?

23                 MR. NIEDERLUECKE:  What I'm saying is we're fine

24    sticking with our principal brief if that's the way you want

25    to do it.  We're fine with the briefing as it is now.
```

1          THE COURT:  Okay.

2          MR. NIEDERLUECKE:  If you give them an

3     opportunity to respond and bring in new evidence that they

4     didn't put --

5          THE COURT:  Then you get a reply.

6          MR. NIEDERLUECKE:  Yes.  As long as we had an

7     opportunity to reply and put in any --

8          THE COURT:  It would just be a reply brief

9     though.  It could not be on anything that has already been

10    raised.  It would be limited to a reply.

11         MR. NIEDERLUECKE:  It would be --

12         THE COURT:  Something new they raised.

13         MR. NIEDERLUECKE:  Exactly.

14         THE COURT:  That would be it.

15         MR. NIEDERLUECKE:  If they're going to bring in

16    new evidence is what I mean, then we would want an

17    opportunity.

18         THE COURT:  Right.  But are you in a position?

19    I require the submission of a concise statement of facts,

20    undisputed facts.  Are you in a position to file that?

21         MR. NIEDERLUECKE:  Yes, we are, Your Honor.

22         THE COURT:  Okay.  And they then respond.  And

23    what I would ask, we set it up, you respond solely to that

24    first.  That's the first thing, because when I'm reviewing

25    these summary judgment briefs, I'm going to look right away.

1     Is there a disputed issue of fact?

2             Now, what's going to come up in this case, we're

3     going to have one expert say it's not indefinite and one

4     says it is.  Maybe I have a hearing or something and just

5     decide that.  I mean, I say it's indefinite -- I mean, what

6     terms are indefinite, just so I'm clear?  What are all the

7     different terms?

8             MR. NIEDERLUECKE:  It's resembling the pan-fried

9     bacon.

10            THE COURT:  That's the term?

11            MR. NIEDERLUECKE:  That's the term, yes.  And,

12    Your Honor, we agree with you, that it's the intrinsic

13    evidence that finishes this case.  That's all that matters,

14    is the intrinsic evidence.

15            THE COURT:  And if I decide that it is

16    indefinite, the whole case is over?

17            MR. NIEDERLUECKE:  Yes.

18            MS. JACOBS:  Your Honor --

19            THE COURT:  I think, Ms. Jacobs, I want to tee

20    this up.  We're going to do an experiment.  Let's see it in

21    this case.  I've spent way too much time on this case in

22    discovery disputes, all sorts of things.  This seems the

23    right type of case.  Let's try a new case management

24    technique.  Let's tee up indefiniteness.  If I have to have

25    a hearing, I will have a quick hearing and let's resolve it.

1    So how do we accomplish that?

2                The defendants are satisfied with their briefs.

3    They need to file a motion, rather, a concise statement of

4    facts, and you would have to file a one-page motion for

5    summary judgment.  Right, Ms. Palapura?  You attach your

6    concise statement of facts and you basically rely.  You

7    would have to say this, we're relying on our briefs already

8    submitted in connection with the claim construction.

9    Then plaintiffs get the chance to respond, and they can

10   submit affidavits and whatever they need to state in

11   response.  They have to file a counter-statement of precise

12   facts, and then there would be a short reply that would be

13   limited to only things that were knew that were raised.  I

14   would strike.  I want to make it very clear to the defense,

15   I'm striking anything unless it's only responding to

16   something newly raised, and we have a hearing and we make a

17   decision.

18                MS. JACOBS:  May we confer for one moment, Your

19   Honor?

20                THE COURT:  Sure.

21                (Pause while counsel conferred.)

22                MS. JACOBS:  What we're discussing here, Your

23   Honor, what we're contemplating, this is an instance where

24   we have not only the expert opinions, but those expert

25   opinions are formed in part, as I was mentioning, by Hormel

```
 1   internal documents where Hormel has skilled artisans, fully

 2   understands assembling a pan-fried bacon product.

 3            What I'm sort of thinking out loud is whether

 4   the expert testimony is sufficient.  There has been no

 5   deposition testimony yet in this case, and whether, you

 6   know, there would need to be a factual deposition.

 7            THE COURT:  Well, I mean, what I would say is, I

 8   don't think there's any requirement that you have

 9   depositions before summary judgment motions.  Right?  So

10   they've got their expert declaration in.  If you have a

11   counter declaration such that I thought there was -- I

12   thought, okay, well, I'm going to need to assess the

13   credibility of them, then we have a hearing, and I guess at

14   that point it's -- I guess it's not summary judgment at that

15   point.  Right?  But I mean --

16            MR. NIEDERLUECKE:  It is summary judgment, Your

17   Honor.  Just a matter of law.

18            MR. SELINGER:  I'm sorry.

19            THE COURT:  It depends.  I mean, it could still

20   be, but if --

21            MR. SELINGER:  Underlying factual disputes are

22   typically, even if it's an ultimate question of law as is

23   obviousness, those are often the kind of questions that go

24   to the jury on the underlying factual premise.

25            THE COURT:  Does indefiniteness go to a jury?
```

1          MR. SELINGER:  We cited a case in our brief

2     where the underlying questions went to the jury just as

3     obviousness is ultimately a question of law, but it goes to

4     the jury.

5          MR. NIEDERLUECKE:  Your Honor, we would disagree

6     with that.  I think indefiniteness is something that's

7     addressed at either claim construction or summary judgment.

8     It does not go to the jury.

9          THE COURT:  I never heard of it going to the

10    jury.

11         MS. JACOBS:  I believe, Your Honor, we could

12    provide some jury instructions where, in fact, the

13    underlying issues have gone to the jury.  Obviously, the

14    Court has a great deal of discretion.

15         THE COURT:  What would be the underlying issue?

16         MS. JACOBS:  The kind of expert testimony that

17    we're talking about.

18         THE COURT:  What would you have a jury say?  I

19    don't understand.  What would be the special verdict, or

20    what would you give to the jury to make a decision?

21         MS. JACOBS:  Well, they could be how one skilled

22    in the art would view this claim term, and then the Court

23    could reach a decision about whether indefiniteness based on

24    that advisory verdict or the evidence could simply come out.

25         As I say, Your Honor has a great deal of

1    discretion about how to hear that testimony.  I think this

2    is the kind of situation where expert testimony is going to

3    be particularly important.  And to the extent that there are

4    credibility determinations to be made about one expert

5    versus another, that typically would not be amenable to

6    summary judgment.  It would be, you know, whether it's as a

7    result of a bench hearing or a trial where that testimony is

8    given.

9              THE COURT:  Well, look.  I mean, what if we do

10   this.  They've got their brief.  When could you get a

11   concise statement of fact in?  And make sure you are

12   familiar with what I'm saying.  You have to support it with

13   a record citation.

14             MR. NIEDERLUECKE:  Your Honor, I think we could

15   put that together certainly within two weeks.

16             THE COURT:  Okay.  So they get two weeks, they

17   get their concise statement of facts.  That puts us in the

18   third week of April.  Then you need to get an expert

19   declaration together, write a brief.  How many weeks do you

20   need?

21             MR. SELINGER:  Do we also respond to their

22   statement of facts, Your Honor?

23             THE COURT:  Sure.  Absolutely.

24             MS. JACOBS:  Would 30 days be acceptable, Your

25   Honor?

1    THE COURT:  Thirty days.  That puts us in the

2    third week of May, and the briefing then.  Do you want a

3    reply?

4    MR. NIEDERLUECKE:  Yes, Your Honor.

5    THE COURT:  You would need what, a week?

6    MR. NIEDERLUECKE:  If we could have ten days,

7    but if you want a week?

8    THE COURT:  No.  I mean, at some point, right,

9    we're going to end up where Ms. Jacobs has a point, are we

10   really doing anything to move the case?  What do you want?

11   MR. NIEDERLUECKE:  I guess we would like ten

12   days because we don't know how much they're going to put

13   in.

14   THE COURT:  Okay.  That's 40 days and you wanted

15   two weeks.  That's 54 days.  Today is April 9th.  All right.

16   So that's June 3rd.  I don't know what day of the week it

17   is, something like that.

18   I mean, now we're at June 3rd.  The question

19   would be:  Could we have a hearing in June to dispose of

20   this?  So I need to look at my calendar.

21   All right.  You can all sit down.  Let me table

22   that, think about that for a second.

23   All right.  Now, what about the other case?

24   Should that case be consolidated with this case?

25   MR. SELINGER:  I don't think so, Your Honor.

1    That case is sort of the mirror image.  We do have a pending

2    motion on their claim for ownership in this case based on

3    collateral estoppel.  That case hasn't started.  Nothing has

4    been done, and so it would, I think -- it would complicate

5    issues because what we would then have is, assuming I'm

6    correct on the indefiniteness issue, we'd have infringement

7    and invalidity in this case and then a fight on ownership on

8    the other patents, which are somewhat -- it's the same

9    people.

10           Part of it is the same story, but at the end of

11   the day, I'm not sure how that will complicate -- I think

12   that would unduly complicate things for the jury.

13           And let me just go back, if I may.  I think I

14   heard counsel say if the Court rules on indefiniteness, then

15   his whole case goes away in his favor, and I want, I just

16   want to be clear on that, because counsel has counterclaims

17   for inequitable conduct that are pending, and while we've

18   moved for partial dismissal on them -- actually, we've moved

19   to dismiss them, I just want to make sure if the Court rules

20   in defendants' favor on indefiniteness, the entire case will

21   go away.  In the briefing, defendants took a somewhat

22   different position than I think I heard.

23           MR. NIEDERLUECKE:  Your Honor, on the

24   consolidation portion, I think, I would agree with Mr.

25   Selinger.  The issue in that case --

```
1              THE COURT:  Holy cow.  Get that down.

2              MR. NIEDERLUECKE:  I think the issues in that

3    case, this patent that we're dealing with here is actually

4    prior art to the next, to that one.  So that one, actually,

5    the issues --

6              THE COURT:  Is it still prior art if it's

7    invalidated?

8              MR. NIEDERLUECKE:  You know what, I actually

9    have a very interesting, very strange issue that's going on

10   right now where someone says when a patent was canceled,

11   later on it retroactively makes it not prior art.  I don't

12   think that's the law, but it's a really interesting argument

13   that was just made before the PTAB.  I think it remains

14   prior art.

15             THE COURT:  So if I invalidated this patent, are

16   you going to give Mr. Selinger an argument in the other

17   case?  No, because I dismissed the infringement.  That's

18   right.  Okay.  Forget it.

19             MR. NIEDERLUECKE:  Right.

20             THE COURT:  What about the inequitable conduct?

21   Has it gone away?

22             MR. NIEDERLUECKE:  I can talk to my client.  I

23   apologize in talking with my co-counsel.  I wanted to raise

24   that with you.  The case will go away.  There isn't an

25   inequitable conduct claim in the case.
```

```
1              THE COURT:  Well, I'm not doing it.  I can tell
2     you right now, I'm not going off on this detail if the case
3     isn't going away.
4              MR. NIEDERLUECKE:  If the case goes away, if I
5     could just -- just because my client isn't here, if I could
6     provide a letter and a representation just so I make sure.
7     If it's going away, that we will agree to dismiss that claim
8     as well, and I can have that to you presumably by the end of
9     this week, Your Honor.
10             THE COURT:  All right.  I will think about it.
11             Can you tell me, how big of a company is HIP?  I
12    mean, I guess it's down to just Mr. Howard now?
13             MR. SELINGER:  It's Mr. Howard, Your Honor.
14             THE COURT:  How big was Unitherm in its day?
15             MR. SELINGER:  It had at least 50 employees at
16    one point.
17             THE COURT:  How much money are we talking in
18    this case?
19             MR. SELINGER:  Since I have not done the expert
20    work, but we're talking quite a few millions of dollars.
21             THE COURT:  Are you talking over $30 million?
22    I'm going to ask the same thing of your adversary.  I
23    mean, I am just trying to figure out, it's an amazingly
24    litigious case.  I went back and read some of the Minnesota
25    opinions.
```

```
 1              MR. SELINGER:  And I'm not trying to dodge a

 2   question, Your Honor.  I've been pondering that prior to

 3   today.  Hormel will have sold by the time we go to trial

 4   over a billion dollars of Bacon 1 products, and so a

 5   reasonable royalty rate is going to turn it into some real

 6   money.

 7              THE COURT:  Okay.

 8              MR. SELINGER:  And that's why -- and I

 9   understand.  I heard when counsel announced in chambers what

10   the damage model was to the prior case --

11              THE COURT:  I don't even remember it.

12              MR. SELINGER:  And that was a different fight,

13   a different law, and we're trying to get our arms around

14   the number, but it's real money is what I -- my

15   understanding.

16              THE COURT:  Do you want to speak to that at

17   all?

18              MR. NIEDERLUECKE:  Certainly, Your Honor.  The

19   last case, I believe the number that they claimed for

20   damages was over $60 million.  While we certainly don't

21   agree with it, I expect the number --

22              THE COURT:  Something like that?

23              MR. NIEDERLUECKE:  Something, perhaps more given

24   the length of time, so that's what we expect.  It is a

25   significant issue for Hormel.
```

```
 1              THE COURT:  And Hormel is a big company.  You
 2    don't dispute, you're selling about a billion dollars worth
 3    of bacon?
 4              MR. NIEDERLUECKE:  He may know the sales numbers
 5    better than I do.  Over the period from the time that it
 6    started, it's somewhere -- well, it's certainly over a
 7    hundred million a year of the product, but I don't know the
 8    exact number.
 9              THE COURT:  All right.
10              MS. JACOBS:  Your Honor, if I could just point
11    out one more thing because we're talking about summary
12    judgment.
13              It just, as I was talking to my co-counsel -- I
14    mean, the reality is, we're still at the threshold level of
15    some of our motions to dismiss that Mr. Selinger is talking
16    about, so we're talking about getting summary judgment ahead
17    of motions to dismiss some of the counterclaims on
18    ownership.
19              THE COURT:  Right.  Well, wait a second.  So
20    you've got motions to dismiss in this case?
21              MS. JACOBS:  Yes.
22              THE COURT:  Didn't I just issue an opinion?
23              MS. JACOBS:  That was in the related case, Your
24    Honor.
25              THE COURT:  Right.
```

1          **MS. JACOBS:  In this case there were pending**

2    **motions to dismiss Hormel's ownership claim based on**

3    **collateral estoppel and the inequitable conduct claim.  Now,**

4    **maybe the inequitable conduct claim becomes moot.**

5          **THE COURT:  Well, and the ownership becomes**

6    **moot, doesn't it?**

7          **MS. JACOBS:  Well, only if they are successful,**

8    **Your Honor.**

9          **THE COURT:  Fair enough.  I mean, I can't**

10   **imagine he's going to agree to sacrifice inequitable**

11   **conduct, win or lose.  I'm assuming that the defense is**

12   **going to take the position if they win on indefiniteness,**

13   **they'll drop inequitable conduct.  Right?  Or am I missing**

14   **something, or is it win or lose?**

15         **MR. NIEDERLUECKE:  Your Honor, we'll look.**

16         **THE COURT:  No, no.  I'm sorry.  Hold on.  So,**

17   **wait.  If I said it was indefinite, the patent is invalid,**

18   **do you still have inequitable conduct claims?**

19         **MR. NIEDERLUECKE:  You do, Your Honor.**

20         **THE COURT:  You do?**

21         **MR. NIEDERLUECKE:  Yes.**

22         **THE COURT:  Okay.**

23         **MR. NIEDERLUECKE:  And, Your Honor, I will talk**

24   **to my client and we'll look to dismiss, you know, without**

25   **prejudice any of the claims that are remaining out there to**

1      take them out of the case so it's final.

2               THE COURT:  Ms. Jacobs, anything further?

3               MS. JACOBS:  No, no, no.  I think, Your Honor, I

4      was just pointing out again just the timing perspective of

5      there are motions that have been pending, and not at all,

6      you know, to shine a light on them, but we're talking about

7      expediting one issue where there are other issues where if

8      they don't come out of plaintiff's favor, I'm sorry, in

9      defense's favor --

10               THE COURT:  Right.

11               MS. JACOBS:  -- that are still going to be out

12      there.  So I just wanted to point that out just from a

13      fairness and a timing perspective as well, that we have a

14      pending motion to directly dispose of inequitable conduct.

15               THE COURT:  So you have a motion to dismiss

16      because of lack of ownership of the patent?  What is it?

17               MR. SELINGER:  No.  Pardon me, Your Honor.

18               THE COURT:  You're the plaintiff.  All right.

19      Sorry.

20               MS. JACOBS:  Well, that was because I just

21      messed it up, Your Honor.

22               THE COURT:  That's fine.

23               MR. SELINGER:  There's a counterclaim and

24      affirmative defenses that Hormel said it owns the '610

25      patent, and our motion to dismiss is based on collateral

1    estoppel.

2              THE COURT:  So wait a second.  Their argument in

3    this case is they own the '610, and your argument in the

4    other case that you own the 480, whatever it is?

5              MR. SELINGER:  Correct.  '498.

6              THE COURT:  '498.  Oh, my gosh, this case is

7    something else.  Have you gone to mediation?

8              MR. SELINGER:  We have not yet, Your Honor, and

9    it's -- in part, we needed discovery, and so that has been

10   postponed.

11             As Your Honor has discerned, there are some very

12   different views and some very personal feelings involved at

13   least on one side on this, but we understand that at some

14   point, we're going to go to mediation.

15             THE COURT:  How old is Mr. Howard?

16             MR. SELINGER:  57, 58.

17             THE COURT:  What does he do?

18             MR. SELINGER:  He's retired from the meat

19   business, his food business.  I'm not privy to what he does,

20   but I think he probably dabbles in stuff as one can after

21   selling a business.

22             THE COURT:  And he sold the business to?

23             MR. SELINGER:  A company called Marvin, a U.K.

24   company, in 2017.

25             THE COURT:  Is that a public company?

1          MR. SELINGER:  It's a U.K. company.  I'm not

2     sure.

3          THE COURT:  Did he sell Unitherm or did he sell

4     HIP?

5          MR. SELINGER:  No.  He sold the assets except

6     for the '610 patent and related patents.

7          THE COURT:  And was HIP a public company when it

8     sold the assets?

9          MR. SELINGER:  No.  Unitherm was never public.

10    And what happened is when the transformation, when the sale

11    happened, he continued to have a Unitherm entity, but it's

12    part of the deal.  He changed the name to HIP.

13          So Unitherm, I think the Unitherm mark -- I'm

14    not a hundred percent sure on this because I wasn't

15    involved, but I believe the Unitherm mark may have gone with

16    the sale of the assets.

17          THE COURT:  All right.  Anything else you want

18    me to think about?  I'm going to think about -- well, I'm

19    not going to think any more until I get a letter by -- what

20    day is today, Tuesday?  I need a letter by Thursday, close

21    of business, informing me whether if the Court ruled on an

22    expedited basis on indefiniteness and ruled in the defense's

23    favor, it would dismiss with prejudice the counterclaim.

24          MR. NIEDERLUECKE:  Your Honor, one question on

25    that, and with regard to our correction of inventorship

1    counterclaim in this case that we would be dismissing, we

2    would want to dismiss that without prejudice only because

3    the line of patents is still open.

4                    THE COURT:  Okay.  That's fair.

5                    MR. NIEDERLUECKE:  I will explain --

6                    THE COURT:  To dismiss the inequitable

7    conduct --

8                    MR. NIEDERLUECKE:  With prejudice.  I would like

9    to dismiss it without prejudice.

10                   THE COURT:  I don't really care.  It doesn't

11   have to be with prejudice.  It can be without prejudice,

12   just that the case is over.

13                   MR. NIEDERLUECKE:  Thank you.

14                   THE COURT:  And the only thing I'm thinking

15   about is, I think you would have to agree also to agree that

16   you're not going to seek any attorneys' fees.  In other

17   words, I'm willing to do this -- I'm not even committing to

18   it a hundred percent.  I need to know that.  But this is one

19   where I've got a loaded docket.

20                   As Ms. Jacobs points out, I've got pending

21   motions in this case to try to get to in 5 or 6 or 700 other

22   cases.  But there's enough here, I'm not prejudging it, but

23   there's enough on indefiniteness for me to think this might

24   be a silver bullet, but I'm not going to do it if there's

25   going to be litigation remaining in the case.  So that

1    includes, you know, getting an exceptional case and trying

2    to seek fees, you would have to agree to all of that.

3    Otherwise, we'll just keep on the schedule we're on.

4            But if you tell me at the close of business

5    Thursday that you agree to those conditions, then I'm going

6    to Friday look at the calendar and see if I think it's

7    worthwhile to try to do something different in this case.

8            MR. NIEDERLUECKE:  Thank you, Your Honor.

9            THE COURT:  And the idea would be, Ms. Jacobs,

10   that we would have some kind of hearing in June with

11   experts, a very abbreviated hearing.  And I think that

12   would be the -- we may not even have a hearing.  I may read

13   the briefs and say there's no way, or I may be persuaded

14   that there are underlying questions that need to go to a

15   jury.

16           My initial reaction, I'm very skeptical, but I

17   will hear it.  I never understood why willfulness goes to a

18   jury.  You might be right.

19           All right.  So does everyone know where we are?

20   I don't think I need to enter an order.  Right?  There's

21   going to be a prepared proposed order by the plaintiff.

22   Obviously, you can consult with the defense, and then that

23   will be submitted.  I will look at it, hopefully sign that

24   forthwith, and then Thursday I'm not going to enter an

25   order.  So we'll look internally here for some kind of

1    letter coming from Hormel, and then I will get back to you

2    on whether we're going to implement or not some kind of

3    amendment to the schedule to address indefiniteness.

4              Anything else?

5              MR. SELINGER:  Not from the plaintiff, Your

6    Honor.

7              MR. NIEDERLUECKE:  Nothing, Your Honor.  Thank

8    you.

9              THE COURT:  All right.  Have a good day.

10             (Counsel respond, "Thank you, Your Honor.")

11             (Hearing concluded at 11:52 p.m.)

12                        -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25